## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD M. VON DER SCHMIDT, | |
| Aka Eddie von der Schmidt, | Civil Action No.: 22-8198 |
| ~ and ~ | |
| KEANNA NGÔ | |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| MORGAN STANLEY, | **JURY TRIAL DEMANDED** |
| MATTHEW HORNBACH, and | |
| DENISE MCCOOL | |
| Defendants. | |

Plaintiff Edward M. von der Schmidt ("Mr. von der Schmidt" or "Eddie") and Keanna Ngô ("Ms. Ngô") by and through their attorney, Tyrone Blackburn, Esq. ("Mr. Blackburn") hereby file this complaint against Defendants Morgan Stanley (the "Firm"), Matthew Hornbach ("Hornbach"), and Denise McCool ("McCool") and state as follows:

## NATURE OF ACTION

1. As set forth herein, Defendants Morgan Stanley, Matthew Hornbach, and Denise McCool (collectively the "Defendants") were major participants in events leading up to and including retaliation, disability discrimination, cybercrimes, and constructive discharge

of Mr. von der Schmidt, as well as the subsequent harm visited upon Ms. Ngô due to the harassment, privacy violations, and cybercrimes directed against Mr. von der Schmidt.

2. Mr. von der Schmidt brings this action for relief according to the Americans with Disabilities Act ("ADA") Disability Discrimination, Retaliation, Intentional Infliction of Emotional Distress, Invasion of Privacy, violation of Title III of the Electronic Communications Privacy Act of 1986 (ECPA), Constructive Discharge, NYSHRL, NYCHRL, NJ Computer Related Offenses Act, as well as Negligent Hiring and Retention.

3. Ms. Ngô brings this action for relief as a direct result of Defendant's Invasion of Privacy, Intentional Infliction of Emotional Distress, NJ Computer Related Offenses Act, and violation of Title III of the Electronic Communications Privacy Act of 1986 (ECPA).

4. Plaintiffs seek injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys 'fees and costs as remedies for violations of Plaintiffs' rights.

PARTIES

5. Mr. von der Schmidt is a multiethnic Hispanic-American Princeton University graduate. Mr. von der Schmidt was formerly employed at Morgan Stanley as a Vice President in Global Research. He was the creator, steward, and lead author of the Global Macro Commentary ("GMC"). Mr. von der Schmidt resides in this Court's Judicial District.

6. Ms. Ngô is a multiethnic Asian-American woman. Ms. Ngô is the long-term partner of Mr. von der Schmidt and is domiciled with him in this Court's Judicial District.

7. Defendant Morgan Stanley (the "Firm") is a global financial services firm and financial holding company incorporated in the State of Delaware with its principal place of business in New York. The Firm is headquartered in this Judicial District.



**Matthew Hornbach**

8. Defendant Matthew Hornbach ("Hornbach") is Morgan Stanley's Head of Global Macro Strategy and a member of the Firm's Global Investment Committee. Hornbach was Mr. von der Schmidt's functional manager at Morgan Stanley.  Hornbach resides in this Judicial District.



**Denise McCool**

9. Defendant Denise McCool is Managing Director and Chief Operating Officer ("COO") of Global Research at Morgan Stanley. McCool is a superior of Hornbach and was

instrumental in the cybercrimes, invasion of privacy, retaliation, and constructive discharge of Mr. von der Schmidt, as well as the allegations raised by Ms. Ngô. McCool resides in this Judicial District.

## JURISDICTION AND VENUE

10. Plaintiff's federal claim arises under 42 U.S.C. § 1981, and this Court has supplemental jurisdiction over Plaintiff's state-law claims according to 28 U.S.C. § 1367.

11. The venue is proper in the Southern District of New York according to 28 U.S.C. §1391(b)(2). Mr. von der Schmidt resides in this District and performed work for Morgan Stanley in this District. Ms. Ngô resides in this District. The Firm is headquartered in this District. A substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

## ADMINISTRATIVE PROCEDURES

12. Plaintiff has filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC has not issued a Final Determination or a notice of right to sue. All conditions precedent to the filing of the suit have been performed or have occurred.

## FACTUAL BACKGROUND

### *Mr. von der Schmidt Created and Authored the Global Macro Commentary, the Most Cumulatively Read Publication at the Firm*

13. The Global Macro Commentary ("GMC") was the most cumulatively read publication in Global Research at Morgan Stanley.

4

14. After being hired in March 2019 to assume responsibility for the daily publication of the Treasury Market Commentary ("TMC"), Mr. von der Schmidt was charged with the creation and production of the GMC in December 2019 by Hornbach, then newly-appointed Head of Global Macro Strategy and member of Morgan Stanley's Global Investment Committee.

15. In contrast to the TMC, which was authored in conjunction with the Morgan Stanley United States ("US") Economics team, the GMC comprised contributions from interest rates, foreign exchange ("FX"), and emerging markets ("EM") strategists based in Tokyo, Hong Kong, London, and New York (in addition to submissions from US Economics colleagues).

16. The GMC was derived from a synthesis of three distinct daily publications ("dailies") to provide the Firm and its research clients with a comprehensive account of a given day's events and noteworthy observations regarding macroeconomic and geopolitical phenomena germane to markets.

17. Production of the GMC involved a significant amount of collaboration with team members and Supervisory Analysts ("SAs"), which included copy-editing and fact-checking responsibilities for up to 5,000 words of submitted material per day.

18. In addition to extensive personal research required to compose the document's master summary, the leadership of the GMC also entailed working with the Firm's Technology team as well as members of the Firm's Control Group ("CG"), with the latter providing the final approval for each GMC before dissemination.

19. Given the prominence of the GMC's readership in Asia, publication timing remained a point of consternation. However, as Mr. von der Schmidt's functional manager, Hornbach routinely neglected to address operational constraints or furnish adequate support resources to address his demands from Mr. von der Schmidt.

20. Meanwhile, and without assistance from Hornbach, Mr. von der Schmidt composed 284 of the 285 publications from the GMC's inception from January 6, 2020, to April 18, 2021, when additional primary authors were added; Mr. von der Schmidt continued to lead the publication until October 2021.

21. In Mr. von der Schmidt's written 2020 year-end review, Guneet Dhingra ("Dhingra") and Hornbach commended his performance in guiding the GMC. They stated they had encountered "no serious complaints" concerning Mr. von der Schmidt's publication timing. In a January 14, 2021, compensation call conducted over Zoom, Hornbach referred to Mr. von der Schmidt's GMC publication as "best in class."

22. For the first 18 months Mr. von der Schmidt had ghostwritten under Hornbach's name (to whom credit and readership metrics accrued). After responding with hostility to an agreed-upon change in the GMC's email sender (initially September 14, 2020), Hornbach's disposition toward Mr. von der Schmidt shifted antagonistically through Fall 2020 and into Winter 2021 as Mr. von der Schmidt was credited for his work with increasing popularity as reflected by readership tracking[1].

23. Outreach addressing critical business issues for the publication consisted of numerous emails and messages over a year that went ignored by Hornbach.

24. Dereliction of these managerial duties resulted in Mr. von der Schmidt having little to no managerial support and overcompensating for the Firm's serious liability exposure stemming from various team contributions throughout a given week. It was Mr. von der Schmidt's relentless commitment to the GMC that maintained an exemplary standard with no readership

---

[1] Note that Hornbach had explicitly referred to Mr. von der Schmidt as the "Head of the Global Macro Commentary" in writing.

complaints.

25. Although his absenteeism had come up in Summer 2020, Hornbach's abdication of critical supervisory responsibilities was first conveyed to his direct manager Vishwanath "Vishy" Tirupattur on January 20, 2021, on a conference call centered on the CG approval process, for which Mr. von der Schmidt suffered direct retaliation by Hornbach on a call taking place January 28, 2021 (one of many instances of retaliation).

26. On January 28, 2021, Hornbach accused Mr. von der Schmidt of "sandbagging" him despite the constructive nature of the January 20 call[2].

### *Mr. von der Schmidt's <u>June 18, 2021</u> Follow Up Regarding Hornbach's Active Retaliation and Additional Racist Behavior to his Superior, Tirupattur, Results in Collective Retaliation*

27. In light of objectionable comments and increasingly hostile posturing from Hornbach in tandem with Mr. von der Schmidt's nominal manager, Dhingra (Head of US Rates Strategy), Mr. von der Schmidt reached out to Tirupattur on June 18, 2021.

28. Mr. von der Schmidt requested over email that they meet at Tirupattur's earliest convenience in order to discuss Hornbach's retaliatory conduct, intentional abandonment of managerial duties affecting Mr. von der Schmidt's daily responsibilities, and inappropriate commentary that concerned Hornbach's references to minorities[3].

29. Tirupattur declined to meet Mr. von der Schmidt before a scheduled trip, instead proposing that they convene upon Mr. von der Schmidt's return.

30. Later that week, Mr. von der Schmidt espoused his concerns about Hornbach's comments -

---

[2] Hornbach later deleted the original calendar entry corresponding to this "Catch Up" call in order to create the fictional narrative that the call had been scheduled after bonuses; several fabricated calendar entries were created for January 13, 2021, which would have been the day *before* compensation was communicated.

[3] Note that photo evidence of this email would later be removed from personal (non-firm issued) devices.

including bigoted remarks and inappropriate personal slights - and Hornbach's unprofessional and, at times, abusive behavior to Tirupattur, who characterized the allegations as "very serious" over coffee in Midtown.

31. Tirupattur asked Mr. von der Schmidt whether he desired to remain in Morgan Stanley's Global Research department before personally initiating a Human Resources ("HR") inquiry into Hornbach's conduct.

***In An Effort to Silence Discrimination and Retaliation,***
***Two Caucasian HR representatives, Katie D'Antonio and Lisa Sweberg, Excuse***
***Hornbach's Anti-Chinese and Anti-Muslim Remarks in an "Investigation,"***
***Pressure Mr. von der Schmidt to Leave The Firm***

32. Katie D'Antonio ("D'Antonio"), the daughter of a former member of the Firm's management committee, contacted Mr. von der Schmidt in early July 2021.



**Katie D'Antonio**

33. Mr. von der Schmidt relayed Hornbach's egregious conduct and inappropriate comments to D'Antonio on an introductory call on July 8, 2021. He later composed a comprehensive

account of his experience in Global Research for the benefit of the Firm's investigation into Hornbach's behavior to date.

34. The supporting documentation, which included email, Skype, and Instant Bloomberg ("IB") correspondence, had been aggregated and saved transparently on Mr. von der Schmidt's remote work desktop before being uploaded to Bloomberg and subsequently downloaded at home.

35. Such precautions were taken in light of Hornbach's active reading of Mr. von der Schmidt's work emails and the attendant risk of retaliation. This motivation was articulated to D'Antonio in an email on July 20, 2021, in which Mr. von der Schmidt authored a thorough background and attached a compressed folder similarly titled "Correspondence.zip."

36. This attachment included various digital documents and conversation histories supporting Mr. von der Schmidt's assertions, albeit nothing of a sensitive nature. With D'Antonio's blessing, he forwarded this email and attachment to Tirupattur on July 23.

### A Caucasian Morgan Stanley HR Vice President, D'Antonio Finds "Nothing Racy" About Hornbach's Mocking of Chinese Accents

37. In late August, D'Antonio communicated that her findings identified no wrongdoing on Hornbach's part. She saw "nothing racy" about Hornbach's mocking of Chinese accents, and, confirming that she had, in fact, read all of the accompanying materials in "Correspondence.zip," D'Antonio maintained that none of Matt's actions or comments warranted an apology[4].

---

[4] In contrast, Hornbach had been compelled to issue a public apology when his unprofessional conduct was directed at Managing Director, Andrew Sheets ("Sheets"; Global Head of Cross Asset Strategy), in front of a large internal audience. This apology stemmed from Hornbach's rude remarks in an internal research discussion over email.

38. On this call, Mr. von der Schmidt appraised D'Antonio of his extensive documentation efforts which contradicted her findings.

39. Mr. von der Schmidt maintained that Hornbach's conduct had been unacceptable and reiterated his demand for an apology in writing, a change in supervision, and independent oversight of his career progression and year-end compensation, given Hornbach's lack of professionalism and impartiality. Pressed, D'Antonio passed off the investigation to a colleague in Employee Relations with whom she had been collaborating, Lisa Sweberg ("Sweberg").



**Lisa Sweberg**

40. Mr. von der Schmidt forwarded the "Correspondence.zip" email to Sweberg upon being introduced at the end of August. When asked directly whether Mr. von der Schmidt should have representation present for their first call, Sweberg, a lawyer herself, indicated that she did not believe this would be necessary as it would be fact-finding in nature[5]. Sweberg omitted reference to her prior involvement in the investigation that had also included the Head of Institutional Equities and Research Human Resources, Patricia "Patty" Hynes ("Hynes").

---

[5] Note that photo evidence of this e-mail from Sweberg would later be removed from Mr. von der Schmidt's personal devices.

10

41. Further interaction with Hornbach in late September 2021 prompted Mr. von der Schmidt to contact Sweberg again to ask about the status of the Employee Relations inquiry; a call was scheduled for the afternoon of September 30, 2021.

42. Sweberg ultimately reaffirmed D'Antonio's previous findings, namely that Hornbach's conduct and comments, including various prejudiced remarks that she excused, did not warrant any apology and that the Firm believed it unnecessary to change Mr. von der Schmidt's reporting structure.

### With Hate Crimes on the Rise, Morgan Stanley Managing Director Hornbach Chose to Showcase his Bigotry at Work

43. While working for the Firm under Hornbach's management, Mr. von der Schmidt was exposed to an onslaught of antagonistic behavior and discriminatory statements.

44. Mr. von der Schmidt raised these concerns with Tirupattur on June 18, 2021[6].

45. Tirupattur then escalated these "very serious" concerns to Human Resources himself. As a result of his disclosure to Tirupattur, Mr. von der Schmidt came to suffer Hornbach and McCool's retaliation.

46. As described below, on multiple occasions, Human Resources pacified Hornbach's CLEAR ACTS OF BIGOTRY by framing his mocking transliterations as simply "phonetic" in nature, ignoring various objectionable comments entirely.

47. On multiple occasions, from September 2020 to September 2021, Hornbach expressed bigoted remarks and stereotypes against the People's Republic of China and the Chinese

---

[6] Note that Morgan Stanley's Code of Conduct calls for outreach to a supervisor when observing discriminatory, legal, or ethical concerns.

people.

48. As detailed below, Hornbach reinforced bigoted stereotypes concerning how Chinese people pronounce "Thank You" and "Hello."

49. Additionally, as detailed below, Hornbach stated that he "liked the sound of […] an II [Institutional Investor] farm in Urumqi."

50. Upon information and belief, the Uighurs (also spelled as Uyghurs) are an ethnic minority group primarily living in the Xinjiang autonomous region of the People's Republic of China; Ürümqi is the capital.

51. The Uighurs are predominantly Muslim and are the alleged subject of human rights abuses that the People's Republic of China have repeatedly denied.

52. By writing "I like the sound of that," Hornbach is saying that he likes the sound of a Muslim-Chinese forced-labor camp dedicated to supporting his Institutional Investor poll results.

53. The following exchanges occurred over Bloomberg IB:

September 10, 2020:
21:00:27 Matthew Hornbach: I chatted with a guy from China Minsheng Bank last night
21:00:32 Matthew Hornbach: His name?
21:00:34 Matthew Hornbach: Wu Han
21:00:38 Matthew Hornbach: No Joke
21:00:44 Employee: Oh boy
21:01:16 Matthew Hornbach: "So, are you positive you'll vote?"

September 11, 2020:
15:12:38 Matthew Hornbach: sankyuu
15:12:49 Matthew Hornbach: Did you bust out any Mandarin last night?

September 18, 2020:
16:22:48 Employee: yo
16:22:55 Matthew Hornbach: harrow
[…]

16:36:02 Matthew Hornbach: Our most successful strategy may just be asking Robin Xing how he did it
16:36:22 Matthew Hornbach: lol
16:36:45 Matthew Hornbach: An II farm in Urumqi
16:36:50 Matthew Hornbach: I like the sound of that
16:36:50 Employee: yikes

November 5, 2020:
20:30:20 Matthew Hornbach: The Ding Dong one?
20:30:22 Matthew Hornbach: lol
20:30:25 Employee: Unleash the Liquidity
20:30:32 Matthew Hornbach: Yeah, that's the title

54. As detailed above, Mr. von der Schmidt is of Cuban heritage with a partner of Asian heritage. Mr. von der Schmidt felt significant discomfort and took offense to the bigoted comments he had fielded from Hornbach over Bloomberg IB, a texting platform utilized for professional workplace communications.

### *Morgan Stanley Managing Director Hornbach's Prejudice Toward Chinese people Negatively Impacts His Chinese Subordinates*

55. Upon information and belief, Morgan Stanley pays Chinese and Asian-American employees less than their Caucasian counterparts. Hornbach's lack of professionalism and mocking bigotry perpetuate harmful prejudices that further persistent wage and promotion gaps.

56. Anti-Chinese violence in New York City has soared during the covid-19 pandemic; the police recorded 131 bias incidents against Asians in 2021, up from 28 in 2020 and just three in 2019[7].

57. Upon information and belief, Hornbach used his power and platform to discriminate against ethnic Chinese and grossly underpaid his Chinese subordinates compared to their non-Chinese colleagues.

---

[7] https://nypost.com/2022/02/20/inside-nycs-skyrocketing-anti-asian-violence-how-hate-speech-led-to-hate-crimes/

58. On or about March 9, 2022, on a recorded call with the Firm's attorney, Dermot J. Sullivan ("Sullivan"),  Mr. Blackburn confronted Sullivan about Mr. von der Schmidt's accusation that his Chinese colleagues that report to Hornbach all earn less than their Caucasian counterparts, which Sullivan justified:

> **Mr. Blackburn:** ... Eddie thinks that Matt thought that he was in a safe space, in a safe room to make anti-Asian statements or make anti-Asian jokes concerning the way how Chinese people speak, and how they pronounce words, and Eddie knows for a fact that the Chinese workers make less than the comparators within Matt's group.

> **Sullivan:** That's a market function.

59. In the face of such tragedies and blatant discrimination, Morgan Stanley and its agents have opted to silence those who would voice good-faith concerns.

### *Hornbach's Islamophobic References at Work Reflect Minorities' Struggle for Equal and Professional Respect*

60. On multiple occasions, Hornbach has made statements akin to the following:

> August 4, 2020:
> 14:52:56 Matthew Hornbach: Sounds like a holdover from the GHadd days
> 14:56:04 Matthew Hornbach: The G-Hadd
> 14:56:20 Matthew Hornbach: He waged a Holy War on the Bond Market
> 14:56:27 Matthew Hornbach: G-Hadd

61. Muslims are overrepresented in EEOC claims, comprising 40% of EEOC workplace discrimination claims despite only accounting for 1% of the U.S. population. Muslims not only experience overt racial attacks in the workplace in the form of various epithets and physical harm, but also experience Islamophobic microaggressions and even unconscious biases that further isolate them from other employees, leading to increased

discrimination and creating barriers to access with respect to career progression. *See*

Mark Fowler et al., *Islamophobia: Challenges and Opportunities in the Workplace,*

Tanenbaum (2019),

https://tanenbaum.org/wp-content/uploads/2019/05/Islamophobia-in-the-Workplace.pdf.

### *As A Caucasian Morgan Stanley Employee Relations Attorney, Sweberg believes she is the voice for ethnic Chinese and is recorded EXCUSING Hornbach's bigotry as acceptable because Hornbach is married to a Japanese woman, ignoring centuries of History between China and Japan*

62. In a *clear and breathtaking display* of ignorance, on a recorded call, Sweberg supported and

excused Hornbach's anti-Chinese statements as acceptable specifically because Hornbach's

wife is Japanese.

63. On the same September 30, 2021, recorded call, Sweberg informed Mr. von der Schmidt that

she did not see any issue with Hornbach's comments and agreed with D'Antonio's statement

that Hornbach's comments were not intended to mock Asian individuals.  Sweberg contended

that Hornbach was only making a ***phonetic*** interpretation of *Japanese*.

64. Sweberg's meager attempt at whitewashing Hornbach's statements fails due to a complete

reading of Hornbach's IM thread detailed in Paragraph 53 above. Hornbach explicitly refers

to Mandarin (a language spoken in China).  Hornbach knew that he was speaking about

Chinese people, Mr. von der Schmidt knew that Hornbach was referring to Chinese people,

yet Morgan Stanley Attorney Sweberg says Hornbach was talking about Japanese people.

65. Sweberg attempted to engage in acrobatic revisionist history to reframe Hornbach's bigotry

as an acceptable conversation because Hornbach's wife is Japanese. Sweberg felt that a

Caucasian man marrying a Japanese woman somehow gave him a pass to make anti-Chinese

comments. Sweberg's ignorance is equivalent to **"all Asians are all the same."**

66. Sweberg's intellectual dishonesty should be gravely embarrassing for the Firm, but a  simple query of the Firm's history concerning racial discrimination and retaliation in the workplace demonstrates that Sweberg was toeing the company line.

67. Sweberg dismissed Mr. von der Schmidt's fears of retaliation, opting to mischaracterize or fictionalize prior documented events to suit a budding Firm narrative that Mr. von der Schmidt was a disgruntled employee who had responded poorly to performance feedback, this notwithstanding his being the most cumulatively read primary author in Global Research and garnering numerous client accolades.

68. Keeping with the nature of Morgan Stanley Research Management and HR's collective retaliation for good faith reporting to a superior (who himself initiated the investigation into Hornbach's misconduct), Sweberg referenced and committed to Hornbach's false assertions vis-à-vis daily responsibilities and publication timing expectations to brazenly allege that Mr. von der Schmidt had not performed adequately (in contrast to reviews and readership).

69. Here, in direct contrast to the firm's written policy (detailed below), Sweberg posited that Mr. von der Schmidt should direct any concerns regarding retaliatory behavior to his HR coverage person (D'Antonio) or Hornbach himself.


www.morganstanley.com/about-us-governance/code-of-conduct



## Raising Legal and Ethical Concerns and Reporting Misconduct

### Speaking Up

We each have an obligation to speak up if, in the course of our employment, we encounter a situation that raises legal or ethical concerns. This includes potential fraud or other wrongdoing, whether within the Firm or by an external party. If you have a concern regarding a potential violation of this Code or a Firm policy, it is your responsibility to promptly inform at least one of: your supervisor, a member of LCD, your HR representative, a designated contact under a specific policy or procedure or the Integrity Hotline ☑.

Morgan Stanley encourages individuals raising concerns to identify themselves so that the information can be reviewed promptly and thoroughly. Reported concerns will be treated as confidentially as possible, including limiting the disclosure of the identity of the person raising the concerns, consistent with applicable law and Morgan Stanley's commitment to conducting a thorough review of any identified issues. In addition, the Firm provides a mechanism for anonymous reporting through the Integrity Hotline ☑, and otherwise as required by law.



### Non-Retaliation Commitment

Our continued success depends on the open communication of concerns by employees without fear of retaliation. The Firm takes allegations of misconduct seriously and prohibits retaliation against or the victimization of anyone raising a concern in good faith.



### Commit to Diversity and Inclusion

Morgan Stanley is committed to providing a work environment that promotes diversity and inclusion, where everyone feels a sense of belonging and is treated with dignity and respect. Our policies promote equal employment opportunity without discrimination or harassment on the basis of race, color, religion, creed, age, sex, sex stereotype, gender or transgender, gender identity or expression, sexual orientation, national origin, citizenship, disability, marital and civil partnership or union status, pregnancy, veteran or military service status, genetic information or any other characteristic protected by law. For more information, refer to the Non-Discrimination and Anti-Harassment/Dignity at Work Policy for your region.

You are encouraged to participate in the programs and activities sponsored by the Firm to promote diversity and inclusion.



## Supervisor Responsibilities

If you are a supervisor, you must:

- demonstrate the highest ethical standards and sustain a culture of doing the right thing

- help employees understand how the Code, as well as laws, regulations and Firm policies, apply to them and with respect to any contingent worker for whom you are an Assignment Contact, help ensure they adhere to the Standard of Conduct applicable to them

- supervise the activities and conduct of the people you manage for compliance with applicable laws, rules, regulations and Firm policies

- take appropriate action, including escalation, when you have concerns

Failure to properly execute your supervisory obligations may result in discipline up to and including the termination of your employment and civil, criminal and regulatory exposure for you and Morgan Stanley.

Morgan Stanley's culture, values and reputation differentiate us from our peers and have provided a strong foundation for our enduring success. As a global financial institution our reputation is our most precious asset. Once damaged or lost, it is very difficult to restore.

Our core values inform everything we do: *Put Clients First, Lead with Exceptional Ideas, Do the Right Thing, Commit to Diversity and Inclusion* and *Give Back*. Our Code of Conduct reflects our continued commitment to act in accordance with these values and in full alignment with the letter and spirit of applicable laws, regulations and our policies.

The Code of Conduct outlines the standards of ethical conduct that we expect of every employee and that underlie our success. Please read it carefully and consider what it says. If you are aware of any actions that violate the Code, we depend on you to speak up. We prohibit retaliation against anyone who makes a good faith report of known or suspected misconduct. We depend on you to challenge yourself and others to evaluate conduct through the lens of the Firm's values.

Like you, I am proud to be part of a Firm that has such a distinguished history and promising future. Our firm's founding partners understood that maintaining the trust of their clients was essential to their success, and they stayed true to this guiding principle. Our culture and values honor both our history and our aspirations for the future. Thank you for doing your part to continue upholding our proud heritage.

*James P. Gorman*

**James P. Gorman**
Chairman and Chief Executive Officer

### Post "Investigation", HR Leaks Findings to Hornbach, Who Escalates Retaliation Against Mr. von der Schmidt

70. In an email on the morning of October 4, 2021, in which he copied Dhingra, Hornbach alluded to some of the contents of the September 30, 2021, confidential ER findings call. In an act of retaliation and in an effort to hide his previous actions, Hornbach attempted to re-write and reframe his retaliatory January 28, 2021, call as instead pertaining to scheduled feedback. On

a whim, he retroactively re-defined Mr. von der Schmidt's work responsibilities in a manner inconsistent with those that had prevailed for the duration of Mr. von der Schmidt's employment, instantly accusing him of not meeting these new criteria, and threatening Mr. von der Schmidt's employment at Morgan Stanley.

### *Hornbach Calls Female Managing Director, Chief U.S. Economist Ellen Zentner an "Embarrassment" to Global Macro Strategy Team*

71. Hornbach's depravity was not limited to discrimination against the People's Republic of China, ethnic Chinese, and disregard for the Muslim community.  Upon information and belief, Hornbach made sexist, misogynistic comments directed against Managing Director, Ellen Zentner ("Ms. Zentner") who is the Firm's Chief U.S. Economist.

72. For example, Hornbach wrote in a permanent Bloomberg "Global Macro Strategy" chat with upwards of 30 members, "Update on the Fed call, apparently Ellen 'sees nothing in the data that warrant more than 4 hikes' so there you have it."  Hornbach continued, "Of course […] they have to choose between the embarrassment of the 4 fed call change in 2 months, or a bigger fed call change in a week post CPI".

73. Upon information and belief, Hornbach has referred to Ms. Zentner as "incompetent" and an "embarrassment to the firm," undermining and disparaging her professional standing to an audience of subordinates and colleagues. Hornbach has openly taken exception to the Firm's decision to have this female executive spearhead strategic publications and discourse regarding the Federal Reserve.

***Morgan Stanley Senior Executives Knew, or Should Have Known About Hornbach's Behavior, and Intentionally Chose to Turn a Blind Eye to It***

74. Pursuant to the Firm's internal policy, managers are privy to the Bloomberg Messenger and Internal Messenger logs of all of their subordinates. Upon information and belief, all of these logs are monitored frequently, and managers are alerted by internal risk of any troubling messages sent over these platforms by their subordinates[8].

75. At the end of July 2021, the Firm attained a copy of Mr. von der Schmidt's Bloomberg Anywhere account data, including his correspondence and IB conversations.

76. Upon information and belief, McCool, Tirupattur, Simon Bound ("Bound"), and Edward "Ted" Pick ("Pick") were made aware of Hornbach's unprofessional, racist, xenophobic, and sexist comments, including his remarks pertaining to the People's Republic of China as well as a prominent female executive, Ellen Zentner.

77. After learning of Hornbach's deplorable behavior specific to retaliation and discrimination, McCool, Tirupattur, Bound, and Pick ignored it, placing Mr. von der Schmidt, the Chinese subordinates of Hornbach, as well as other minorities or anyone willing to speak up in harm's way.

---

[8] This would include profanity, discrimination, racist remarks, sexist jokes, etc.

Over the past two years, Mr. von der Schmidt directly informed the following individuals of Hornbach and/or Human Resources's actions; in spite of Mr. von der Schmidt's irrefutable reporting, these **WILLING PARTICIPANT** senior executives placed profits over people in condoning and emboldening bigoted Managing Director Hornbach.



**James Gorman, CEO**
**Simon Bound's Direct Manager**

78. Notified by Mr. von der Schmidt via email on April 18, 2022.  As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.



**Simon Bound**
**Managing Director and Global Director of Research**
**Denise McCool's Direct Manager**

79. Notified by Mr. von der Schmidt via email on April 5, 2022. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.



**Vishwanath "Vishy" Tirupattur**
**Managing Director and Global Director of Fixed Income Research**
**Hornbach's Direct Manager**

80. Notified by Mr. von der Schmidt on June 18, 2021. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.

**Denise McCool**
**Managing Director and COO of Research**
**Tirupattur's Co-Manager, and Hornbach's Superior**

81. Notified by Mr. von der Schmidt via email on April 5, 2022. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.

*Morgan Stanley Research Management's Brazen Collective Retaliation Against*
*Mr. von der Schmidt For Participating in A Protected Activity Causes Emotional Distress,*
*Prompts His Temporary Disability Leave*

82. With Friday's GMC publication canceled without explanation on Thursday, October 7, 2021

24

(three days after Hornbach's October 4 retaliatory email), Tirupattur sent an unsolicited Zoom meeting invitation on Friday morning for a videoconference. Mr. von der Schmidt was unable to accommodate the sudden request. In his reply, Tirupattur had attached a formal letter of reprimand authored by Hynes and requiring immediate acknowledgment from Mr. von der Schmidt.

83. Advising Mr. von der Schmidt of consequences up to and including termination and reminding him of his at-will employment in the context of alleged conduct violations, the letter incorporated demonstrable mischaracterizations and falsehoods in what appeared to establish a precursor to fire Mr. von der Schmidt for a contrived set of causes.

84. Notably, the Firm cited Mr. von der Schmidt's forwarding of the "Correspondence.zip" email to Sweberg as an infraction, failing to reference the original message sent to D'Antonio on July 20, 2021, and then Tirupattur on July 23.

85. Both Tirupattur and Hynes were aware that Mr. von der Schmidt was participating in a protected activity regarding the investigation by HR and that his forwarding the attachment to Sweberg (who was already involved in the investigation) constituted an aspect of this protected activity.

86. Physically overwhelmed by the acute stress[9] stemming from the Firm's retaliation in response to his participation in the HR investigation and his voicing concerns about Hornbach's behavior and objectionable comments to a supervisor (as per policy), out of concern for his health, Mr. von der Schmidt met with his psychologist, Dr. Judith Lee ("Dr. Lee"), that afternoon and requested Short Term Disability / FMLA leave the evening of October 8, 2021.

---

[9] In an "acute stress" response, the autonomic nervous system is activated and the body experiences increased levels of cortisol, adrenaline, and other hormones that produce an increased heart rate, quickened breathing rate, and higher blood pressure.

87. At this time, Mr. von der Schmidt first spoke with his attorney, Tyrone Blackburn, Esq. ("Mr. Blackburn").

88. Mr. von der Schmidt's mobile and remote log-in privileges were removed on October 22 after he had been copied on an email pertaining to GMC scheduling; the IT hotline informed him that this was due to an HR hold.

### *Morgan Stanley HR <u>Again</u> Leaks Confidential Employee Information to Managing Director Hornbach, who violates HIPAA to Defame and Disparage Mr. von der Schmidt*

89. Hornbach conveyed to an equity sales colleague that Mr. von der Schmidt's departure was medical, which was subsequently relayed to a client.

90. Hornbach also spread mistruths about Mr. von der Schmidt's character and work product internally to senior management and other team members. Hornbach questioned Mr. von der Schmidt's work ethic and baselessly claimed that Mr. von der Schmidt was mentally and/or physically incapable of executing his role.

91. Upon information and belief, Hornbach went so far as to inform individuals who work in other financial institutions outside of Morgan Stanley that Mr. von der Schmidt was mentally incapacitated; he even falsely asserted that Mr. von der Schmidt had been effectively terminated.

92. All of Hornbach's claims are demonstrably false. Hornbach also has considerable power as a Morgan Stanley Managing Director who is a globally-recognized strategist. He fully understood that his attacks on Mr. von der Schmidt's character, intellect, and fortitude could lead to the end of Mr. von der Schmidt's career in financial services.

### *Protected Medical Leave Fails to Protect Mr. von der Schmidt from*
### *Morgan Stanley's Continued Harassment*

93. Upon MetLife's first formal approval of his short-term leave, Mr. von der Schmidt received voicemails from different numbers in addition to a personally-addressed email from Arpan Parmar ("Parmar"), a lawyer for Morgan Stanley's Legal Department. This outreach began October 26, and Hynes left a voicemail for Mr. von der Schmidt on November 1 instructing Mr. von der Schmidt to contact Parmar (as opposed to her directly) in order to resolve an "urgent" matter.

94. Upon receipt of an appearance letter from Mr. Blackburn on November 3, 2021, which informed the Firm that Mr. Blackburn had been retained as Mr. von der Schmidt's counsel and which issued a preservation notice as well as instructions to refrain from further direct contact with his client, the Firm put in a request to Bloomberg Anywhere to deactivate Mr. von der Schmidt's account.

95. The Firm also sought information on any materials transferred via the terminal software, specifically those related to "Correspondence.zip.". The account deactivation the next day on November 4, 2021, de-linked Mr. von der Schmidt's name and account from his published research and affiliation with the Firm.



*Morgan Stanley Requests "Correspondence.zip"*

96. Concurrent with a colleague's outreach to Mr. von der Schmidt that conveyed his impression of a medically-related leave, Morgan Stanley's attorneys, including Sullivan, did not deny Hornbach's defamation of Mr. von der Schmidt in conversations with Mr. Blackburn in December 2021.

97. Having feigned detente in suggesting settlement negotiations in mid-December, days afterward the Firm's lawyers proceeded to indirectly threaten Mr. von der Schmidt with dismissal upon his return from protected leave, replete with a commensurate FINRA U5[10] disclosure.

98. If Mr. von der Schmidt did not accept a $75,000 buy-out, Morgan Stanley's lawyers had assured Mr. Blackburn that his 2021 variable compensation award would be minimal and that Mr. von der Schmidt would be terminated for cause.

99. Albeit ignored, this request was delivered as Mr. von der Schmidt remained on leave, which would be extended through early March 2022 in light of his acute stress and difficulties brought on by Morgan Stanley's prior and ongoing retaliatory posture.

### *Defendants Admittedly Retaliated Against Mr. von der Schmidt with his Variable Compensation for the Fiscal Year 2021 After Classifying His Work as "Best In Class."*

100. On January 14, 2021, Mr. von der Schmidt, Hornbach, and Dhingra participated in a year-end (2020) performance review, which Mr. von der Schmidt had recorded.

101. During the year-end call, Hornbach offered routine praise and delivered a modest raise to Mr. von der Schmidt for his efforts captured in a $150,000.00 bonus.

102. Towards the end of the call, Hornbach told Mr. von der Schmidt, "You obviously

---

[10] FINRA Form U5 is used in relation to separation of employment; in practice, (negative) U5 disclosures preclude gainful employment opportunities at other financial industry firms.

have a tremendous value add to our team. Your product is bar none **the best in class**. And I do think this number should be higher myself[11]."

103.     Hornbach also guaranteed that Mr. von der Schmidt would be promoted to Executive Director at 2021 year's end when he said, "My hope is that at the end of this year, **when you get to Executive Director** because you've earned it, this [compensation] number is going to be a much better number."

104.     Instead and true to their word, the Firm awarded Mr. von der Schmidt a $10,000.00 bonus for 2021, the de facto minimum, on January 13, 2022. At the same time, Hornbach claimed credit internally for the GMC's successes despite having had almost no hand in its creation or execution.

105.     An important client of the Firm reached out to Mr. von der Schmidt in January 2022 after he "saw that [Mr. von der Schmidt] left [Morgan Stanley]," presuming such from the Firm's removal of Mr. von der Schmidt from Bloomberg and his position leading the Global Macro Commentary.

### *Morgan Stanley Routinely Violates HIPAA*
### *And Pressures Mr. von der Schmidt to go on Long-Term Disability*
### *to Delay his Plans to Return to Work*

106.     Upon information and belief, based on conversations with MetLife representatives, the Firm's HR and managers often disclose confidential medical information to other employees at the Firm.

---

[11] However, it is Hornbach who ultimately decided Mr. von der Schmidt's compensation.

107.     On Friday, March 4, 2022, Mr. Blackburn emailed a settlement demand letter to the

Firm's lead attorney for the Institutional Securities Group ("ISG"), Sullivan, who immediately

attempted to contact Mr. Blackburn upon receipt[12].

108.     On Tuesday, March 15, 2022, Gina Mango ("Mango") at MetLife emailed Mr. von

der Schmidt to schedule a Citrix Webex conference meeting to prepare him for his return to

work after a final leave extension had been granted through March 27, 2022.

109.     After Sullivan demurred on settlement absent further information and materials

backing Mr. von der Schmidt and Mr. Blackburn's assertions, they notified Morgan Stanley of

their intention to file at the Equal Employment Opportunity Commission (EEOC).

110.     On Monday, March 21, 2022, Mango emailed Mr. von der Schmidt a courtesy

reminder of their scheduled Webex appointment for the following day. In the early evening,

Ira Rosenstein ("Rosenstein"), the Firm's external counsel from Morgan Lewis, contacted Mr.

Blackburn for the first time.

111.     On Tuesday, March 22, 2022, a new point of contact at MetLife, Kim Christopher

("Christopher"), reached out to Mr. von der Schmidt to tell him that she would be taking over

for Mango.

112.     On Wednesday, March 23, 2022, Mr. Blackburn emailed Rosenstein to remind him

of Mr. von der Schmidt's planned return to work on March 28.

113.     On Thursday, March 24, 2022, Mr. von der Schmidt called Christopher together with

Dr. Lee. Christopher suggested that Mr. von der Schmidt apply for another medical leave

extension through April 16, 2022, to afford the Firm additional time to arrange

---

[12] Note that Sullivan's position would necessitate direct interaction with Pick, the Head of ISG.

accommodations, which were meant to include remote work provisions and a change in reporting structure (among others).

114.     Leave through April 16 at this juncture would have pushed Mr. von der Schmidt into Long-Term Disability, almost certainly resulting in the legal termination of his employment. Mr. Blackburn emailed Rosenstein on this same day to propose a mediation alternative.

### *In Anticipation of his Return to Work, The Firm Follows Through on Threat, Pro-Morgan Stanley FINRA Investigator Displays Intimidation Tactics Aiming to Confiscate Incriminating HR Evidence Eight Months Later, Fearing EEOC filing*

115.     On Tuesday, March 29, 2022, Leslie Boo Jackson ("Boo Jackson"), a Principal Investigator for FINRA based in New Orleans, composed a letter (the "March 29 Letter") demanding materials related to Mr. von der Schmidt's July 20, 2021 email to HR (which included "Correspondence.zip") in accordance with FINRA Rule 8210 in response to a Morgan Stanley filing.

116.     The various materials and personal account information were requested no later than March 12, 2022, a date that *preceded* the letter's by 17 days and was nevertheless bolded. Coincidentally, April 12 would have amounted to a two-week interval from the date of the letter, suggesting it may have been pre-populated earlier in March.

117.     The March 29 Letter's Addendum A - Request for Information provides: "We will not (1) entertain requests for confidential treatment of any information or documents the firm provides in response to this request; (2) give the firm notice of any subpoena or access request we receive that encompasses any such information or documents; or **(3) undertake to return documents when this examination is completed**." FINRA's motto, displayed in the footer of its correspondence, is "Investor protection. Market integrity."



118.     Thomas Nelli ("Nelli"), a Senior Vice President leading FINRA examination teams, served as Regional Director overseeing FINRA's South Region, which included the New Orleans office. Additionally, Nelli previously worked as a Managing Director and high-ranking compliance officer at Morgan Stanley, where he had spent most of his career.

### *Mr. von der Schmidt Returns to Work: Pleas Ignored by Morgan Stanley, Treated Like a Second Class Employee, Vulnerability to Cyber Attacks Increased*

119.     On April 4, 2022, Mr. von der Schmidt emailed the Firm's IT department to prepare for his return to work. D'Antonio replied to this email on April 5, informing Mr. von der Schmidt that his manager had been "changed" to Dhingra, that his password may have since lapsed, and that the Firm was removing him from his role with GMC; a full-time hire had begun managing the GMC in December 2021. Instead, Mr. von der Schmidt was instructed to continue working on a machine-learning project.

120.     On Tuesday, April 5, 2022, Mr. von der Schmidt contacted the Firm's IT support to restore his remote log-in credentials. After confirming that his account had been locked by HR on October 22, 2021, Mr. von der Schmidt was asked to restore his work-issued iPhone, thus wiping all stored data.

121.     The technician, based in Utah, instructed Mr. von der Schmidt on a recorded call to change his Citrix display settings to accommodate his monitors' native resolution instead of windowed mode, leaving Mr. von der Schmidt more vulnerable to a cyber attack.

122.     Upon first logging in to "MyDesk" (the Firm's remote networking portal),  Mr. von der Schmidt found that a former employee's name appeared before his name was displayed. Mr. von der Schmidt discovered that he had only been granted limited systems access, which had not been the case prior to his leave. His access to the Firm's and other professional software was now severely limited.

123.     D'Antonio's email correspondence with Mr. von der Schmidt continued by way of Mr. von der Schmidt's personal email account, wherein she ignored his highlighting of the loss of his standing and opportunity commensurate with his removal from the GMC. D'Antonio justified the Firm's retaliatory action by contending that this arrangement obviated the need to interact with Hornbach directly.

124.     D'Antonio also disregarded Mr. von der Schmidt's concerns regarding his managerial structure, which remained identical to the official reporting structure before his leave began in October.

125.     On the same day, McCool was conspicuously added to an email reply (on which Bound was copied) after 10pm.

***Week One: Return to Work coincides with a Sudden Denial of MetLife's suggested Leave
Extension, Firm Further Restricts Mr. von der Schmidt's Resource Access***

126.     On Wednesday, April 6, 2022, Mr. von der Schmidt logged in to work remotely, encountering limited systems access. Dhingra emailed Mr. von der Schmidt to say that he would touch base the following week and rebuffed a request for assistance.

127.     Mr. von der Schmidt was excluded from Microsoft Teams, remaining on Skype despite the Firm's plans to deprecate the application after fully migrating. Mr. von der Schmidt's request for NY Floor Support's help initially went unanswered while, in contrast, D'Arcy Carr (Managing Director of a separate group) had a team member contact Mr. von der Schmidt to ensure that he regained access to certain Research publishing resources.

128.     An automatically-generated email indicated that Hornbach had removed Mr. von der Schmidt from a Global Macro Commentary directory role on or around March 2, 2022.

129.     That afternoon, a OneDrive sync failure populated in the bottom right corner of Mr. von der Schmidt's primary monitor. That error indicated that Mr. von der Schmidt's access to an unfamiliar drive was denied. He did not recall ever utilizing OneDrive at work, and the red alert window appeared to be the wrong color scheme. Clicking for further details prompted administrative credentials that were not supplied by Mr. von der Schmidt.

130.     D'Antonio emailed Mr. von der Schmidt on Thursday, April 7 to inform him that McCool was working to restore his credentials for Bloomberg and Teams, and that she was responsible for his systems access; in reality, McCool withheld *critical components necessary* to perform Mr. von der Schmidt's job.

131.     Upon information and belief, McCool orchestrated the harassment campaign that followed.

*Within Days of His Return to Work, Morgan Stanley Directs CyberAttacks toward*
*Mr. von der Schmidt's Computer and Tampers with Evidence to Absolve Firm Culpability*

132.     On Friday, April 8, 2022, Mr. von der Schmidt emailed a prominent member of the

press at 11:11am from his personal account as a follow-up to a previous introduction conveying

the parameters of Mr. von der Schmidt's emerging conflict with Morgan Stanley and their

efforts to silence him.

133.     At 1:02pm, Mr. von der Schmidt received a Skype notification for an IM from an

unfamiliar research blast-mail account. The message carried a hyperlink ostensibly containing

information pertaining to a new Research toolkit. Mr. von der Schmidt did not recall ever

seeing such a blast message in seven years of employment at Morgan Stanley.

134.     In light of his limited systems access, the invitation to preview a toolkit struck Mr.

von der Schmidt as odd, as did delivery via an application marked for deprecation. The syntax

also resembled Morgan Stanley's simulated spam exercises. Mr. von der Schmidt right-clicked

the window to dismiss the spam notification alert.

135.     Within thirty seconds, the Skype notification flash reappeared on the taskbar and in

the conversation window. An identical message appeared below the first. Mr. von der Schmidt

right-clicked once more to dismiss the second notification.

136.     At 1:03pm, Mr. von der Schmidt received an email within his work Outlook inbox,

displaying the conversation history for just one of the IMs. Unlike a typical Skype log, which

would populate natively in Outlook's 'Conversation History' folder, the sender was hyperlinked

for reply in the primary inbox message's 'Subject' field. Thus, the receipt did not appear

genuine.

137.     Upon information and belief, Petroni Bascombe ("Bascombe"), an HR employee with

an MS in Information Systems and Data Analytics, who was involved in designing Human

Resources Information Systems (HRIS)[13] and User Acceptance Testing (UAT)[14] for the Firm, was instrumental in this tunneling attempt.

### *After Receiving a Detailed, Comprehensive Preservation Notice From Mr. Blackburn, The Firm Tampers with Discoverable Evidence*

138.      Mr. von der Schmidt discovered evidence tampering concerning Outlook calendar entries pertaining to dates relevant to the HR investigation that took place during the summer of 2021. New, and in some cases, multiple, acceptance records for a January 28, 2021 call (in which Hornbach had retaliated) appeared in internal archive queries, as did cancellations or deletions of original entries.

139.      The selection of January 13, 2021, does not appear coincidental: Sweberg falsely portrayed the January 28 retaliatory call as instead motivated by Hornbach's desire to discuss Mr. von der Schmidt's dissatisfaction with his 2020 compensation award when she delivered her HR findings to Mr. von der Schmidt on September 30, 2021. While 2021 compensation was communicated on January 13, 2022, bonuses for 2020 were communicated on January 14, 2021. The latter date corresponded to Mr. von der Schmidt's recorded Zoom call with Hornbach and Dhingra that was later shared with Morgan Stanley lawyers in March 2022.

140.      Mr von der Schmidt was not even appraised of his fiscal year 2020 compensation on January 13, 2021, given that he was not informed until the next day. The fabricated entries were inconsistent with the 2021 calendar: it is impossible for Mr. von der Schmidt to have expressed displeasure with a compensation figure that had not yet been disclosed to him.

141.      Please note the Firm's publicly stated position with respect to evidence preservation:

---

[13] "HRIS" (Human Resources Information Systems) is a system that is used to collect and store data on an organization's employees.
[14] "UAT" (User acceptance testing) is the final testing stage in software development, it is usually done manually, with users creating real-world situations and testing how the software reacts and performs.

https://www.morganstanley.com/about-us-governance/code-of-conduct



**Potential Litigation and Legal Holds:** You must promptly notify LCD if you become aware of any potential litigation or regulatory proceeding involving you in your professional capacity or Morgan Stanley. We are required to preserve information, documents and other materials, whether in physical or electronic form, in connection with litigation, investigations and regulatory and administrative proceedings. You must comply with any notices from LCD directing you to preserve information, documents or materials, including those that may reside on any personal phone, tablet, computer, or other device—such as email, text/SMS, and messaging applications. This preservation obligation extends to applications you have used that have not been approved by the Firm for business use, including communications on devices outside of Morgan Stanley platforms, in violation of Firm policy.

### *Week Two: Absent Accommodations, Cyber Exploitation Attempts Escalate, Hacking Attempt Caught*

142.      On Saturday, April 9, 2022, privacy analytics logs on Mr. von der Schmidt's personal iPad later showed a host of logging reports (such as "Speech Training") and other forensic artifacts beginning on this date.

143.      Mr. von der Schmidt and Ms. Ngô noticed CAPTCHA verifications surfacing with increasing frequency while browsing web pages and applications on their phones, both when connected to the home network and via cellular data. They proceeded to set up personal VPN accounts. A mobile hotspot appeared in network lists displayed on Mr. von der Schmidt and Ms. Ngô's devices; neither had recently set up a hotspot or enabled one.

144.      Mr. Blackburn emailed Rosenstein to inform him that Mr. von der Schmidt would be unavailable on Monday, April 11, and cited the lack of previously agreed-upon accommodations.

145.    On Tuesday, April 12, 2022, anticipating that the malicious script window from Friday would remain active upon logging in remotely that day, Mr. von der Schmidt set up a spare laptop so that only the software required to connect to the Firm's MyDesk portal through a Citrix client was installed.

146.    Upon left-clicking into the Skype application window with the aforementioned suspicious hyperlink, a series of command windows briefly populated ahead of a stream of error messages related to UDP requests as well as network authorization and access.

147.    The hyperlink itself furnished a presentation within a browser on the remote client. While the Cisco network error prompts ran their course, Mr. von der Schmidt emailed Dhingra to inform him that he would be absent for the remainder of the week, per Dr. Lee's recommendation.

148.    With a series of live photos of the attempted breach in hand, Mr. von der Schmidt closed the remote client window, disabled the wireless adapter, and created a post-login backup file of the disk on an already-inserted USB key. The aggregate file sizes differed by approximately 30MB.

149.    Mr. von der Schmidt called Natural Wireless, the internet service provider, to inform them of a possible network breach. The representative informed him that the matter would be escalated and to expect outreach from the incident response team.

150.    Later corresponding with the Natural Wireless support team's inbox, Mr. von der Schmidt produced photos of the incident and was told that the breach appeared to stem from a compromised host computer. Mr. von der Schmidt and Mr. Blackburn sought to secure forensic services.

151.     Mr. von der Schmidt and Ms. Ngô spent the day changing passwords and removing saved credentials. Mr. von der Schmidt discovered that his Morgan Stanley email account remained listed as a backup recovery address for his personal Gmail account and removed it. He also disabled the hotspot functionality that had been enabled on his iPad, a feature he had not used recently and was turned on without his knowledge.

### One Day After Mr. von der Schmidt Captured Evidence of Morgan Stanley's Cybercrime, Ms. Ngô and Mr. von der Schmidt Tackle a Wave of Cyber attacks on Their Home Network and Personal Electronic Devices

152.     That evening, their AppleTV prompted Ms. Ngô for the iTunes passcode when she opened Netflix. Despite entering the password multiple times, which had been written down on paper, authentication continued to fail. Ms. Ngô asked Mr. von der Schmidt if he had given her the correct password, but even his repeated entries with the AppleTV remote failed.

153.     Mr. von der Schmidt unwittingly entered the ExpressVPN password using the keyboard on his iPhone, connected via AirPlay, when he and Ms. Ngô immediately witnessed strange activity on their iPhones. Realizing too late that the phone's graphical instability could have been indicative of an attack in progress, Mr. von der Schmidt attempted to power down his phone; Ms. Ngô did the same.

154.     While doing so, the magnification settings were suddenly amplified, rendering the power-off slider nearly the width of the display, raising the difficulty of shutting off the phone considerably. Ms. Ngô's iPhone, which had been powered off, inexplicably turned back on.

155.     Mr. von der Schmidt and Ms. Ngô raced to power off and unplug other computing devices. The living room sound-bar continued to switch to Bluetooth as an input, despite the HDMI connection to the AppleTV. The Phillips Hue lights no longer responded to app commands. The iPad hotspot reappeared, prompting Mr. von der Schmidt to download and

install the latest iOS update at the time (15.4.1), hoping that this could mitigate any further exploitation. Instead, the iPad restarted with its background changed.

156.     The next day, Ms. Ngô turned on her phone and encountered a host of foreign modules tied to ExpressVPN in her settings. Mr. von der Schmidt took pictures with his iPhone, and they shut down her phone. The rest of their personal devices were rendered unusable after the attacks.

### *Mr. von der Schmidt and Ms. Ngô Reach Out to Federal and Local Law Enforcement*

157.     Requesting help from friends on Discord and in contact with Mr. Blackburn on Signal, Mr. von der Schmidt called the FBI to file a report.

158.     In the afternoon, Mr. von der Schmidt brought the spare laptop and Ms. Ngô's iPhone to the NYPD Strategic Response Group ("SRG") on 42nd. One member told Mr. von der Schmidt quietly that Morgan Stanley was not allowed to do what Mr. von der Schmidt had alleged, but he lamented that a report must be filed with a detective, which SRG did not have on-site. He furnished Mr. von der Schmidt with written addresses and phone numbers for two local precincts and wished him luck.

159.     Both recommended precincts turned Mr. von der Schmidt away, refusing to allow him to file any report for cyber and other crimes or even to take custody of the compromised laptop, telling him to return the personal device to "Morgan Stanley HR".

### *Mr. von der Schmidt Sends Evidence of The Firm's Cyber Activity to The DOJ's Criminal Division*

160.     On Friday, April 15, 2022, Mr. von der Schmidt encountered an unexpected cryptographic services process while running an old HP laptop in Safe Mode in order to create

additional copies of the disk backup image for the spare laptop used Tuesday, April 12. USB functionality ceased after making one additional copy.

161.     Mr. von der Schmidt then started a Surface Pro 4 (which he had used until mid-2020) to investigate the nature of the malware[15]. Seeing at least three command prompt windows flash in succession, he identified unusually high memory throughput in Task Manager: approximately 200MB/s for Windows Defender and several Node.js modules with similarly elevated memory utilization - indicators of an in-memory cyber attack.

162.     Reviewing System Services as an Administrator, Mr. von der Schmidt was unable to terminate various components, including a redundant instance of Bluetooth Support Services.

163.     Mr. von der Schmidt sent evidence via FedEx that contained two blue USB sticks, one of which had successfully copied the disk image files of the laptop - capturing the cyberattack on Tuesday - to the Computer Crime and Intellectual Property Section ("CCIPS") at the Criminal Division of the US Department of Justice ("DOJ").

***Mr. von der Schmidt Suspects the Firm Compromised Newly Purchased Devices Disrupting Mr. von der Schmidts Access to Emergency Services***

164.     On April 15, 2022, Mr. von der Schmidt and Ms. Ngô realized that different applications, consistent with those on their compromised iPhones, were being pushed to their temporary Android phones.

165.     On Saturday, April 16, 2022, Mr. von der Schmidt received a call from a spoofed number masquerading as Dr. Lee's. After answering the call, the lock-screen passcode prompt could not be dismissed and now began with "For your security[ ... ]."

---

[15] "Malware" (malicious software) is a program or code that is created to do intentional harm to a computer, network, or server, it interferes with normal computer functions or sends personal data about the user to unauthorized parties over the Internet

42

166.     Alarmed by the external commandeering of a newly purchased phone, Mr. von der Schmidt used Ms. Ngô's phone to dial 911. After conveying their sense of urgency to the operator, Mr. von der Schmidt was transferred to an automated recording announcing that all officers in the area were unavailable. Hours elapsed without any response, only for Ms. Ngô to realize that the 911 outreach had been entirely wiped from the call log.

167.     Mr. von der Schmidt called 911 from the lobby of his apartment complex, in the late afternoon.

**Week Three: Amid Cybercrimes and Harassment, Mr. von der Schmidt Sends Plea Letter to Morgan Stanley CEO James Gorman to De-Escalate Suffocating Intimidation and Retaliation**

168.     On the morning of Monday, April 18, 2022, Mr. von der Schmidt sent the following email with the subject line "Zersetzung"[16] to Gorman.  In it, he summarized all the incidents that occurred after Mr. von der Schmidt's brief return to work, including various malicious cyber activities on his work and personal devices leaving him unable to consult confidentially with counsel.

169.     The following email called upon Gorman to take action in the face of cyber harassment tactics and 'cruelty':

> James,
>
> In the twelve days since I have returned to work remotely, my girlfriend and I have encountered the following:
>
> - Indications of evidence tampering with respect to Outlook calendar entries and other items in the wake of a federal records retention notice

---

[16] "Zersetzung" is a term denoting a Stasi psychological warfare technique once used to repress political opponents in East Germany.

- An HR attempt to control and exploit our local network via the MyDesk Citrix workspace portal, which was corroborated by Natural Wireless and captured by a "honeypot" that has been sent for forensic attestation
- A MetLife claims denial citing telephone calls and correspondence that demonstrably never took place
- Intimidation in concert with FINRA, who referenced a letter dated March 29 demanding documents already earmarked for legal preservation by March 12 (reproduced in bold no less)
- A compromised local network, including all personal devices, even our smart lights and power strips, as a result of multi-vector phishing and tunneling scheme; the latter exploited Bluetooth and AirPlay security vulnerabilities to cripple our apartment, attempted to violate attorney-client privilege, and may have risen to the level of obstruction of justice
- An inability to consult with counsel on account of now-compromised temporary Android phones, which flash a "security update" requesting a ten-minute 911 hiatus every two hours
- Clandestine surveillance equipment, including a "hidden" (i.e., hastily glued to a circuit board) Bluetooth transmitter in an Omada controller, one of many blatant violations of the Computer Fraud and Abuse Act, Wiretap Act, as well as other network crime statutes

Creating and publishing the Global Macro Commentary under the Morgan Stanley banner had been the greatest honor of my career. To say nothing of prior events, the nightmare that Keanna and I continue to endure has shattered that esteem.

Morgan Stanley once felt like my home. My sincere hope is that you, as the leader of this Firm, do not stand for such tactics and cruelty.

Eddie

170.    The email to Gorman on April 18, 2022, prompted Mr. von der Schmidt's removal from all Firm systems. In Airplane mode, his work-designated iPhone was wiped and restarted remotely within two hours.

171.    Having encountered numerous suspicious circumstances, Ms. Ngô and Mr. von der Schmidt would later meet with an employee of a West Coast cybersecurity firm who helped corroborate many of Mr. von der Schmidt's observations related to sophisticated, multi-vector

attacks, all as the cyber-harassment continued in the form of unauthorized surveillance[17] and

remote administration of their personal devices.

172.     The week culminated with persistent harassment and cyber-attacks, prompting Mr.

von der Schmidt and Ms. Ngô to seek refuge with family in New Jersey.

### *Despite Mr. von der Schmidt's Resignation from Morgan Stanley One Month After Returning to Work, Cyber Harassment and Tampering Continues*

173.     Morgan Stanley has demonstrated the capacity to remotely administer devices: the

Firm did so when it remotely wiped and shut down Mr. von der Schmidt's work-issued iPhone

8 Plus on April 18, 2022. On that same day, Mr. von der Schmidt was removed from the Firm's

internal directory despite remaining employed.

174.     In addition to the devices present in their apartment, a variety of newly-purchased

personal devices belonging to Ms. Ngô and Mr. von der Schmidt were compromised since

April 22 and have been actively exploited via remote administration.

175.     This exploitation of Ms. Ngô and Mr. von der Schmidt's personal devices has been

predicated on Remote Procedure Calls (RPC), transmitted via all manner of protocols, which

facilitate distributed computing environments shared by their devices and remote servers on

external domains.

176.     Forensic artifacts indicate that the principal method of maintaining control has

involved the widespread manipulation of drivers and services (see Create or Modify System

Process: Windows Service, https://attack.mitre.org/techniques/T1543/003/), including those

---

[17] "Computer and network surveillance" is the monitoring of computer activity and data stored locally on a computer or data being transferred over computer networks such as the Internet. This monitoring is often carried out covertly and may be completed by governments, corporations, criminal organizations, or individuals.

related to Universal Plug and Play (UPnP) and Bluetooth, furthered by the corruption of Certificates, Digital Signatures, and Trust Stores.

177.     The notification and event infrastructure has been utilized not just for synchronization purposes but also for redirection, process injection (https://attack.mitre.org/techniques/T1055/), and payload delivery. Most devices have been remotely configured for network-based debugging as well.

178.     All devices have had default and/or recommended settings adversely manipulated by an external party or parties. Such reconfiguration has not just applied to privacy and hardware settings, but also to security features such as firewalls and authentication protocols.

179.     On their Windows devices, remote administration has been effected programmatically through Windows Management Instrumentation (WMI[18]).

180.     Based on the Component Object Model (COM), WMI is also a known attack vector[19].

181.     Windows telemetry, both native to the OS and from the SysInternals suite, has shown extensive services-related activity often tied to the registry, with resultant changes to system settings and configurations also evident in the registry itself.

182.     Such active manipulation of the Windows registry is consistent with the broader weaponization of methods "designed to avoid many traditional forensic artifacts and tools, by keeping attack techniques in memory[20]."

---

[18] WMI is an implementation of Web-Based Enterprise Management (WBEM), a standard defined by an industry consortium and that "encompasses the design of an extensible enterprise data-collection and data-management facility that has the flexibility and extensibility required to manage local and remote systems that comprise arbitrary components." (*Windows Internals, Part 2, 7th Ed.*, Allievi, Ionesco, Russinovich, & Solomon, Microsoft Press).
[19] See for example, Matt Graeber's 2015 Black Hat paper, "Abusing Windows Management Instrumentation (WMI) to Build a Persistent, Asynchronous, and Fileless Backdoor" (https://www.blackhat.com/docs/us-15/materials/us-15-Graeber-Abusing-Windows-Management-Instrumentation-WMI-To-Build-A-Persistent%20Asynchronous-And-Fileless-Backdoor-wp.pdf). The WBEM interface itself is susceptible to privilege escalation techniques (https://attack.mitre.org/tactics/TA0004/).
[20] (*Adversarial Tradecraft in Cybersecurity*, Borges, Packt). The expert adds: "the irony is, using these techniques as well as variations on these techniques, is anomalous and different in terms of computing."

183.     While the archives furnished by Event Tracing for Windows (ETW) represent digital receipts (to the extent that their veracity may be assumed), forensic artifacts on Apple devices include extensive iOS data and analytics reports chronicling anomalous memory corruption (with stack traces) and recurring logs scraping plaintext data fields such as "MenstrualCycleDaily."

184.     iOS artifacts began to materialize on Ms. Ngô and Mr. von der Schmidt's iPhones and iPads in April amid irregular activity exhibited on other devices[21].

185.     Customized boot volumes and drivers have edified post-exploitation persistence on Ms. Ngô and Mr. von der Schmidt's personal devices, in conjunction with HTTP/TCP-based Command and Control (C2) listening posts that remain active as of this filing.

186.     In summary, all personal devices have had their settings, behavior, and functionality administered remotely, with available forensic artifacts[22] decidedly pointing to in-memory techniques and obfuscation mechanisms dovetailing with various persistence implementations.

187.     This platform has not just allowed for the monitoring and interception of virtually all input and output (I/O) operations and networking activity occurring on Ms. Ngô and Mr. von der Schmidt's personal devices, but it has also enabled malicious actors to gain controlling access to Ms. Ngô and Mr. von der Schmidt's private data and personal communications. This includes evidence backups.

188.     Critical photographic evidence pertaining to the 2021 HR investigation, subsequent retaliation, restored audio of a September 30, 2021, Findings Call with the Firm's HR, and pending civil claims have been accessed, altered or deleted entirely.

---

[21] Note that Apple Privacy reports have flagged conspicuous resource access as well as suspicious IP connections corroborating other indicators of domain-fronting (see Proxy, https://attack.mitre.org/techniques/T1090/).
[22] (see Indicator Removal on Host, https://attack.mitre.org/techniques/T1070/).

189.     Attachments once named "Correspondence.zip," which the Firm itself referred to by that name in a November 3, 2021, outreach to Bloomberg, have been renamed to "HR.zip" on all devices and personal email accounts for Mr. von der Schmidt, Ms. Ngô, and others.

190.     The contents of the email message and the components within the attached folder have been fabricated, degraded, or removed.

191.     Meanwhile, illegitimate examiner correspondence demanding evidence earmarked for preservation culminated with the imposition of a public FINRA suspension. If all of Mr. von der Schmidt's personal devices and accounts are not surrendered, he will be banned indefinitely from associating with any member Firm in any capacity[23].

### Morgan Stanley "Risk Management" Tactics Consist of Illegal Cyber Activity with the Intent to Silence Misconduct and Discrimination, Violating Civil and Privacy Rights

192.     Out of good faith, Mr. von der Schmidt was transparent about his documentation of Hornbach's liable behavior and that of his voluntary participation in the investigation into his conduct started by Management and HR. Inadvertently, Mr. von der Schmidt came into possession of an aggregate amount of incriminating digital and physical evidence of Morgan Stanley Research Management's institutionalized culture of discrimination and retaliation and that of how Human Resources conducts its business.

193.     The backlash suffered by Mr. von der Schmidt and by extension Ms. Ngô for following the Code of Conduct implemented by Morgan Stanley in reporting discrimination and misconduct privately to a superior offers an example of how cultural misconduct can invite circumstances that further corporate and criminal malfeasance[24].

---

[23] Note that Mr. von der Schmidt's constructive discharge took effect May 17, and his registration with Morgan Stanley was closed on June 10, absent any disclosures.
[24] https://www.sec.gov/rules/proposed/s74002/scgilman1.htm

194.     Malicious cyber activities by the agents of Morgan Stanley to mitigate the liability presented by evidence of employee or HR misconduct pose an inevitable risk to investors, the safety and civil liberties of the public, and (current, former, or future) employees.  Upon information and belief, "Risk Management" tactics such as cybercrime, harassment, invasion of privacy, and evidence tampering are an abuse of power and resources.

*May 19, 2022*

*DNS Leak Test results for Mr. von der Schmidt and Ms. Ngô's iPhone 13 Pro*



*June 19, 2022*

*"Someone else is still using this PC. If you shut it down now, they could lose unsaved work."*



*June 24, 2022*

*Suspicious external payloads discovered on Ms. Ngô's MacBook Pro*



*August 31, 2022*

*Settings changed externally from default authentication values to enable insecure guest logons:*
*"allowing guest logons makes the client vulnerable to man-in-the-middle attacks"*



*August 31, 2022*

*Settings changed externally from default values to allow access by anonymous users, which "increases the security risk of the computer by allowing unauthenticated users to connect"*



*"Correspondence.zip" is Replaced with "HR.zip",*
*Explicit Evidence of Morgan Stanley Employee Misconduct has Been*
*Compromised and Replaced.*



<u>COUNT I</u>
<u>AS FOR THE FIRST CAUSE OF ACTION</u>
<u>ADA DISABILITY DISCRIMINATION</u>
**(On behalf of Mr. von der Schmidt against Morgan Stanley)**

195.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint in paragraphs 1-194.

196.     The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

197.     Because acute stress disorder substantially limits at least one of Plaintiff von der Schmidt's major life activities, Plaintiff von der Schmidt is an individual with a disability under the ADA.

198.     Plaintiff von der Schmidt was fully qualified to be a Vice President in Global Research and could perform all the essential functions of the position, as evidenced from his "Best in class" 2020 performance review, and $150,000.00 bonus. Plaintiff von der Schmidt worked for Defendant for over a year and a half before he was diagnosed with acute stress disorder and was constructively discharged, as detailed above.

199.     Defendant is a covered employer to which the ADA applies.

200.     Defendant constructively discharged Plaintiff von der Schmidt from employment solely because Plaintiff von der Schmidt requested (and the Firm reneged on) the following reasonable accommodations:

   a.   Refusal of changing managerial and organizational reporting structure after agreeing to do so.

   b.   Refusal to provide Mr. von der Schmidt with the same resources or extended time to complete and submit the Global Macro Commentary[25].

201.     Defendant made no individualized assessment to determine whether Plaintiff von der Schmidt could perform the job's essential functions or whether an alternate reasonable

---

[25] Mr. von der Schmidt never asked to be removed from the Global Macro Commentary; he only requested the same resources that his colleagues received.

accommodation would enable him to be employed as a Vice President in Global Research by Defendant, as is required under the ADA.

202.    Defendant's constructive discharge of Plaintiff von der Schmidt based on his disability and Defendant's failure to make an individualized assessment to determine whether Plaintiff von der Schmidt could be employed or whether a reasonable accommodation would enable him to be employed by Defendant violated the ADA.

203.    The Defendant's conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of the defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

<u>**COUNT II**</u>
<u>**AS FOR THE SECOND CAUSE OF ACTION**</u>
<u>**ADA RETALIATION (Against Morgan Stanley)**</u>
**(On behalf of Mr. von der Schmidt against Morgan Stanley)**

204.    Plaintiffs incorporate herein by reference as if outlined in full the averments of paragraphs 1-203.

205.    To state a retaliation claim under the ADA or Title VII, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citation omitted) (setting forth elements of a Title VII retaliation claim); *see also Smith v. New York City Dep't of Educ.*, 808 F. Supp. 2d 569, 581 (S.D.N.Y. 2011) (setting forth elements of an ADA retaliation claim and noting that "[r]etaliation claims under the ADA . . . subject to the same burden-shifting analysis as claims arising under Title VII"). *McCarrick v. Corning, Inc.*, No. 18-CV-6435-FPG, 2019 U.S. Dist. LEXIS 81227, at *7-8 (W.D.N.Y. May 14, 2019).

<u>PARTICIPATION IN A PROTECTED ACTIVITY</u>:

206.    Here, Plaintiff von der Schmidt participated in protected activity when he went on disability leave for acute stress disorder.

## MORGAN STANLEY WAS AWARE THAT PLAINTIFF VON DER SCHMIDT WENT ON DISABILITY LEAVE:

207.     As detailed above, Mr. von der Schmidt's medical provider, Dr. Lee, placed him on short-term disability leave beginning in October 2021. Mr. von der Schmidt utilized the Firm's leave provider, MetLife Insurance, to facilitate his short-term disability leave of absence. Upon information and belief, Met Life notified the Firm about Mr. von der Schmidt's taking ADA-protected short-term disability leave.

## MORGAN STANLEY RETALIATED AGAINST MR. VON DER SCHMIDT, UPON RETURN FROM DISABILITY LEAVE:

208.     As detailed above, upon Mr. von der Schmidt's return from short-term disability leave, he was a victim of sophisticated cyber tunneling attacks. In addition, Mr. von der Schmidt was intentionally isolated from his colleagues. Upon information and belief, the intentional isolation[26] of Mr. von der Schmidt upon return to work was in the following form:

   a.  Minimal to no contact with colleagues.

   b.  Limited or no systems access[27], intentionally withheld by Denise McCool, and

   c.  Mr. von der Schmidt's revocation and removal from the Global Macro Commentary[28], which Mr. von der Schmidt created and stewarded for the better part of two years[29].

---

[26] The social environment in a workplace can prove to be a powerful motivator; fear of employer-sponsored isolation "might well" influence an employee's decision whether to "make or support a charge of discrimination." *White*, 548 U.S. at 57. *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 U.S. Dist. LEXIS 31469, at *28 (D. Conn. March 11, 2016).

[27] Plaintiff's inability to access or use the MetLife computer system for a given period of time would have the indicia of an adverse employment action. See *Gelin v. Geithner*, No. 06 Civ. 10176, 2009 U.S. Dist. LEXIS 24865, 2009 WL 804144, at *14 (S.D.N.Y. March 26, 2009) ("The disruption to Plaintiff's remote access from October through November 2005 also arguably qualifies as an adverse employment action, as it continued after Plaintiff's suspension had ended, thereby interfering with Plaintiff's ability to access the IRS computer system while at home or working in the field."); see also *Terry v. Ashcroft*, 336 F.3d 128, 145 (2d Cir. 2003) (holding that suspension of use of a government-owned vehicle was materially adverse where "it appears that to fully engage in his . . . position [plaintiff] would have had to perform field work.").   Thus, MetLife's action in depriving the Plaintiff of access to the computer system, which appears to have been needed to fully engage in his position, could easily fall into the category of "adverse employment action." *De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 411-12 (E.D.N.Y. 2013).

[28] Matthew Hornbach stated that the GMC was the most cumulatively read document in global research every year.

[29] Viewing Plaintiff's alleged adverse actions in the aggregate, the Court finds that Plaintiff has raised triable issues of fact as to whether the withholding of documents, stripping of responsibilities, hostility, assignment to an isolated cubicle, failure to receive a multiline telephone, and malfunctioning security badge constitute adverse actions. These incidents, to the extent they were intentional, would dissuade a reasonable employee from making a discrimination

<u>CAUSAL CONNECTION BETWEEN MR. VON DER SCHMIDT TAKING DISABILITY
LEAVE AND THE RETALIATION</u>:

208.    As detailed above, the temporal proximity between Mr. von der Schmidt's attempted
return to work and the Firm's intentional acts detailed in the preceding paragraphs are so close
(48 hours) that it removes all doubt of retaliatory intent.

209.    As previously stated, and as evidenced by his glowing performance reviews, Plaintiff
von der Schmidt was fully qualified to be a Vice President in Global Research and could
perform all the essential functions of the position.  Plaintiff von der Schmidt worked for
Defendant for over a year and a half before he was diagnosed with acute stress disorder and
was constructively discharged, as detailed above.

210.    The Defendant is a covered employer to which the ADA applies.

211.    The Defendant's conduct was intentional, willful, deliberate, and in callous disregard
for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt
has suffered and will continue to suffer both economic and non-economic harm.  Because of
the defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and
equitable remedies available under the law.


**COUNT III**
**AS FOR THE THIRD CAUSE OF ACTION**
**VIOLATION OF TITLE III OF THE ELECTRONIC COMMUNICATIONS**
**PRIVACY ACT OF 1986 (ECPA)**
**(On behalf of the Plaintiffs against Defendants)**

212.    Plaintiffs incorporate herein by reference as if outlined in full the averments of this
Complaint's paragraphs 1-211.

213.    The general purpose of the Electronic Communications Privacy Act ("ECPA"), 18
U.S.C. Section 2701, et seq., was to create a cause of action against "computer hackers
(e.g. electronic trespassers)." *Sherman & Company v. Salton Maxim Housewares, Inc.,* 94 F.

---

charge."); *Siddiqi v. N.Y.C.  Health & Hosps. Corp.*, 572 F. Supp.  2d 353, 372 (S.D.N.Y. 2008) ("[F]or the purposes
of a retaliation claim, bad performance reviews are an adverse employment action."). *Van Brunt-Piehler v.  Absolute
Software, Inc.*, 504 F. Supp. 3d 175, 195 (W.D.N.Y. 2020).
That Plaintiff maintained the same salary is of little consequence because "even where a plaintiff retains the same title
and salary following a transfer, [s]he may demonstrate an adverse action by showing that [s]he has been *de
facto* 'stripped of [her job] responsibilities and not allowed to perform those functions.'" *Torregiano v. Monroe Comm.
College*, 11-CV-6300, 2015 U.S. Dist. LEXIS 144992, 2015 WL 6641784, at *12 (W.D.N.Y. Oct. 26, 2015).
*Panagopoulos v. N.Y.  State DOT*, 172 F. Supp. 3d 597, 619 (N.D.N.Y. 2016).

Supp.2d 817 N.Y 2000), citing *State Wide Photocopy Corp. v. Tokai Financial, Inc.,* 909 F. Supp. 137, 145 (S.D.N.Y. 1995). The Court in *In re Doubleclick Inc.* Privacy Litigation found that Section 2701 of ECPA "aims to prevent hackers from obtaining, altering or destroying certain stored electronic communications." *In re Doubleclick Inc. Privacy Litigation*, 154 F. Supp.2d 497, 507 (S.D.N.Y. 2001). Plaintiffs fail to state a claim against SRS for a violation of the ECPA.

## THE FIRM ACCESSED AND OR OBTAINED
## DATA FROM PLAINTIFFS 'PERSONAL DEVICES[30]

214.     As detailed above, Plaintiff contends that the Firm violated the ECPA under Section 2701 of the ECPA. A claim under Section 2701 requires that Defendant has gained unauthorized access, or access more than authority, to a facility through which an electronic communication service is provided and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system. (*See* 18 U.S.C. § 2701(a).

215.     As detailed above, Plaintiffs have alleged that Defendants are "hackers" that obtained, altered, or prevented authorized access to their personal devices or data. As such, Plaintiffs have stated a claim against Defendants under ECPA Section 2701.

## ECPA SECTION 2701

216.     18 U.S.C. Section 2701 prohibits unauthorized access to stored communications. Persons liable and subject to criminal and civil sanctions include those who:

    a.   intentionally   access   without   authorization   a   facility   through   which an electronic communication service is provided; or

    b.   intentionally exceeds an authorization to that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system. 18 U.S.C. § 2701(a).

---

[30] It is important to note, that Defendants illegally accessed, altered, and deleted data from Mr. von der Schmidt's computer and cellphones, and other personal devices up to and after the date of his resignation from the Firm. Mr. Blackburn made several criminal referrals on behalf of Plaintiffs to the following agencies: NYS Attorney General; NJS Attorney General; United States Securities Exchange Commission; United States Department of Homeland Security; United States Cybersecurity and Infrastructure Security Agency; US Attorney's Office Southern District of New York; US Attorney's Office District of New Jersey; and the United States Federal Bureau of Investigation. (**Exhibit A**).

217.     Section 2701 prohibits intentional accessing of stored electronic information by those without authorization or in excess of authorization.  In order for there to be "intentional" access in excess of authorization to be a crime and civilly actionable, the offender must have obtained access to private files without authorization.  *Sherman & Company*, 94 F. Supp.2d at 821.

218.     As detailed above, ECPA Section 2701 applies to Defendants' actions because Defendants obtained access to, and altered, Plaintiffs' data. The Plaintiffs allege that the Firm was not provided with permission to access their electronic data.  Section 2701 does not apply with respect to conduct authorized. . . by the person or entity providing a wire or electronic communication service[.] 18 U.S.C. § 2701(c)(1).  Plaintiffs allege that the Firm "knowingly accessed and altered data on their personal cellphones, laptops, and other electronic devices."

219.     The Defendant's conduct was intentional, willful, deliberate, and in callous disregard of Plaintiffs' rights.  As a result of Defendant's actions, the Plaintiffs have suffered and will continue to suffer economic and non-economic harm. Because of the Defendant's discrimination and retaliation, the Plaintiffs are entitled to all legal and equitable remedies available under the law.

**COUNT IV**
**AS FOR THE FOURTH CAUSE OF ACTION**
**CONSTRUCTIVE DISCHARGE**
**(On behalf of Mr. von der Schmidt against Morgan Stanley)**

220.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-219.

221.     A constructive discharge claim requires a showing that "an employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Ingrassia v. Health and Hosp. Corp.*, 130 F. Supp. 3d 709, 724 (E.D.N.Y. 2015) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). An employee must show that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign... [and that] he actually resigned." *Richard v. N.Y.C. Dep't of Educ.*, No. 16-CV-957(MKB), 2017 U.S. Dist. LEXIS 50748, 2017 WL 1232498, at *13 (E.D.N.Y. March 31, 2017) (internal quotation marks omitted) (quoting *Green v. Brennan*, 578 U.S. 547, 136 S.Ct. 1769, 1777, 195 L. Ed. 2d 44 (2016)).

222.     An employee plaintiff is not required to prove that h[is]er employer intended to cause h[is]er resignation but must show that the Defendant's actions were deliberate.  See *Murdaugh v. City of New York*, No. 10-Civ-7218(HB), 2011 U.S. Dist. LEXIS 23333, 2011 WL 798844. *Knight v. MTA N.Y.C. Transit Auth.*, No. 19 CV 1428 (PKC)(LB), 2021 U.S. Dist. LEXIS 187672, at *25-26 (E.D.N.Y. September 28, 2021).

<u>DEFENDANTS CREATE AN INTOLERABLE WORK ENVIRONMENT</u>

223.     As detailed above, the Firm and their agents created an intolerable working environment throughout Mr. von der Schmidt's employment. Mr. von der Schmidt experienced the following:

   a.  Retaliation after exposing Hornbach's racist rants and unprofessional behavior,

   b.  Isolation in an act of retaliation after returning from ADA disability leave, and

   c.  Cyberattacks and hacking of his and Ms. Ngo's personal devices.

224.     After raising concerns about the aforementioned acts, Mr. von der Schmidt was ignored by Gorman, McCool, Tirupattur, and Bound. As a direct result of the onslaught of cyberattacks and hacking attempts, Mr. von der Schmidt moved out of his home and temporarily relocated to New Jersey with his family. Despite these moves, Defendant persisted with their actions, and Mr. von der Schmidt was left with no option other than to resign.

<u>MR. VON DER SCHMIDT ATTEMPTED TO MAINTAIN HIS RESOLVE AND CONTINUE WORKING, BUT THE CYBER ATTACK AND INTENTIONAL ISOLATION FROM HIS COLLEAGUES MADE EXECUTING HIS ROLE IMPOSSIBLE</u>

225.     Here, any objective, reasonable person in Mr. von der Schmidt's position would have resigned if faced with intentional isolation from their work colleagues. As detailed above, Mr. von der Schmidt's job required him to interact with colleagues across the world. One way Mr. von der Schmidt could do that was through Bloomberg Messenger and Microsoft Teams.  As stated above, upon his return to work from ADA-protected disability leaves, Mr. von der Schmidt was only given access to Skype messenger, a system that was phased out of the Firm. The remaining essential platforms (Bloomberg Messenger and Microsoft Teams) were deliberately withheld by McCool (with the knowledge of Bound as he was copied on relevant emails).

<u>MORGAN STANLEY'S ACTIONS WERE DELIBERATE</u>

226.     Here, as evidenced by the emails Mr. von der Schmidt sent to HR, of which both Bound and McCool were aware, Mr. von der Schmidt requested access to be reinstated to all of the necessary platforms to execute the essential functions of his position and the Firm ignored him.  From the date of his return to the date of his resignation, Mr. von der Schmidt was not given access to Bloomberg Messenger and Microsoft Teams.  McCool oversaw giving Mr. von der Schmidt access to the necessary platforms to execute the essential functions of his position. As evidenced by several emails, McCool ignored Mr. von der Schmidt's requests and elected not to provide him with the necessary access.

227.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

**COUNT V**
**AS FOR THE FIFTH CAUSE OF ACTION**
**VIOLATION OF THE NYSHRL AND NYCHRL**
**(On behalf of Mr. von der Schmidt against Defendants)**

228.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-227.

229.     The New York State Human Rights Law (*see* Executive Law § 296) prohibits discrimination in employment on the basis of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status (*see* Executive Law § 296[1][a]).  To establish a prima facie violation of this provision, a plaintiff must show at trial that (1) he or she is a member of a protected class, (2) he or she was qualified to hold the subject position, (3) he or she was terminated from employment or suffered another adverse employment action, and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination (*see Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305, 819 N.E.2d 998, 786 N.Y.S.2d 382; *Cotterell v State of New York*, 129 AD3d 653, 654, 10 N.Y.S.3d 558).  *D'Agostino v. MMC E., LLC*, 2020 NY Slip Op 03381, ¶ 2, 184 A.D.3d 719,

721, 125 A.D.3d 751, 721, 125 N.Y.S.3d 751, 753 (App. Div.).

## MR. VON DER SCHMIDT IS A MEMBER OF A PROTECTED CLASS

230.    As detailed above, Mr. von der Schmidt is a Hispanic male, and as a Hispanic male, Mr. von der Schmidt is a member of the minority protected class.

## MR. VON DER SCHMIDT WAS QUALIFIED FOR HIS POSITION AS VICE PRESIDENT IN GLOBAL RESEARCH

231.    Here, as evidenced from January 14, 2021, compensation call, Hornbach referred to Mr. von der Schmidt's GMC publication as "best in class;" Mr. von der Schmidt was awarded a $150,000.00 compensation bonus for the fiscal year 2020, and Mr. von der Schmidt was promised a promotion to Executive Director at the end of the year.

## MR. VON DER SCHMIDT SUFFERED AN ADVERSE EMPLOYMENT ACTION

232.    Here, as evidenced by a recorded call the week of March 21, 2022, the Firm's attorney Rosenstein conceded that the Firm retaliated against Mr. von der Schmidt because Mr. von der Schmidt raised concerns surrounding Hornbach's Chinese and Muslim bigotry.

233.    In addition to their admission, the Firm and Hornbach deliberately stripped Mr. von der Schmidt of the tools needed to execute the essential functions of his job by refusing to provide him with the same resources (as detailed above) afforded to his colleagues.

234.    In addition to refusing to provide Mr. von der Schmidt with the necessary resources, the defendants gave Mr. von der Schmidt a $10,000 bonus for the fiscal year ending 2021 (down $140,000 from the prior year's bonus), and they reneged on their promise to promote Mr. von der Schmidt to Executive Director.

## THE ADVERSE ACTION OCCURRED UNDER CIRCUMSTANCES GIVING RISE TO AN INFERENCE OF DISCRIMINATION

235.    Here, as detailed above, the temporal proximity between the $150,000 bonus, the promise to be promoted to Executive Director, and being referred to as "Best in Class" vs. Mr. von der Schmidt raising concerns about Hornbach's bigotry and the defendants admitted acts of retaliation is so close that it removes all doubt of discriminatory intent.

236.    The Defendants' conduct was intentional, willful, deliberate, and in callous

disregard for Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

### COUNT VI
### AS FOR THE SIXTH CAUSE OF ACTION
### Retaliation under NYCHRL and NYSHRL
### (On behalf of Mr. von der Schmidt against Defendants)

237.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-236.

### RETALIATION UNDER NYSHRL

238.     To state a *prima facie* case, Plaintiff must allege (1) that he participated in a protected activity, (2) that his participation was known to his employer, and (3) that his employer, after that, subjected him to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ 02512 (CM), 2022 U.S. Dist. LEXIS 31075, at *29 (S.D.N.Y. February 22, 2022).

### MR. VON DER SCHMIDT PARTICIPATED IN A PROTECTED ACTIVITY

239.     As detailed above, Mr. von der Schmidt participated in protected activity when he raised concerns about Hornbach's anti-Chinse and Muslim bigotry.

### DEFENDANTS KNEW OF MR. VON DER SCHMIDT'S PARTICIPATION IN A PROTECTED ACTIVITY

240.     Here, as detailed above, defendants were made aware of Mr. von der Schmidt's participation in a protected activity because Mr. von der Schmidt cooperated with Human Resources' sham investigation into Hornbach's bigotry and behavior.

### MATERIALLY ADVERSE EMPLOYMENT ACTION

241.     Here, as detailed above, Mr. von der Schmidt was the victim of relentless acts of retaliation:

a.  Denied equal research associate assistance in researching and writing the GMC,

b.  Denied a promotion to Executive Director after being promised a promotion before reporting Hornbach's bigotry,

c.  Received a $10,000 bonus after being characterized as "Best in Class" and receiving a $150,000 bonus,

d.  Heightened scrutiny of Mr. von der Schmidt's work product in comparison to his colleagues.  Defendants punished Mr. von der Schmidt for publishing the GMC "late" while allowing several of Mr. von der Schmidt's colleagues to publish after 7 pm, and

e.  On a recorded call, the Defendant's counsel, Rosenstein, admits that the defendants retaliated against Mr. von der Schmidt.

## CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE EMPLOYMENT ACTION

242.     Here, as detailed above, the temporal proximity between the $150,000 bonus, the promise to be promoted to Executive Director, and being referred to as "best in class" vs. Mr. von der Schmidt raising concerns about Hornbach's bigotry and the defendants admitted acts of retaliation is so close that it removes all doubt of discriminatory intent.

## **RETALIATION UNDER NYCHRL**

243.     The elements of retaliation claims brought against employers under § 1983 or the NYSHRL mirror those under Title VII.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).  By contrast, NYCHRL claims "must be analyzed separately and independently from federal and state discrimination claims." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112-13 (2d Cir. 2013). The NYCHRL's retaliation provision must be interpreted broadly and provides liability for conduct not covered by its federal and state counterparts.  *Campo v. City of N.Y.,* No. 19-CV-04364 (NGG) (SJB), 2022 U.S. Dist. LEXIS 60288, at *18 (E.D.N.Y. March 31, 2022).

244.     The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice ... to retaliate or discriminate in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin.  Code § 8-107(7).  "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citation omitted).

<u>ENGAGED IN PROTECTED ACTIVITY</u>

245.     As detailed above, Mr. von der Schmidt participated in protected activity when he raised concerns about Hornbach's anti-Chinse and Muslim bigotry.

<u>MR. VON DER SCHMIDT HAD A GOOD FAITH BELIEF THAT
HORNBACH'S ACTIONS WERE UNLAWFUL</u>

246.     The plaintiff "need not prove that her underlying complaint of discrimination had merit but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

247.     As detailed above, by reporting Hornbach's bigotry Mr. von der Schmidt sacrificed his career in standing up for his Chinese-American colleagues, citizens of the People's Republic of China, and his Muslim colleagues.

248.     As the manager of several Chinese employees, Hornbach was in the position to allow his bigotry to detrimentally impact their compensation and careers. Mr. von der Schmidt's motivation for reporting Hornbach's behavior was to shine a light on his

misconduct and callous discrimination, which is evident in the clear pay disparity experienced by his Chinese and other Asian colleagues.

249.     As detailed above, when this issue was raised to the Firm's attorney, Sullivan, he ignored NYS and NYC equal pay laws when he downplayed the Chinese employee's pay disparity by blaming it on "market conditions."

## MATERIALLY ADVERSE EMPLOYMENT ACTION

250.     Here, as detailed above, Mr. von der Schmidt was the victim of relentless acts of retaliation:

   a.  Denied equal research associate assistance in researching and writing the GMC,

   b.  Denied a promotion to Executive Director after being promised a promotion prior to reporting Hornbach's bigotry,

   c.  Received a $10,000 bonus after being characterized as "Best in Class" and receiving a $150,000 bonus,

   d.  Heightened scrutiny of Mr. von der Schmidt's work product in comparison to his colleagues.  Defendants punished Mr. von der Schmidt for publishing the GMC "late" while allowing several of Mr. von der Schmidt's colleagues to publish after 7 pm, and

   e.  On a recorded call, the Defendant's counsel, Rosenstein, admits that the defendants retaliated against Mr. von der Schmidt.

## CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE EMPLOYMENT ACTION

251.     Here, as detailed above, the temporal proximity between the $150,000 bonus, the promise to be promoted to Executive Director, and being referred to as "Best in class" vs. Mr. von der Schmidt raising concerns about Hornbach's bigotry and the defendants' admitted acts of retaliation is so close that it removes all doubt of discriminatory intent.

252.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.

Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

**COUNT VII**
**AS FOR THE SEVENTH CAUSE OF ACTION**
**Invasion of Privacy under Common Law Intrusion Upon Seclusion**
**New York and New Jersey**
**(On behalf of Plaintiffs against Morgan Stanley)**

253.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-252.

254.     New Jersey recognizes the common law privacy tort of "intrusion upon seclusion." *Soliman v. Kushner Cos., Inc*., 433 N.J. Super. 153, 77 A.3d 1214, 1224 (N.J. Sup. Ct. App. Div. 2013) (quoting *Hennessey v. Coastal Eagle Point Oil Co*., 129 N.J. 81, 609 A.2d 11, 17 (N.J. 1992)).   This tort imposes civil liability for invasion of privacy on "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Hennessey, 609 A.2d at 17 (quoting Restatement (Second) of Torts, § 652B).  The privacy invasion "need not be physical"; indeed, it may arise from "some other form of investigation or examination" into an individual's "private concerns." See id. To succeed with a claim for intrusion upon seclusion, a plaintiff "must establish that he possessed a reasonable expectation of privacy" in the affairs or concerns intruded upon.  See *G.D. v. Kenny*, 205 N.J. 275, 15 A.3d 300, 320 (N.J. 2011).

255.     As detailed above, the Plaintiffs were forced to take refuge with family in New Jersey due to the Defendants' relentless invasion of privacy. While in New Jersey, the defendants continued to engage in acts of invasion of privacy.

DEFENDANTS INTRUDED UPON THE SOLITUDE OR SECLUSION OF PLAINTIFFS'
PERSONAL AFFAIRS

256.     Here, as detailed above, on multiple occasions beginning no later than April 9, 2022, to present, the Firm, either directly and or indirectly through their authorized agents, invaded, accessed, altered, and destroyed data stored on multiple personal computer and cellphone devices belonging to Ms. Ngô and Mr. von der Schmidt.

## PLAINTIFFS NGÔ AND VON DER SCHMIDT POSSESSED A REASONABLE EXPECTATION OF PRIVACY

257.     Plaintiffs had a reasonable expectation of privacy not to have the data on their cellphones and computers invaded, accessed, altered, and destroyed by Defendants directly and indirectly by their authorized agents.

258.     As an employee of Defendant, Mr. von der Schmidt often worked from home on personal and corporate devices. Mr. von der Schmidt did not grant the Defendants permission to access his non-work devices.

259.     On the other hand, Ms. Ngô is not an employee of the Defendants.  Ms. Ngô did not work on any of Defendants' corporate devices. Ms. Ngô exclusively used her personal devices.  Ms. Ngô did not have a relationship with Defendant and was an innocent bystander and victim of Defendants' cyber intrusion targeting Mr. von der Schmidt's personal devices.

260.     Mr. von der Schmidt and Ms. Ngô both had personal information, files, and documents pursuant to this case, as well as images and calendar entries that were altered and/or deleted.

261.     When agreeing to work from home, Mr. von der Schmidt did not anticipate that the defendants would intentionally engage in a sophisticated phishing and tunneling attack on his personal devices.

## PLAINTIFFS WERE HARMED

262.     As a direct and proximate cause of the Defendant's invasion of privacy, the Plaintiffs have suffered financial and psychological harm, the details of which can be provided under seal.

263.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Ms. Ngô and Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiffs Ngô and von der Schmidt have suffered and will continue to suffer both economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt and Ms. Ngô are entitled to all legal and equitable remedies available under the law.

## COUNT VIII
## AS FOR THE EIGHTH CAUSE OF ACTION
## The New Jersey Computer Related Offenses Act
### (On behalf of Plaintiffs against Morgan Stanley)

264.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-263.

265.     The CROA is an anti-computer-hacking statute that provides a civil remedy to "[a] person or enterprise damaged in business or property as the result of" certain enumerated actions. N.J. Stat. Ann. 2A:38A-3; see also *Marcus v. Rogers*, 2012 N.J. Super. Unpub. LEXIS 1523, 2012 WL 2428046, at *4 (N.J. Sup. Ct. App. Div. June 28, 2012).

    a.  The purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data, database, computer program, computer software, or computer equipment existing internally or externally to a computer, computer system, or computer network;

    b.  The purposeful or knowing, and unauthorized altering, damaging, taking, or destroying of a computer, computer system, or computer network;

    c.  The purposeful or knowing, and unauthorized accessing or attempt to access any computer, computer system, or computer network;

    d.  The purposeful or knowing, and unauthorized altering, accessing, tampering with, obtaining, intercepting, damaging, or destroying of a financial instrument; or

    e.  The purposeful or knowing accessing and reckless altering, damaging, destroying, or obtaining of any data, database, computer, computer program, computer software, computer equipment, computer system, or computer network.

### PLAINTIFFS LOST USE OF THEIR COMPUTERS AND CELLPHONES

266.     Here, as detailed above, the Plaintiffs lost the use of their personal cellphones and computer devices as a direct and proximate cause of the Defendants' relentless acts of cyber exploitation.

267.     Upon information and belief, Defendants knew or should have known that accessing Plaintiffs' personal devices was an illegal invasion of their privacy.

268.     Upon information and belief, Defendants knew or should have known that Plaintiffs did not provide them with permission to invade, access, and/or alter data on their personal devices.

269.     Upon information and belief, as detailed above, Defendants purposefully or knowingly altered data on the personal computer and cellphone devices of Plaintiffs.

<u>PLAINTIFFS WERE HARMED</u>

270.     As a direct and proximate cause of the Defendants' invasion of privacy, the Plaintiffs have suffered financial and psychological harm, the details of which can be provided under seal.

271.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt and Ms. Ngô have suffered and will continue to suffer both economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt and Ms. Ngô are entitled to all legal and equitable remedies available under the law.

**COUNT IX**
**AS FOR THE NINTH CAUSE OF ACTION**
<u>**Intentional Infliction of Emotional Distress**</u>
**(On behalf of Mr. von der Schmidt against Morgan Stanley)**

272.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-271.

273.     Under New York Law, [IIED] has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Saleh*, 2013 U.S. Dist. LEXIS 142207, 2013 WL 5439140, at *11. *Tigano v. United States*, 527 F. Supp. 3d 232, 246 (E.D.N.Y. 2021).

<u>EXTREME AND OUTRAGEOUS CONDUCT</u>

274.     Here, as detailed above Defendants engaged in several acts of extreme and outrageous conduct.  The following are a sample of the extreme and outrageous conduct visited upon Mr. von der Schmidt:

    a.  Denied equal research associate assistance in researching and writing the GMC,

    b.  Denied a promotion to Executive Director after being promised a promotion before reporting Hornbach's bigotry,

    c.  Received a $10,000 bonus after being characterized as "Best in Class" and receiving a $150,000 bonus,

    d.  Heightened scrutiny of Mr. von der Schmidt's work product in comparison to his

72

colleagues.  Defendants punished Mr. von der Schmidt for publishing the GMC "late" while allowing several of Mr. von der Schmidt's colleagues to publish after 7 pm,

e.   Intentional isolation from members of his team upon his return to work after a disability leave,

f.   Denial of his requested accommodations upon return from disability leave, and

g.   Unauthorized access and exploitation of his and Ms. Ngô's personal computers, cellphones, and other electronic devices.

### DEFENDANTS INTENDED TO CAUSE MR. VON DER SCHMIDT HARM

275.     It is evident from a recorded call that the Defendant's counsel, Rosenstein, admits that the defendants retaliated against Mr. von der Schmidt after he reported Hornbach's bigotry.  Rosenstein's recorded admission is a concession to Defendant's desire to cause Mr. von der Schmidt harm.

### THERE WAS A CAUSAL CONNECTION BETWEEN DEFENDANT'S CONDUCT AND MR. VON DER SCHMIDTS INJURIES

276.     As detailed above, the temporal proximity between Mr. von der Schmidt reporting Hornbach's bigotry, his attempted return to work after a disability leave, and the Firm's intentional acts detailed in the preceding paragraphs are so close that it removes all doubt of harm visited upon Mr. von der Schmidt and Ms. Ngô.

### MR. VON DER SCHMIDT SUFFERED SEVERE EMOTIONAL DISTRESS

277.     As evidenced by Mr. von der Schmidt and Ms. Ngô's medical provider's medical records, Mr. von der Schmidt and Ms. Ngô have suffered immensely. The details of Mr. von der Schmidt and Ms. Ngô's mental and emotional distress can be revealed under seal.

278.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Ms. Ngô and Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiffs von der Schmidt and Ngô have suffered and will continue to suffer both economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt and Ms. Ngô are entitled to all legal and equitable remedies available under the law.

**COUNT X**
**AS FOR THE TENTH CAUSE OF ACTION**
**Negligent Hiring, Retention**
**(On behalf of Mr. von der Schmidt against Morgan Stanley)**

279.      Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-278.

280.      A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others (*see Gonzalez v City of New York*, 133 AD3d 65, 67-68, 17 N.Y.S.3d 12 [1st Dept 2015]; Restatement [Second] of Agency § 213, Comment *d*).   The cause of action does not need to be pleaded with specificity (*Doe v Enlarged City Sch. Dist. of Middletown*, 195 AD3d 595, 596, 144 N.Y.S.3d 639 [2d Dept 2021]; *see JG v Goldfinger*, 161 AD3d 640, 641, 79 N.Y.S.3d 1 [1st Dept 2018]).  *Waterbury v. N.Y.C. Ballet, Inc*., 2022 NY Slip Op 02890, ¶ 4, 205 A.D.3d 154, 160, 168 N.Y.S.3d 417, 423 (App. Div.).

THE FIRM KNEW OF HORNBACH'S HARMFUL PROPENSITIES

281.      As detailed above, Hornbach had been compelled to issue a public apology when his unprofessional conduct was directed at Managing Director Sheets in front of a large internal audience. This apology stemmed from Hornbach's rude remarks in an internal research discussion over email.

282.      Additionally, pursuant to the Firm's internal policy, managers are privy to the Bloomberg Messenger and Internal Messenger logs of all of their subordinates.   Upon information and belief, all of these logs are monitored frequently, and managers are alerted to the internal risk of any troubling messages sent over these platforms by their subordinates.

283.      Upon information and belief, McCool, Tirupattur, Bound, Pick, and Gorman were aware of Hornbach's unprofessional, racist, xenophobic, and sexist comments, including his remarks concerning the People's Republic of China as well as those pertaining to a prominent female executive, Ellen Zentner.   They were made aware of this by Mr. von der Schmidt directly and indirectly, as well as through the Firm's internal Risk Monitoring Program.

74

284.       After learning of Hornbach's deplorable behavior, McCool, Gorman, Tirupattur, Bound, and Pick ignored it, placing Mr. von der Schmidt, the Chinese subordinates of Hornbach, as well as other minorities or anyone willing to speak up in harm's way.

285.       The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

## **JURY DEMAND**

Plaintiffs demand a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

    a.  For past, present, and future general damages in an amount to be determined at trial;

    b.  For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

    c.  Any appropriate statutory damages;

    d.  For costs of suit;

    e.  For interest as allowed by law;

    f.  For attorney's fees;

    g.  The cause of action authorized by any appropriate punitive or exemplary damages against Defendant Morgan Stanley, Defendant Hornbach, and Defendant McCool;

    h.  For such other and further relief as the Court may deem proper.

Dated: September 26, 2022
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.