# EXHIBIT # A



# T. A. BLACKBURN LAW

TYRONE A. BLACKBURN

---

MEMBER OF
NY & NJ BAR

---

FEDERAL MEMBERSHIP
EDNY, SDNY, NDNY & DNJ

---

1242 EAST 80TH STREET, 3RD FLOOR
BROOKLYN, NY 11236

July 8, 2022

Honorable Merrick Brian Garland
United States Attorney Generals' Office
950 Pennsylvania Avenue NW
Washington, DC 20530

**Re: Criminal Referral**

Dear Mr. Garland:

My firm represents Edward von der Schmidt ("Mr. von der Schmidt"), a former employee of Morgan Stanley ("MS"). Mr. von der Schmidt is a victim of MS's inexplicable cyberattacks, invasion of privacy, and harassment. Not only has Mr. von der Schmidt fallen victim to MS's cyberattacks, but his partner, Keanna Ngo ("Ms. Ngo"), and his family have also experienced these attacks since Mr. von der Schmidt remotely returned to work on April 6, 2022.

MS's actions directly violate Title I, Title II, and Title III of the Electronic Communications Privacy Act of 1986 (ECPA). MS did not have a legitimate business purpose for violating Mr. von der Schmidt and Ms. Ngo's privacy and did not have their consent. As detailed in the attached brief, MS accessed Mr. von der Schmidt and Ms. Ngo's home network and personal devices after Mr. von der Schmidt remotely returned to work on April 6, 2022. Mr. von der Schmidt utilized his home network and his personal (non-MS issued) devices to work remotely. Finally, Ms. Ngo and Mr. von der Schmidt's family are not employees of MS.

The officers of MS that ordered and orchestrated the ECPA violation Mr. von der Schmidt and his family experienced are Denise McCool ("McCool"), Managing Director and Global Chief Operating Officer Research at Morgan Stanley, and Matthew Hornbach ("Hornbach"), Managing Director, and Global Head of Macro Strategy at Morgan Stanley.

We request that your office open a criminal probe of MS, Ms. McCool, and Mr. Hornbach under the ECPA and any other applicable statute. My clients are prepared to fully cooperate with your office to ensure that MS and its officers are brought to justice.

**<u>Summary of claims</u>:**
Beginning January 2021, Mr. von der Schmidt raised concerns about Hornbach's unethical, anti-Asian, anti-Muslim, and questionable activities. Mr. von der Schmidt's concerns led to an internal

 



# T. A. Blackburn Law

investigation. As a result of the internal investigation, Mr. von der Schmidt was subject to relentless retaliation, which was admitted to by MS's legal representation. MS's retaliation caused Mr. von der Schmidt to take medical leave.

Upon returning to work remotely on April 6, 2022, Mr. von der Schmidt was isolated from his colleagues at the direction of McCool and Hornbach. Mr. von der Schmidt had limited or no systems access, intentionally withheld by McCool and Hornbach.

McCool and Horbach violated a preservation notice sent to MS by this writer on November 1, 2021. McCool and Hornbach also orchestrated or ordered the deletion and tampering of Mr. von der Schmidt's Outlook calendar entries and other items. These actions by MS, McCool, and Hornbach equate to the destruction of evidence.

MS, McCool, and Hornbach engaged in unauthorized access to Mr. von der Schmidts' local network, personal computer, and personal cellphone. Ms. Ngo's and Mr. von der Schmidt's cellphones and laptops suffered multi-vector phishing and tunneling attacks within days of Mr. von der Schmidt's return to work. Files and documents on Mr. von der Schmidt's laptop, which he used when he returned to work, were accessed remotely by systems that do not belong to Mr. von der Schmidt and Ms. Ngo.

The temporal proximity between Mr. von der Schmidt engaging in protective activity, and the onslaught of privacy violations and retaliation he experienced upon his brief return to work, is so close that it removes all doubt of wrongdoing on behalf of MS, McCool, and Hornbach.

<u>**Conclusion**</u>:

This matter's breadth and complexity require your jurisdictional powers and resources to tackle and end the stream depravity committed by MS, McCool, and Hornbach. My clients and their witnesses are prepared to speak with investigators and prosecutors from your office and provide you with irrefutable evidence that substantiates their allegations.

Thank you for your time and consideration. As stated above, **<u>please see attached</u>** a brief that details the activities outlined above.

Kind regards,

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.

CC:
Attorney General for the State of New York,
Attorney General State of New Jersey,

## T. A. BLACKBURN LAW

United States Securities and Exchange Commission,
United States Department of Homeland Security,
United States Cybersecurity and Infrastructure Security Agency,
United States Attorney's Office Southern District of New York,
United States Attorney's Office District of New Jersey, and
United States Federal Bureau of Investigation.

Background

The Global Macro Commentary ("GMC") was the most cumulatively read publication in Global Research at Morgan Stanley. After being hired in March 2019 to assume responsibility for the daily Treasury Market Commentary ("TMC"), Mr. von der Schmidt ("Eddie") was charged with the creation, management, and production of the GMC in December 2019 by Matt Hornbach, newly appointed Head of Global Macro Strategy and member of Morgan Stanley's Global Investment Committee. In contrast to the TMC, which was authored in conjunction with the US Economics team, the GMC comprised contributions from interest rates, foreign exchange ("FX"), and emerging markets ("EM") strategists based in Tokyo, Hong Kong, London, and New York (in addition to submissions from US Economics colleagues).

The Global Macro Commentary derived from a synthesis of three distinct dailies in order to provide the firm and its research clients with a comprehensive account of a given day's events and noteworthy observations regarding macroeconomic and geopolitical phenomena germane to markets. As such, production of the GMC involved a significant amount of collaboration with team members as well as Supervisory Analysts ("SAs"), including copy-editing and fact-checking responsibilities for up to 5,000 words of submitted material. To say nothing of the extensive personal research required to compose the document's master summary, stewardship of the GMC also entailed working with the Technology team as well as members of the Morgan Stanley Control Group ("CG"); the latter provided final approval for each GMC before dissemination.

Given the prominence of readership in Asia, publication timing remained a point of consternation. However, in his capacity as Eddie's functional manager, Matt routinely neglected to address operational constraints or to furnish adequate support resources to address his

own demands. Meanwhile, Eddie composed 284 of 285 publications from
the GMC's inception on January 6, 2020 to April 18, 2021, when additional
primary authors were incorporated for Monday and Thursday. After reneging
on a commitment to put Eddie forward for promotion (upon information and
belief, this was orchestrated on Matt's behalf by Denise McCool, COO of
Global Research), Matt responded with hostility to an agreed-upon change
in the GMC's email sender address (initially on September 14, 2020).
Notably, Eddie had ghostwritten under Matt's name for the preceding
18 months.

Matt's disposition toward Eddie continued to shift antagonistically
through the Fall and into the Winter of 2021. He made a point of deriding
Eddie's observations concerning election and COVID risks and retaliated
in a January 28 call (brought forward from a previously scheduled monthly
call on February 4) after a presumed rebuke from Vishy Tirupattur, which
had followed a January 20 conference call centered on the CG approval
process and that highlighted Matt's abdication of supervisory responsi-
bilities. With Guneet Dhingra, Head of US Rates Strategy and Eddie's
nominal manager, assuming a more adversarial posture in tandem with Matt,
an Institutional Investor team omission and Matt's charged response to a
clerical scheduling update (which he had approved on multiple occasions)
precipitated Eddie's outreach to Vishy on June 18 in order to discuss
Matt's unprofessional and inappropriate comments and conduct.

Declining to meet with Eddie before his trip to attend a wedding the
following week with his partner, Ms. Ngo (Keanna), Vishy instead proposed
that they convene upon Eddie's return. In the interim, Guneet brought
forward a quarterly update call scheduled in March to Monday, June 28,
thus precluding an opportunity for Eddie to discuss his concerns with
Vishy prior to his mid-year review. Notwithstanding the glowing reception

and substantial readership that the GMC had garnered, nor performance ratings that exceeded VP averages, Guneet chose to focus on publication timing discrepancies that failed to account for differential analyst support and ended an otherwise constructive performance assessment with a cryptic remark about "let[ting] the numbers do the talking" at year-end. Later that week, Eddie espoused his concerns about Matt's comments (including bigoted remarks and personal slights) as well as Matt's unprofessional and at times abusive behavior to Vishy, who characterized the allegations as "very serious" over coffee. Vishy asked Eddie whether he desired to remain in research before personally initiating an HR inquiry.

Having previously been introduced to Eddie by virtue of her involvement in coordinating an internal mentorship pilot, Katie D'Antonio (the daughter of a former member of the Firm's management committee) contacted Eddie in early July 2021; this outreach coincided with Matt's impromptu vacation. Eddie relayed Matt's conduct and inappropriate comments to Katie on an introductory call, and he later composed a comprehensive account of his experience within research for the benefit of the investigation into Matt's behavior to date. The supporting documentation, which included representative email, Skype IM, and Bloomberg IB correspondence, had been aggregated and saved transparently on Eddie's remote desktop prior to being uploaded to Bloomberg and subsequently downloaded at home. Such precautions were taken in light of Matt's active reading of Eddie's work emails and the attendant risk of retaliation. This motivation was articulated to Katie in an email on July 20, in which Eddie authored a thorough background and attached a compressed folder ("Correspondence.zip"). This attachment included various documents and conversation histories in support of Eddie's assertions, albeit nothing of a sensitive nature.

Forwarding this summary to Keanna, his siblings and mother, as well
as a trusted friend out of concern stemming from HR's perfunctory
response, Eddie also sent a copy from his personal Gmail account to
Vishy on July 23, 2021.

After granting Eddie time off and repeatedly emphasizing the Firm's
health resources, Katie communicated that her findings identified no
wrongdoing on Matt's part; she even saw "nothing racy" about Matt's
mocking of Chinese accents. Instead, Katie shifted the conversation
toward Eddie's personal circumstances and falsely characterized the HR
inquiry as having been raised by Eddie directly in response to performance
criticism, albeit conceding shortly thereafter that it was in fact
Vishy who had initiated the proceedings. On this call, Eddie appraised
Katie of his extensive documentation efforts and even referenced call
recordings. Eddie maintained that Matt's conduct had been unacceptable
and reiterated his demand for an apology in writing, a change in manager,
and independent oversight of his year-end compensation and career
progression. Pressed, Katie passed off the investigation to a colleague
in Employee Relations with whom she had been collaborating, Lisa Sweberg.

Eddie forwarded the "Correspondence.zip" email to Lisa upon being
introduced at the end of August. When asked directly whether Eddie should
have representation present for their first call, Lisa (a lawyer herself)
indicated that she did not believe this would be necessary as it would be
fact-finding in nature; she omitted reference to her prior involvement in
the investigation that had also included the Head of Institutional Equities
and Research Human Resources, Patty Hynes. His father's sudden hospitali-
zation for multiple strokes spurred another round of both managers and
HR representatives repeatedly encouraging Eddie to take personal leave and
pursue the Firm's mental health resources, with Employee Relations'

investigation as yet unresolved. Further interaction with Matt prompted
Eddie to contact Lisa once again in late September to ask about the
status of her inquiry; a call was scheduled for the afternoon of
September 30.

Lisa ultimately reaffirmed HR's previous findings, namely that
Matt's conduct and comments (including various prejudiced remarks that
she excused) did not warrant any apology and that the Firm believed it
unnecessary to change Eddie's reporting structure from Guneet to Matt
directly (thus preventing Eddie from reviewing Matt's performance at
year-end). Lisa dismissed Eddie's fears of reprisal, opting to mis-
characterize or fictionalize prior events in order to suit a budding
Firm narrative that Eddie was a disgruntled employee who had responded
poorly to performance feedback (this notwithstanding his being the
most cumulatively read primary author in Global Research). Lisa referenced
Matt's false assertions vis-a-vis daily responsibilities and publication
timing expectations, going so far as to demand that Eddie take unpaid
family leave given a purported inability to fulfill work obligations.
Here again Lisa raised the possibility of switching groups, reminded
Eddie of the Firm's family leave and health resources, and posited
that he should direct any concerns regarding retaliatory behavior to his
HR coverage person or Matt himself.

Matt alluded to that confidential findings call in penning an agg-
ressive missive the morning of October 4, copying Eddie's nominal manager
(Guneet). Matt re-framed the January 28 call in which he retaliated
against Eddie for comments made to Vishy as instead pertaining to
scheduled feedback, and he retroactively re-defined Eddie's work respons-
ibilities in a manner inconsistent with those that had prevailed for some
time. This hostile dialogue continued into Tuesday afternoon during

the GMC publication rush. With Friday's GMC publication cancelled
without explanation on Thursday, Vishy sent an unsolicited Zoom meeting
invitation on Friday morning for a videoconference to be held shortly
thereafter. Unable to accommodate the sudden request, Eddie voiced his
discomfort joining the call absent legal counsel. Vishy's email reply
stated that as Eddie had refused this meeting request, Vishy had attached
a formal letter of reprimand authored by Patty Hynes and requiring
immediate acknowledgment.

Advising Eddie of consequences up to and including termination and
reminding  him of his at-will employment in the context of alleged
conduct violations, the letter incorporated demonstrable mischaracter-
izations and falsehoods in what appeared to establish a precursor to
fire Eddie for a contrived set of causes. Notably, the Firm cited
Eddie's forwarding of the "Correspondence.zip" email to Lisa from his
personal email as an infraction, failing to reference the original
message sent to Katie on July 20 and then Vishy on July 23. Physically
overwhelmed by the stress stemming from the Firm's retaliation in
response to his participation in an HR investigation and voicing his
concerns about Matt's behavior to a supervisor (as per policy), Eddie
met with his therapist, Dr. Judith Lee, that afternoon and requested
Short Term Disability / FMLA leave the evening of October 8. At this
time, Eddie first spoke with his attorney, Tyrone Blackburn, Esq.

Within days of Eddie's leave (effective October 12), Matt revoked
the privilege (Lisa's diction) of having his name as the sender of
the Global Macro Commentary (to whom readership tracking metrics accrue)
by replacing it with his own on October 14 (despite having the publica-
tion go out under Eddie's name on Tuesday and Wednesday). This change
not only violated company policy regarding protected leave and against

retaliation for good-faith participation in conduct investigations, but it also represented an unambiguously public statement (considering readership's scope and engagement level) that implied Eddie's separation from the group. Eddie's mobile and remote log-in privileges were removed on October 22 after he had been copied on an email pertaining to GMC scheduling; the IT hotline informed him that this was due to an HR hold. Following MetLife's formal approval of his short-term leave, Eddie received voicemails from different numbers in addition to a personally addressed email from Arpan Parmar, a lawyer in Morgan Stanley's Legal Department. This outreach began October 26, and Patty Hynes left a voicemail for Eddie on November 1 instructing him to contact Arpan (as opposed to her directly) in order to resolve an urgent matter. Meanwhile, Matt privately conveyed to an equity sales colleague that Eddie's departure was medical in nature, which was relayed to a client (and Eddie's personal friend).

Upon receipt of a certified letter from Mr. Blackburn on November 3, which informed the Firm that he had been retained as Eddie's counsel and issued a preservation notice as well as instructions to refain from further direct contact with his client, Morgan Stanley requested that Eddie's Bloomberg Anywhere account be deactivated. The Firm also sought information on any materials transferred via the terminal software, specifically those related to "Correspondence.zip" as exhibited in an attached email. The account de-activation on November 4 de-linked Eddie's name and account from his published research and affiliation with Morgan Stanley, listing Eddie as a "TRIAL USER".

With Eddie's leave extended from November 22 into January, Arpan expedited delivery of a letter dated December 9 (Eddie's birthday) that alleged concerns related to the handling of confidential information.

Concurrent with a colleague's outreach to Eddie that conveyed his impression of a medically-related leave, Morgan Stanley's attorneys, including Dermot J. Sullivan, did not deny Matt's defamation of Eddie in conversations with Mr. Blackburn, proposing a two-track process wherein regulatory questions could be fielded in a future conference call in conjunction with the separate initiation of private settlement negotiations. Feigning detente, days later the Firm's lawyers proceeded to indirectly threaten Eddie with dismissal upon his return from protected leave, replete with a commensurate FINRA U5 disclosure. If Eddie did not accept a $75,000 buy-out, Morgan Stanley's lawyers assured Mr. Blackburn that his 2021 variable compensation award would be minimal and that Eddie would be terminated for cause based on an inability to perform his job functions and violations of the Firm's communication policies. Albeit ignored, this ultimatum was delivered as Eddie remained on leave and received treatment for uncomplicated Post-Traumatic Stress Disorder, the latter attributable to the Firm's prior and ongoing harassment.

With Keanna staying with her family out-of-state for the holidays, Eddie returned from visiting his father (from December 24 until January 2) to resume isolation in their midtown apartment after contracting COVID-19. Taking note of the dislodged KeyLink module and malfunctioning wall unit temperature control, Eddie catalogued GMC publication times in the wake of his full-time replacement assuming primary authoring responsibilities in December. His leave would be extended once again until early March, in light of his extended illness and difficulties brought on by Morgan Stanley's relentless retaliatory posture. Apropos, another important client of the firm as well as personal friend reached out in January after he "saw that [Eddie] left MS", despite Eddie's

remaining employed by the Firm. True to their word, Morgan Stanley awarded him a $10,000 bonus (the de facto minimum) as Matt claimed credit internally for the GMC's successes. Around the time that Eddie completed his best-efforts audio restoration and transcription of the September 30 findings call with Lisa (via Audacity and GoTranscript, respectively), and as Morgan Stanley sought to ascertain his return intentions, Dr. Lee asked Eddie whether he had considered any risks to his personal safety.

Return to Work

## Monday, February 28

· A MetLife packet is sent to Eddie that includes materials to apply
for Long-Term Disability benefits. On a prior call with an associated
health advocate, Gina Mango, Eddie maintained that he did not intend
to apply for LTD. On that same call, Gina shared that she had covered
mental health claims for Morgan Stanley employees for a long time, and
that Eddie would be "surprised" by how often others had voiced concerns
about inappropriate disclosure of their private medical information
at work

## Thursday, March 3

· A previously scheduled call with Arpan Parmar to go over "routine"
regulatory questions is cancelled

## Friday, March 4

· Eddie and Tyrone finish drafting their settlement demand letter.
When Eddie returns from an appointment with Dr. Lee that morning,
his apartment key fails to register a valid entry (as reflected in
River Place logs). The finalized demand letter is emailed as an attach-
ment to Dermot J. Sullivan, who immediately attempts to contact Tyrone
upon receipt

## Tuesday, March 15

· Gina emails Eddie to schedule a Citrix Webex conference to prepare
for his return to work, after a final leave extension had been granted
through March 27. Among the four time slots offered, Eddie elects
to meet virtually on Tuesday, March 22

Wednesday, March 16

· Amid ongoing conversations between Dermot and Tyrone, in which audio of Eddie's January 14, 2021 compensation call with Matt and Guneet is shared with the Firm and Dermot characterizes the initial settlement demand as "high", a senior executive invites Keanna and Eddie to spend the weekend at their home, away from the city

Friday, March 18

· Dermot demurs on settlement absent further information and materials backing Eddie and Tyrone's assertions. Consequently, Morgan Stanley is notified of their intention to file at the Equal Employment Opportunity Commission (EEOC). Dermot protests that any claim must be filed with FINRA, given that Eddie was subject to binding arbitration provisions

Monday, March 21

· Gina emails Eddie a courtesy reminder of their scheduled Webex appointment the following day on Monday morning

· In the early evening, Ira Rosenstein, Morgan Stanley's external counsel and Morgan Lewis partner, replies to Tyrone's Friday email notifying the Firm of an intention to file by categorically denying all allegations while excusing Matt's prejudiced comments

Tuesday, March 22

· A new point of contact at MetLife, Kim Christopher, reaches out to inform Eddie that Gina was "unexpectedly out of the office today". Preferring to speak with Gina given her prior assistance, Eddie indicates that he is content to try again the next day

### Wednesday, March 23

· Eddie contacts Kim to inquire as to Gina's call availability. Kim states that "Gina is out again today and is not sure if she will be back this week". Kim asks for a Thursday or Friday call; Eddie agrees to the former

· Tyrone emails Ira to remind him of Eddie's planned return to work on March 28

### Thursday, March 24

· Eddie calls Kim Christopher, who appears caught off guard when informed that Dr. Lee would be joining the discussion as well. Kim suggests that Eddie apply for another leave extension through April 16 in order to afford Morgan Stanley additional time to arrange accommodations, which were meant to include remote work provisions and a change in reporting structure, among others. Note that leave through April 16 at this juncture would have pushed Eddie into Long-Term Disability, almost certainly resulting in the legal termination of his employment

· Tyrone emails Ira to propose a mediation alternative

### Monday, March 28

· Dr. Lee receives a suspicious email pertaining to a 'OneDrive' document delivery from 'browndavehen@msn.com', displayed as 'drjudithlee'

### Tuesday, March 29

· Boo Jackson, a Principal Investigator for FINRA based in New Orleans, composes a letter demanding materials related to Eddie's July 20, 2021 email to HR ("Correspondence.zip") pursuant to FINRA Rule 8210 in

response to a Morgan Stanley filing. Assorted materials and personal account information are requested no later than March 12, 2022. Coincidentally, April 12 would have amounted to a two-week interval from the date of the letter, suggesting it may have been prepopulated earlier in March

· The letter's Addendum A - Request for Information concludes:

"We will not (1) entertain requests for confidential treatment of any information or documents the firm provides in response to this request; (2) give the firm notice of any subpoena or access request we receive that encompasses any such information or documents; or (3) undertake to return documents when this examination is completed."

· Thomas ("Tom") Nelli, a Senior Vice President leading FINRA examination teams, served as Regional Director overseeing FINRA's South Region, which included the New Orleans office. Tom previously worked as a Managing Director and high-ranking Compliance officer at Morgan Stanley, where he had spent the majority of his career

· FINRA's motto, displayed in the footer of its correspondence, is "Investor protection. Market integrity"

Wednesday, March 30

· Ira emails Tyrone soliciting an update regarding Eddie's return to work plans, claiming he had not heard back yet

· Gina emails Eddie to ask about his return to work plans

Thursday, March 31

· Dr. Lee informs her patients of a suspected email breach

· Eddie receives the letter from Boo Jackson, requesting materials

stemming from his July 20, 2021 "Correspondence.zip" email

· Ira emails Tyrone once more, writing, "my client hasn't heard from yours about a return..."

## Friday, April 1

· Ira informs Tyrone that Morgan Stanley rejected the settlement and mediation proposals, and that the Firm had agreed on Eddie returning to work on April 6

· Tyrone reiterates his intention to file a claim with the EEOC, drawing a rebuke from Ira and the insinuation that he may be sanctioned if the claim were not filed directly with FINRA instead

## Monday, April 4

· On or about this date, Eddie receives a letter from Shelly, a MetLife claims specialist, informing him that his LTD claim had been closed as per a telephone conversation on March 31; no such call took place

· Eddie emails 'Rescov' in order to prepare for his return to work. Katie D'Antonio responds, informing Eddie that his manager had been changed to Guneet and that his password may have since lapsed. Eddie's responsibilities no longer include his involvement with the Global Macro Commentary. Instead, Eddie is instructed to continue to work on a machine-learning project that he had conceived prior to his leave in October

## Tuesday, April 5

· Eddie contacts IT support in order to restore his remote login credentials. He is informed that his access was in fact revoked on

October 22 while being asked to restore his work-issued iPhone (thus wiping all stored data). The technician, based in Utah, instructs Eddie to change his Citrix display settings to accommodate his monitors' native resolution (as opposed to windowed mode)

·   Upon first logging in to MyDesk, a former employee's name appears before Eddie's name is displayed. Eddie discovers that he has only been granted limited systems access

·   Katie's email correspondence with Eddie continues (by way of Eddie's Gmail account), wherein she ignores Eddie's highlighting of the loss of standing and opportunity commensurate with his removal from the GMC. Katie justifies the latter by contending that this arrangement obviates the need to interact with Matt directly; she also disregards his concerns following from his identical reporting structure. Denise McCool is conspicuously added to a reply after 10pm. Eddie requests that correspondence be confined to professional hours, particularly in light of his father's hospitalization. This, too, is ignored

## Wednesday, April 6

·   Eddie logs in remotely, encountering limited systems access. Guneet emails Eddie to say that he will touch base the following week; he rebuffs a request for assistance in restoring systems access. Katie moves their prior discussion over to Eddie's work email, where she denies any instances of retaliation. Eddie is excluded from Microsoft Teams, instead remaining on Skype (despite the Firm's plans to deprecate the application after having migrated to Teams). A request for NY Floor Support's help goes unanswered; in contrast, D'Arcy Carr has a team member contact Eddie to ensure that he regains access to Research publishing resources

·   Eddie counts only four direct emails received since losing access
in October: a message from a senior salesperson in Asia offering praise
for the GMC (10/23), two messages from Guneet coinciding with Eddie's
original return-to-work date (11/22) and birthday (12/9), and an email
from Vishy requesting a call to discuss compensation (1/13). Eddie
also notices an automatically-generated email indicating that Matt
had removed him from a Global Macro Commentary directory role on or
around March 2

·   Eddie's compensation history and some prior reviews are missing
from certain internal portals. Guneet authored a scathing year-end
performance review, notwithstanding Eddie's extended absence and prior
contributions

·   Eddie receives a call from Carolyn at MetLife, his assigned claims
specialist. In their first conversation since he initiated leave in
October, Carolyn informs Eddie that his latest extension request has
been denied. Unaware of Kim Christopher's directive to ask for additional
time, she informs Eddie that he should expect a lengthy summary explaining
the claim verdict. Carolyn adds that since the claim has been denied,
Eddie's file has been closed pending a 180-day appeal window and 45-day
review period thereafter. Carolyn informs Eddie that he will not be able
to access records concerning his short-term disability leave or related
correspondence between MetLife and Morgan Stanley during this time

·   Eddie documents Morgan Stanley conduct policies, reviews interaction
records relevant to Matt's defamatory conversations and email surveillance,
and begins required compliance modules; a FINRA attestation is due
by April 26

·   A OneDrive sync failure populates in the bottom right corner of

Eddie's primary monitor. Ther error indicates that Eddie's acces to this drive is denied. He does not recall ever utilizing OneDrive at work, and the red alert window appears to be the wrong color scheme. Clicking for further details prompts administrative credentials that are not given

## Thursday, April 7

· NY Floor Support contacts Eddie over Skype shortly before noon

· Katie emails Eddie to inform him that Denise McCool is working to restore his access to Bloomberg, Teams, and other systems; in reality, Denise withheld critical components necessary to perform his job and upon information and belief orchestrated the harassment that followed

· Phone support does not reach out until EOD. The technician instructs Eddie that the requisite work must be completed in approximately one hour

## Friday, April 8

· Eddie emails a prominent member of the press as a follow-up to a previous introduction sent by a personal friend, who had introduced Eddie as well as the parameters of his emerging conflict with Morgan Stanley; Eddie emails this contact at 11:11am from his personal Gmail account

· At 1:02pm, Eddie receives a Skype notification for an IM from an unfamiliar research blastmail account. The message contains a hyperlink ostensibly containing information pertaining to a new Research toolkit. Eddie does not recall ever seeing such a blast message in seven years of employment at Morgan Stanley. In light of his limited systems access, the invitation to preview a toolkit strikes him as odd, as does delivery

via an application marked for deprecation. The syntax also resembles that of Morgan Stanley's simulated spam exercises. Eddie right-clicks the window to dismiss the notification alert

· Within thirty seconds, the Skype notification flash reappears on the taskbar and conversation window. An identical message appears below the first. Eddie right-clicks once more to dismiss the second notification

· At 1:03pm, Eddie receives an email within his Outlook inbox, displaying the conversation history for just one of the IMs. Unlike a typical log, which would populate natively in Outlook's 'Conversation History' folder, the sender is hyperlinked for reply in the primary inbox message's 'Subject' field

· Within an hour, Eddie receives a LinkedIn notification on his personal iPhone alerting him that someone at Morgan Stanley has viewed his profile. Investigating, Eddie discovers this individual to be Petroni Bascombe, an MS Candidate in Information Systems / Data Analytics

· Petroni Bascombe's LinkedIn profile does not display a photo. However, the account page lists a detailed employment history, revealing expertise and practical experience at Morgan Stanley specifically, where Petroni works in HR. This includes designing Human Resources Information Systems (HRIS) and User Acceptance Testing (UAT)

· In the early evening, Eddie discovers clear indications of evidence tampering with respect to Outlook calendar entries pertaining to dates relevant to the Summer's HR investigation. New, and in some cases multiple, acceptance records for the January 28, 2021 retaliatory call appear in internal archive queries, as do cancellations or deletions of original entries. The archive web portal exhibits stability issues itself

· Of note, the original monthly "Catch up" invitation has been removed. This had been sent by Matt in August 2020, specifying a recurring calendar event taking place on the first Thursday of every month. Of the many new entries appearing in its stead, January 13, 2021 is displayed as an "Accepted" date for the January 28 call. At the time, Matt brought forward the recurring monthly "Catch up" call on February 4 to January 28. He did so on Saturday, January 23, after a CG walk-out on Friday, January 22 nearly derailed that day's GMC publication, leading Eddie to cancel the January 25 GMC for personal reasons (Matt would ultimately assume responsibility for that Monday's publication, his only direct GMC contribution in the first 18 months of the document's history). The selection of January 13 does not appear coincidental: Lisa (falsely) portrayed the January 28 call as motivated by a desire to discuss Eddie's dissatisfaction with his 2020 compensation award when she delivered her findings on September 30. While compensation was communicated on January 13 this year, however, bonuses were communicated on January 14 in 2021

· Moreover, a new "Accepted" entry on June 15 is displayed for Eddie's mid-year review, which had been brought forward to June 28 while Eddie attended a wedding the previous week. Metadata shows that the invitation was accepted within a minute of being sent by Guneet, with Eddie working from home in June. The original invitations, sent and accepted March 15, were also cancelled

· Eddie powers off the Lenovo Thinkstation (miniature form factor) he had dedicated to remote work sessions and connected via ethernet to an ASUS RT-AX89X router, mindful that the device may be compromised already

Saturday, April 9

·  Eddie begins to update all personal account credentials, concerned
that Morgan Stanley's next attempt to exploit his home network will not
require any user interaction at all apart from simply logging in to MyDesk.
He configures a recently-purchased Omada SDN controller and managed
network switch (ordered online and received by the mailroom) to enhance
security. Keanna begins to change her passwords as well

·  Eddie and Keanna notice CAPTCHA verifications surfacing with increasing
frequency while browsing web pages and applications on their phones, both
when connected to the home network and via cellular data. They proceed to
set up personal VPN accounts

·  Separately, their inability to modulate heat radiating from the
wall units in the bedroom and living room necessitate running the air
conditioning at all times, as had been the case in January and February

·  A mobile hotspot continues to appear in network lists displayed on
Eddie and Keanna's devices; neither had set up a hotspot or enabled one
of late

·  Unbeknownst to either of them, logging artifacts on Eddie's iPad
Air begin to populate, including those related to speech training and
other modules

Sunday, April 10

·  Tyrone visits the apartment to speak with Eddie and Keanna. Eddie
asks whether tendering his resignation at that time would be advisable,
given cybersecurity and potential safety concerns. Absent proof of
the malicious script, Tyrone suggests using a spare, unused laptop in
order to log in and verify the suspected tunneling attempt and pursue

whistleblower protections once confirmed. He assures Eddie and Keanna that they will be safe living on the 36th floor of a residential complex with security and a concierge desk

· Tyrone emails Ira to inform him that Eddie will be unavailable on Monday and cites the lack of previously agreed upon accommodations. Ira denies the latter to be the case

## Monday, April 11

· Tyrone drops off the spare HP laptop, unopened in the original package, when he meets Eddie at the circle in front of River Place before his planned trip to Barbados (where Tyrone intended to author the legal claim absent distraction)

THERE ARE SEVERAL ADDITIONAL SECTIONS TO THE
BRIEF THAT WAS PROVIDED TO THE NAMED STATE
AND FEDERAL AGENCIES.  IN PRESERVING THE
INTEGRITY OF ANY CRIMINAL INVESTIGATION, WE
HAVE DECIDED TO EXCLUDE THE REMAINING
SECTIONS AS IT PROVIDES A DETAILED ANALYSIS OF
THE DEFENDANT'S VIOLATION OF THE ECPA.