# Demand For Arbitration - Edward Von der Schmidt vs. Morgan Stanley #5425001266

## Submission Date: 6/14/2023

## 1. JAMS Local Center

JAMS resolution center | Requested Hearing Location

**New York , New York** New York

Arbitration Rules

JAMS Employment Arbitration Rules and Procedures

## Filing & submission fees

### Standard Arbitration

◉ If the parties' agreement calls for Respondent to pay the full filing fee, no payment is required at this time.

---

### Claimant(s)

1. Edward von der Schmidt
   T. A. Blackburn Law, PLLC.
   1242 EAST 80TH STREET, 3RD FLOOR
   11236 BROOKLYN NY
   3473427432
   tblackburn@tablackburnlaw.com

### Claimant Representatives

A. TYRONE BLACKBURN
   T. A. BLACKBURN LAW, PLLC.
   5619416NYNY
   1242 EAST 80TH STREET, 3RD FLOOR
   11236 BROOKLYN NY
   3473427432
   tblackburn@tablackburnlaw.com

---

### Respondent(s)

1. Morgan Stanley
   Morgan Stanley
   1585 Broadway
   10036 New York NY
   9173780563
   Dermot.sullivan@morganstanley.com

### Respondent Representatives

A. Michael Fleming
   Morgan, Lewis & Bockius LLP
   NY
   101 Park Avenue
   10036 New York NY
   2123096207
   michael.fleming@morganlewis.com

---

2. Matthew Hornbach
   Morgan Stanley
   1585 Broadway
   10036 New York NY

A. Michael Fleming
   Morgan, Lewis & Bockius LLP
   101 Park Avenue
   10036 New York NY
   2123096207
   michael.fleming@morganlewis.com

3. Denise McCool
   Morgan Stanley
   1585 Broadway
   10036 New York NY

A. Michael Fleming
   Morgan, Lewis & Bockius LLP
   101 Park Avenue
   10036 New York NY
   2123096207
   michael.fleming@morganlewis.com

## 4. Nature of Dispute

☑ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

See attached federal complaint. Summary: This is an employment dispute initially filed in the Southern District of New York. Mr. von der Schmidt voluntarily dismissed his employment-related claim (Negligent Hiring, Retention, NYCHRL, NYCHRL Retaliation, NYSHRL, NYSHRL Retaliation, Constructive Discharge, ADA/FMLA Disability Discrimination, and ADA/FMLA Disability Retaliation) so the case could be arbitrated here in JAMS. Plaintiff is requesting a stipulation that this matter is before Chris M. Kwok, Esq.

Amount in Controversy $ 9,000,000

- JAMS_Arbitration_Demand form-V01012023.pdf Other
- Arbitration Provision-jams.pdf Other
- First Amended Complaint.pdf Other

## 5. Agreement

See attached.

## 6. Consumer & Employment

⊙ NO, this is not a CONSUMER ARBITRATION
⊙ More than $250,000

## 7. Submission information

Name Tyrone Blackburn
Address 1242 EAST 80TH STREET
Zip Code 11236
City Brooklyn
State NY
Phone 3473427432
E-mail tblackburn@tablackburnlaw.com
☑  I Agree to the Terms of Service

# Demand for  Arbitration Form

Instructions  for Submittal  of Arbitration to JAMS

📞 **1-800-352-JAMS**
🖥 **www.jamsadr.com**

## INSTRUCTIONS

Please submit  this form  to  your local JAMS  Resolution Center. Once the below items are received, a JAMS professional will  contact all  parties to  commence and coordinate the arbitration process, including the appointment  of an arbitrator and scheduling a hearing date.

---

If you  wish to  proceed with an arbitration by  executing and serving a Demand for  Arbitration on  the appropriate party, please  submit the following items to  JAMS with the requested number of copies:

**A. Demand  for Arbitration**  *(2 copies)*

**B. Proof of service  of the  Demand  on  the  appropriate party**  *(2 copies)*

**C. Entire  contract  containing the  arbitration clause**  *(2 copies)*
- *To the extent there  are  any court orders or stipulations  relevant  to this arbitration demand, e.g. an order com- pelling arbitration, please  also  include  two  copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $2,000. For matters involving three  or more  parties,  the  filing fee  is $3,500. The entire Filing Fee must  be  paid in full to expedite  the commencement  of the proceedings. Thereafter, a Case Management Fee of 13% will  be assessed against  all Professional Fees, including time spent  for hearings, pre- and post- hearing reading  and  research  and  award  preparation. JAMS also charges  a $2,000 filing fee for counterclaims. For matters involving  consumers,  the  consumer  is only required  to pay $250.  See JAMS Policy on Consumer  Arbitrations Pursuant to Pre-Dispute Clauses.  For matters based on a clause or agreement that is required  as a condition of employment, the employee  is only required  to pay $400.  See JAMS Policy on Employment  Arbitrations, Minimum Standards  of Fairness. JAMS may apply its  Employment Minimum Standards where an individual claims to have been  misclassified  as  an independent contractor  or  otherwise improperly placed into a category other than employee  or  applicant for employment.*

- *A refund of $1000  will  be issued  if the  matter  is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please  submit  to your local JAMS Resolution  Center.**
*Resolution  Center locations  can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| RESPONDENT NAME |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY |
|---|

| FIRM/ COMPANY |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## FROM CLAIMANT

Add more claimants on **page 7**.

| CLAIMANT NAME |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY |
|---|

| FIRM/ COMPANY |
|---|

| ADDRESS |
|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

AMOUNT IN CONTROVERSY (US DOLLARS) _____



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT

This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.**

ARBITRATION PROVISION LOCATION

## RESPONSE

The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.**

## REQUEST FOR HEARING

REQUESTED LOCATION

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)

See: **Comprehensive Rule 16.1**

☐ By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

SIGNATURE *Tyrone A. Blackburn, Esq.*   DATE

NAME
(PRINT/TYPED)

# Demand for Arbitration Form (continued)

## Instructions for Submittal of Arbitration to JAMS

Completion of this section is <u>required for all consumer or employment claims</u>.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION.  For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☐ <u>YES</u>, this **is** a CONSUMER ARBITRATION.

☐ <u>NO</u>, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1. The contract is with a consumer party, as defined in these standards;
2. The contract was drafted by or on behalf of the non-consumer party; and
3. The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1. An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2. An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3. An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4. An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

NOTE:  JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.  In addition, JAMS may treat a matter as a consumer matter and apply the Employment Minimum Standards where an individual claims to have been misclassified as an independent contractor or otherwise improperly placed into a category other than employee or applicant for employment.

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000     ☐ $100,000 to $250,000     ☐ More than $250,000     ☐ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

 # Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

## CLAIMANT #3

| CLAIMANT NAME | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | |
|---|---|

| FIRM/ COMPANY | |
|---|---|

| ADDRESS | |
|---|---|

| CITY | STATE | ZIP |
|---|---|---|

| PHONE | FAX | EMAIL |
|---|---|---|

# EXHIBIT A

1585 Broadway
New York, NY 10036

# Morgan Stanley

February 27, 2019

Mr. Edward von der Schmidt, IV
1 River Place, Apt. 3602
New York, NY 10036

Dear Edward:

I am pleased to extend to you an offer of employment at Morgan Stanley. You will be employed by Morgan Stanley & Co. LLC in the Research Division as a Vice President in the 1585 Broadway, New York, NY office. Your employment is expected to begin following completion of the required actions set forth in "Joining Morgan Stanley" below (with your ultimate employment commencement date being your "Start Date").

## *COMPENSATION AND BENEFITS*

### *Annual Compensation*

As of your Start Date, your annual Total Reward for 2019 will consist of an annual base salary of $200,000, pro-rated from your Start Date, and may include a discretionary full-year year-end bonus. Your 2019 annual base salary will be paid in semi-monthly installments (generally on the 15th and the last day of the month, or the nearest weekday preceding these days if they fall on a weekend or bank holiday), and pro-rated from your Start Date. Your year-end bonus may be payable partially in cash and partially in the form of deferred incentive compensation under one of the Firm's compensation plans. Any deferred incentive awards will be subject to terms and conditions set forth in the applicable award documentation. Your year-end cash bonus will be payable when year-end cash bonuses are paid to similarly situated employees, and in no event later than March 15, 2020.

In order to be eligible for any year-end bonus, you must be in good standing (meeting the Firm's performance and conduct expectations) and actively employed as of the date on which bonus decisions are communicated broadly to the eligible employee population.

### *Benefits*

Most of Morgan Stanley's US employees who work at least 20 hours per week are eligible for our standard package of employee benefits, including 401(k), medical, disability and others. If you are eligible, you will receive information from Morgan Stanley's Benefit Center shortly after your start date. If you have questions about what benefits Morgan Stanley offers, please call HR Services at 1-877-674-7411 or visit our website at **mybenefits.morganstanley.com/new-hires**. Nothing in this letter is a guarantee of any particular benefits for any period of time; Morgan Stanley may amend or terminate its benefits at any time.

## *VACATION*

In accordance with Firm policy, for 2019, you will be eligible for 20 days of vacation, pro-rated from your Start Date.

## *ADDITIONAL TERMS & CONDITIONS*

### *Tax Related Provisions*

All payments provided for in this letter are subject to applicable withholdings and deductions.

1



# Morgan Stanley

You understand and agree that if any provision of this letter fails to comply with Section 409A of the Internal Revenue Code or any regulations or Treasury guidance promulgated thereunder, or would result in your recognizing income for United States federal income tax purposes with respect to any amount payable under this letter before the date of payment, or to incur interest or additional tax pursuant to Section 409A, the Firm reserves the right to modify such provision; provided that the Firm shall maintain, to the maximum extent practicable, the original intent of the applicable provision without violating the provisions of Section 409A.

### *At-Will Employment*

All employment with Morgan Stanley is at-will which means that nothing in this letter should be construed as a guarantee of employment for any period of time, and that you or the Firm may terminate your employment for any reason, with or without cause, at any time.

### *Integration Clause*

This letter, any annexes (if applicable), and any addenda as referenced in this letter constitute the entire understanding and contain a complete statement of all agreements between you and Morgan Stanley and supersede all prior or contemporaneous verbal or written agreements, understandings or communications. You acknowledge that you have not relied on any assurance or representation not expressly stated in this letter.

## *JOINING MORGAN STANLEY*

### *Background Clearance and New Hire Paperwork*

Your fingerprints will be used to check your criminal history records, including records maintained by the Federal Bureau of Investigation (FBI).

Morgan Stanley is required to perform due diligence to ensure that individuals are not disqualified from employment with the Firm because of certain disqualifying events, which include, but are not limited to, certain criminal records, certain adverse regulatory or Self-Regulatory Organization actions and certain court-issued injunctions. It is important that you follow the required tasks immediately in order to avoid delay of your onboarding. Failure to complete these tasks and/or receive background clearance will result in a delay to your start date. To the extent that you may be disqualified from employment or the results of the background check or fingerprint check are unsatisfactory, you understand and agree that this offer is null and void and your employment with Morgan Stanley & Co. LLC will be terminated.

### *U.S. Work Authorization*

Pursuant to federal law, you are required to complete the Form I-9 and provide proof of your identity and eligibility to work in the United States, Cisive (morganstanley_HRservices@Cisive.com) will send an email providing instructions on how to complete Section 1 of the Form I-9, which must be completed no later than the close of business of the date stipulated. In addition, in order to complete Section 2 of the Form I-9, you are required to present, in person, original document or documents to demonstrate your identity and work authorization on your Start Date. If you fail to do so, you will be asked to leave and return with the required documentation. You will have two business days to present the required documents. Failure to provide the necessary documentation may potentially result in your being put on a leave and ultimately terminated.

# Morgan Stanley

### *Licensing & Registration*

Your employment is contingent on your obtaining and retaining all licenses and registrations from FINRA, the various exchanges, state securities commissions and other regulatory bodies as Morgan Stanley determines necessary for your position. Any such licenses and registrations that you do not have are required to be obtained as soon as practicable, and no later than the time period outlined for your division in the attached addendum. Failure to do so may result in disciplinary action, including the termination of your employment. You understand and agree not to engage in any activities that have a licensing/registration requirement unless you have obtained such licensing/registration.

### *Outside Business Activities & Personal Trading Accounts*

As of your Start Date and consistent with local law, you will be required to disclose any outside business activities, private investments, and any and all information concerning any outside brokerage/securities accounts over which you could be expected to exercise influence or control (such as a brokerage account for your spouse or domestic partner or a brokerage account on behalf of your or your spouse's or domestic partner's dependent child) so that the Firm may assess whether there are any real or potential conflicts of interest associated with any such external activities or accounts. You hereby authorize Morgan Stanley, if it requests, to receive or obtain duplicate confirmations and monthly brokerage statements and, if Morgan Stanley requests, will help it to receive such information directly from the broker-dealer. In addition, you understand and agree that, as a condition of employment and as permitted by law (absent a written waiver granted by the Compliance Department), should Morgan Stanley decide in its sole discretion that these outside brokerage/securities accounts must be maintained here, you will transfer any outside brokerage/securities accounts to Morgan Stanley.

### *New Hire Training and Firm Policies*

You understand and agree that you are required to promptly complete all mandatory online new hire training requirements including the electronic acknowledgement of the Firm's Code of Conduct. You further agree to review and comply with all applicable Firm policies and procedures.

### *Prior Employment*

You understand and agree that you may not bring onto Firm premises any confidential information, whether documents or other tangible forms, relating to your prior employers' business. Your signature below confirms that you are not subject to any contractual or other restrictions/obligations that are inconsistent with your accepting this offer of employment and performing your duties on behalf of Morgan Stanley.

### *Arbitration Agreement*

As part of accepting this offer of employment, you agree to the terms and conditions of the Firm's Arbitration Agreement, which is attached, unless you opt out of the Arbitration Agreement by submitting the New Hire CARE Arbitration Program Opt Out Form within 30 days of your Start Date. To obtain the form once you are employed by the Firm, type "newhirecareoptout" in your internet browser and then click the "Download" button at the bottom of the webpage that displays. If you accept this offer and do not timely submit an opt out form, you will be deemed to have agreed to the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook as of the date of your acceptance of this offer. The Arbitration Agreement provides, among other things, that you agree to have all Covered Claims (as defined in the agreement) resolved by final and binding arbitration on an individual basis (i.e., non-class action, non-collective action and non-representative action).

3



# Morgan Stanley

### _Notice and Non-Solicitation Agreement_

In your role with the Firm, you will be uniquely positioned to advance the Firm's business interests. You will also have access to certain confidential and trade secret information that provides a competitive advantage to the Firm by virtue of not being known outside the Firm. As a result, the Firm requires certain commitments of you in the event your employment with the Firm terminates, so that the Firm can protect its business interests, trade secrets and confidential information and to ensure an orderly transition of business, responsibilities, and business relationships for the benefit of the Firm, our clients and customers and our other employees. The attached Notice and Non-Solicitation Agreement constitutes a material part of this offer; therefore, as part of accepting this offer, you agree to accept and be bound by the terms set forth therein in their entirety.

### _Getting Started_

Please report to 1585 Broadway at 9:00 am on your Start Date to complete your I-9 in order to receive your Morgan Stanley badge. Your employment may not commence until your I-9 is completed.

### _In Conclusion_

If you have any questions regarding any aspect of this letter or attached addenda, please call Benjamin Smith at (212) 761-1151.

Please confirm your acceptance of this offer by signing/dating this letter and scanning/emailing all pages of the signed documents to Recruiting.Offer.Management@morganstanley.com. If you are unable to scan, please mail all pages of the signed documents to LeAnn Srock at 1585 Broadway, 19th floor, New York, NY 10036.

Very truly yours,

Christine Baron
Executive Director, Human Resources

Offer Accepted and Agreed To:

Signed: _____

Date: _2 / 27 / 2019_

4

## ARBITRATION AGREEMENT

By entering into this Arbitration Agreement, you and Morgan Stanley ("Morgan Stanley" or the "Firm") agree as set forth below. For purposes of this Arbitration Agreement, "Morgan Stanley" and "Firm" shall include Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and any and all of its and their former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities.

1. **Binding Mutual Arbitration.** You and Morgan Stanley agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement and in the arbitration provisions of the CARE Guidebook, a copy of which is available on the intranet at me@MS under "CARE" and also upon request from Human Resources. This Arbitration Agreement, including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA"). This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by you or Morgan Stanley, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims. **BY ENTERING INTO THIS ARBITRATION AGREEMENT, YOU AND MORGAN STANLEY EACH ACKNOWLEDGE AND AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY LAW, YOU AND MORGAN STANLEY ARE GIVING UP YOUR AND ITS RIGHT TO A JURY TRIAL IN ANY FORUM**.

2. **Covered Claims.** Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring. Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized. **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

3. **Excluded Claims.** The following claims and disputes are not subject to this Arbitration Agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in

1

plaintiff, defendant or other named party before the date on which this Arbitration Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute. Nothing in this Arbitration Agreement shall prohibit you from filing a charge, complaint or claim or communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency. You also have the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against you in the event you choose to do so or engage in other protected legal activity. Morgan Stanley, however, reserves the right to enforce the terms and conditions of this Arbitration Agreement in any appropriate forum.

4. **WAIVERS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT YOU ARE NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION**. You further agree that if you are included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this Arbitration Agreement ("Waivers") shall be governed by and determined under and in accordance with the FAA, and shall be decided by a court of competent jurisdiction, and not by an arbitrator. Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court. Insofar as any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration. Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim. For the sake of clarity, nothing in this Arbitration Agreement shall preclude you from pursuing or participating in any claim, including any class action, collective action, or representative action in court where your claim is based solely on your status as a customer or an investor and does not arise out of or in any way relate to your employment relationship with Morgan Stanley.

5. **Selection and Rules.** Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated below, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum.

a. **Forum:**

i. **FINRA & JAMS:**

**Registered Employees:** Except as specified herein or in the CARE Guidebook, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules")[1]. This Agreement does not prohibit or restrict you from filing an arbitration claim in the FINRA arbitration forum as specified in FINRA rules. If a Covered Claim may not be arbitrated before FINRA or is ineligible for or otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"),[2] except as specified herein or in the CARE Guidebook. In addition, employment discrimination claims under or based on any federal, state or local law (including claims of harassment and retaliation under those laws) will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules, except as specified herein or in the CARE Guidebook. To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the CARE Guidebook or the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern.

**Non-Registered Employees:** Except as specified herein or in the CARE Guidebook, any arbitration of a Covered Claim will be conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules. To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the CARE Guidebook or the JAMS Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern.

b. **Hearing Location**

Arbitration shall be held in the county of your current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to your current or last principal place of employment with Morgan Stanley. If your current or last principal place of employment with Morgan Stanley is outside of the U.S., the arbitration shall be held in New York, New York.

c. **Awards**

Arbitrators are required to issue a written award and, subject to the parties' right to appeal or seek vacatur under applicable law, their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

d. **Remedies**

Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. Thus, for example, you shall be entitled to recover attorney's fees and costs in any arbitration in

---

[1] Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).

[2] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

which you assert and prevail on any statutory claims or counterclaims to the same extent as you could in court.

### e. Additional Provisions Applicable to Arbitration at JAMS[3]

#### (i) Arbitrators

Any arbitration of Covered Claims before JAMS shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators.

#### (ii) Procedure

The parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. In addition, the arbitration shall be subject to the same rules of evidence, burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court.

#### (iii) Awards

The Award shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law.

#### (iv) Arbitration Fees

Except as provided by law and as provided below for statutory claims and counterclaims, in any arbitration before JAMS, you shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee if any you would have incurred had you filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

### f. Additional Provisions Applicable to Statutory Claims and Counterclaims

Subject to any applicable fee-shifting provisions, if you initiate arbitration of statutory claims with FINRA or JAMS or assert any statutory claims as counterclaims, you shall be responsible for the filing fee required to initiate arbitration of such claims or to assert such counterclaims up to the amount of the filing fee you would have incurred had you filed such claims in court and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

6. **Severability.** The provisions set forth herein shall be severable and, if any provision of this Arbitration Agreement shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law. In the event any of the Waivers set forth in paragraph 4 above are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum for such claim) and the Waivers set forth in paragraph 4 above shall

---

[3] The provisions in this paragraph 5.e. only apply to arbitration at JAMS. They do not apply to arbitration at FINRA.

remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

7.      **Employment at will.**   Nothing herein constitutes, or may be construed as constituting, a guarantee of employment for any length of time. Your employment with Morgan Stanley is on an "at will" basis. Accordingly, your employment can be terminated with or without cause at the option of either you or Morgan Stanley.

8.      **Governing Law**.  The provisions set forth herein, including the Waivers set forth in paragraph 4, shall be governed by and interpreted in accordance with the FAA.

9.      **Acknowledgement.**   You acknowledge and agree that, before agreeing to this Arbitration Agreement, you have had the opportunity and a reasonable period of time to review and consider this Arbitration Agreement and the CARE Guidebook, to review and discuss this Arbitration Agreement and the CARE Guidebook with counsel of your choice, and to raise any questions you wish of Morgan Stanley.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD M. VON DER SCHMIDT, | |
| Aka Eddie von der Schmidt, | Civil Action No.: 22-8198 |
| ~ and ~ | |
| KEANNA NGÔ | |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| MORGAN STANLEY, | **JURY TRIAL DEMANDED** |
| MATTHEW HORNBACH, and | |
| DENISE MCCOOL | |
| Defendants. | |

Plaintiff Edward M. von der Schmidt ("Mr. von der Schmidt" or "Eddie") and Keanna Ngô ("Ms. Ngô") by and through their attorney, Tyrone Blackburn, Esq. ("Mr. Blackburn") hereby file this complaint against Defendants Morgan Stanley (the "Firm"), Matthew Hornbach ("Hornbach"), and Denise McCool ("McCool") and state as follows:

### NATURE OF ACTION

1. As set forth herein, Defendants Morgan Stanley, Matthew Hornbach, and Denise McCool (collectively the "Defendants") were major participants in events leading up to and including retaliation, disability discrimination, cybercrimes, and constructive discharge of Mr. von der Schmidt, as well as the subsequent harm visited upon Ms. Ngô due to the harassment, privacy violations, and cybercrimes directed against Mr. von der Schmidt.

2. Retaliating against Mr. von der Schmidt in the wake of his participation in a protected

activity and during his protected leave, Morgan Stanley has repeatedly crossed the line to silence testimony related to its misconduct and avoid accountability for its statements and actions, including those it has already admitted to.

3. Mr. von der Schmidt brings this action for relief according to the Americans with Disabilities Act ("ADA") Disability Discrimination, Family Medical Leave Act (FMLA), Retaliation, Intentional Infliction of Emotional Distress, Invasion of Privacy, Constructive Discharge, NYSHRL, NYCHRL, NJ Computer Related Offenses Act, as well as Negligent Hiring and Retention.

4. Ms. Ngô brings this action for relief as a direct result of Defendant's Invasion of Privacy, Intentional Infliction of Emotional Distress, NJ Computer Related Offenses Act, and violation of the Computer Fraud And Abuse Act (CFAA). Ms. Ngô uses her cellphone, computer, and server to execute her interstate S-Corp.

5. Plaintiffs seek injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys 'fees and costs as remedies for violations of Plaintiffs' rights.

## **PARTIES**

6. Mr. von der Schmidt is a multiethnic Hispanic-American Princeton University graduate. Mr. von der Schmidt was formerly employed at Morgan Stanley as a Vice President in Global Research. He was the creator, steward, and lead author of the Global Macro Commentary ("GMC"). Mr. von der Schmidt resides in California.

7. Ms. Ngô is a multiethnic Asian-American woman. Ms. Ngô is the long-term partner of Mr. von der Schmidt and is domiciled with him in California.

8. Defendant Morgan Stanley (the "Firm") is a global financial services firm and financial holding company incorporated in the State of Delaware with its principal place of business in New York. The Firm is headquartered in this Judicial District.



**Matthew Hornbach**

9.  Defendant Matthew Hornbach ("Hornbach") is Morgan Stanley's Head of Global Macro Strategy and a member of the Firm's Global Investment Committee. Hornbach was Mr. von der Schmidt's functional manager at Morgan Stanley. Hornbach resides in this Judicial District.



**Denise McCool**

9.  Defendant Denise McCool is Managing Director and Chief Operating Officer ("COO") of Global Research at Morgan Stanley. McCool is a superior of Hornbach and was instrumental in the cybercrimes, invasion of privacy, retaliation, and constructive discharge of Mr. von der Schmidt, as well as the allegations raised by Ms. Ngô. McCool resides in this Judicial District.

**JURISDICTION AND VENUE**

10. Plaintiff's federal claim arises under 42 U.S.C. § 1981, and this Court has supplemental jurisdiction over Plaintiff's state-law claims according to 28 U.S.C. § 1367.

11. The venue is proper in the Southern District of New York according to 28 U.S.C. §1391(b)(2). Prior to living in California, Mr. von der Schmidt resided in this District and performed work for Morgan Stanley in this District. Ms. Ngô currently resides in California. The Firm is headquartered in this District. A substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District. Ms. Ngô and Mr. von der Schmidt independently allege damages of more than $75,000.00.

12. While Mr. von der Schmidt has an executed Arbitration Agreement in place with Morgan Stanley, "[…] Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this Arbitration Agreement ("Waivers") shall be governed by and determined under and in accordance with the FAA, and shall be decided by a court of competent jurisdiction, and not by an arbitrator."

13. The Arbitration Agreement further stipulates: "[…] You also have the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against you in the event you choose to do so or engage in other protected legal activity."

14. Upon information and belief, Defendants have repeatedly violated the terms of the Arbitration Agreement by "disciplin[ing], discharg[ing], or engag[ing] in […] retaliatory actions against [Plaintiff]" in the wake of Mr. von der Schmidt's challenge its validity and appropriately seeking redress in a "court of competent jurisdiction."

15. The Arbitration Agreement states that "[…] Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world […]."

16. A company's factual designation as an employer or former employer does not in and of itself make an employee or former employee's claims employment related. Violations visited upon Mr. von der Schmidt and Ms. Ngô, which include attempts by Morgan Stanley and its agents to gain unauthorized access to data stored on and transmitted from or to Plaintiffs' computing devices and certain digital accounts, are not based on, arising out of, or in any way related to

Mr. von der Schmidt's employment relationship with the Firm, where he authored and led a daily markets commentary for Global Research. Ms. Ngô has never been employed by or affiliated with Morgan Stanley at any time.

17. Moreover, Mr. von der Schmidt was constructively discharged on May 16, 2022. Devices procured and utilized in New Jersey and New York have since been visibly compromised, after demonstrable attempts to gain unauthorized access directly attributable to Morgan Stanley occurred in New York.

18. Mr. von der Schmidt's employment experience is germane to the causes enumerated in the complaint insofar as it establishes legal pretext and plausibility. Citing an employer's past behavior and admissions to establish motive and circumstantial evidence related to a cause of action otherwise unrelated to Plaintiff's employment relationship does not make that cause employment-related *per se*, or, by extension, a "Covered Claim."

19. The Arbitration Agreement's severability provisions proscribe adjudicating joint causes of action separately, even if deemed to be a "Covered Claim": "[…] In the event any of the Waivers set forth in paragraph 4 above are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum for such claim) […]."

20. Whether or not they constitute a "Covered Claim," Mr. von der Schmidt's causes to which the "Arbitration Agreement" is not applicable must proceed "in a court of competent jurisdiction and not in arbitration". Given the fact that Ms. Ngô is also not subject to the "Arbitration Agreement" and that Plaintiffs' joint pleadings will satisfy plausibility thresholds to remain in court, the terms of the agreement stipulate that this district must be the "exclusive forum for such claim[s]."

21. Hiding the circumstances of Defendants' impropriety by compelling arbitration in Mr. von der Schmidt's case would also establish a standard detrimental to the public interest and trust. Allowing Defendants to pervert the applicability of a standard arbitration agreement and dismiss causes that satisfy requisite standards *prima facie* would allow the Firm to hide its brazen activity from the public view while avoiding accountability, effectively permitting Morgan Stanley's initiatives to silence accounts of its own malfeasance to the detriment of

Plaintiffs and the public.

22. Such cataloged behavior from a publicly traded, regulated financial services entity is not just unacceptable but bears reputation risks as well as first (i.e. fines and settlement awards) and second-order (e.g. potential loss of business) monetary risks to be borne by stakeholders, including investors and shareholders, likely without their knowledge and all while denigrating the public's trust in such institutions.

## ADMINISTRATIVE PROCEDURES

23. Plaintiff has filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC has not issued a Final Determination or a notice of right to sue. All conditions precedent to the filing of the suit have been performed or have occurred.

## FACTUAL BACKGROUND

### *Mr. von der Schmidt Created and Authored the Global Macro Commentary, the Most Cumulatively Read Publication at the Firm*

24. The Global Macro Commentary ("GMC") was the most cumulatively read publication in Global Research at Morgan Stanley. After being hired in March 2019 to assume responsibility for the daily publication of the Treasury Market Commentary ("TMC"), Mr. von der Schmidt was charged with the creation and production of the GMC in December 2019 by Hornbach, then newly-appointed Head of Global Macro Strategy.

25. In contrast to the TMC, which was authored in conjunction with the Firm's United States ("US") Economics team and was only dedicated to coverage of US markets, the GMC assumed a global scope and comprised contributions from interest rates, foreign exchange ("FX"), and emerging markets ("EM") strategists based in Tokyo, Hong Kong, London, and New York (in addition to submissions from US Economics colleagues).

26. In contrast to the TMC, which was authored in conjunction with the Morgan Stanley United States ("US") Economics team, the GMC comprised contributions from interest rates, foreign exchange ("FX"), and emerging markets ("EM") strategists based in Tokyo, Hong Kong, London, and New York (in addition to submissions from US Economics colleagues).

6

27. The GMC was derived from a synthesis of three distinct daily publications to provide the Firm and its research clients with a comprehensive account of a given day's events and noteworthy observations regarding macroeconomic and geopolitical phenomena germane to world markets.

28. As Mr. von der Schmidt's functional manager, Hornbach routinely neglected to address operational constraints or furnish adequate support resources to address his own demands from Mr. von der Schmidt. With virtually no assistance from Hornbach, Mr. von der Schmidt composed 284 of the 285 publications from the GMC's inception on January 6, 2020, to April 18, 2021, when additional primary authors were finally added. Mr. von der Schmidt continued to lead the publication until the Firm retaliated by removing him from the daily in October 2021.

29. In Mr. von der Schmidt's written 2020 year-end review, Guneet Dhingra ("Dhingra") and Hornbach commended his performance in guiding the GMC. In a January 14, 2021, compensation call conducted over Zoom, Hornbach exalted, "You obviously have a tremendous-tremendous value add to our team. Your product is-is bar none the best in class". He then volunteered, "I do think this [compensation] number should be higher myself," notwithstanding his discretion over Mr. von der Schmidt's performance award.

30. For the first 18 months since returning to Morgan Stanley, Mr. von der Schmidt had ghostwritten under Hornbach's name (to whom credit and readership metrics accrued). After responding with hostility to an agreed-upon change in the GMC's email sender (initially September 14, 2020), Hornbach's disposition toward Mr. von der Schmidt shifted antagonistically through Fall 2020 and into Winter 2021 as Mr. von der Schmidt was credited for his work with increasing popularity as reflected by readership tracking[1].

31. Although Hornbach's absenteeism had come up in Summer 2020, his abdication of critical supervisory responsibilities was first conveyed to Hornbach's direct manager Vishwanath "Vishy" Tirupattur on January 20, 2021, on a conference call centered on the publication approval process, for which Mr. von der Schmidt suffered direct retaliation by Hornbach on a call taking place January 28, 2021. Hornbach accused Mr. von der Schmidt of

---

[1] Note that Hornbach had explicitly referred to Mr. von der Schmidt as the "Head of the Global Macro Commentary" in writing.

"sandbagging" him despite the constructive nature of the January 20 call with Tirupattur[2].

***Mr. von der Schmidt's June 18, 2021 Follow Up Regarding Hornbach's Active Retaliation and Additional Racist Behavior to his Superior, Tirupattur, Results in Collective Retaliation***

32. In light of objectionable comments and increasingly hostile posturing from Hornbach in tandem with Mr. von der Schmidt's nominal manager, Dhingra (Head of US Rates Strategy), Mr. von der Schmidt reached out to Tirupattur on June 18, 2021.

33. Mr. von der Schmidt requested over email that they meet at Tirupattur's earliest convenience in order to discuss Hornbach's retaliatory conduct, intentional abandonment of managerial duties affecting Mr. von der Schmidt's daily responsibilities, and inappropriate commentary, including Hornbach's concerning references to minorities[3].

34. Tirupattur declined to meet Mr. von der Schmidt before a scheduled trip, instead proposing that they convene upon Mr. von der Schmidt's return from travel. At that time, Mr. von der Schmidt espoused his concerns about Hornbach's comments - including bigoted remarks and inappropriate personal slights - and Hornbach's unprofessional, harassing, and, at times, abusive behavior to Tirupattur, who characterized the allegations as "very serious". Tirupattur asked Mr. von der Schmidt whether he desired to remain in Morgan Stanley's Global Research department before personally initiating a Human Resources ("HR") inquiry into Hornbach's conduct.

***In An Effort to Silence Discrimination and Retaliation,***
***Two Caucasian HR representatives, Katie D'Antonio and Lisa Sweberg, Excuse Hornbach's Anti-Chinese and Anti-Muslim Remarks in an "Investigation," Pressure Mr. von der Schmidt to Leave The Firm***

35. Katie D'Antonio ("D'Antonio"), the daughter of a former member of the Firm's management committee, contacted Mr. von der Schmidt in early July 2021.

---

[2] Hornbach later deleted the original calendar entry corresponding to this "Catch Up" call (**Attachment 1**) in order to create the fictional narrative that the call had been scheduled after bonuses to provide feedback; several fabricated calendar entries (**Attachment 2**) were subsequently created, including on January 13, 2021, which would have been the day *before* compensation was communicated.

[3] Note that certain photo evidence of this email would later be removed from personal (non-firm issued) devices.



**Katie D'Antonio**

36. Mr. von der Schmidt relayed Hornbach's egregious conduct and inappropriate comments to D'Antonio on an introductory call on July 8, 2021. He later composed a comprehensive account of his experience in Global Research for the benefit of the Firm's investigation into Hornbach's behavior to date. The supporting documentation, which included email, Skype, and Instant Bloomberg ("IB") correspondence, had been aggregated and saved transparently on Mr. von der Schmidt's remote work desktop before being uploaded to Bloomberg and subsequently downloaded.

37. Such precautions were taken in light of Hornbach's active reading of Mr. von der Schmidt's work emails and the attendant risk of retaliation. This motivation was articulated to D'Antonio in an email sent July 20, 2021, in which Mr. von der Schmidt authored a thorough background and attached a compressed folder similarly titled "Correspondence.zip." Following their second call and with D'Antonio's blessing, Mr. von der Schmidt forwarded this email and attachment to Tirupattur on July 23, 2021.

*A Caucasian Morgan Stanley HR Vice President,*
*D'Antonio Finds "Nothing Racy" About Hornbach's Mocking of Chinese Accents*

38. On August 25, D'Antonio communicated that her findings identified no wrongdoing on Hornbach's part. She saw "nothing racy" about Hornbach's mocking of Chinese accents, and, confirming that she had, in fact, read all the accompanying materials in "Correspondence.zip," D'Antonio maintained that none of Matt's actions or comments

9

warranted an apology[4].

39. On this call, Mr. von der Schmidt appraised D'Antonio of his extensive documentation efforts (including recordings) that contradicted her findings. Mr. von der Schmidt maintained that Hornbach's conduct had been unacceptable and reiterated his demand for an apology in writing, a change in supervision, and independent oversight of his career progression and year-end compensation.

40. D'Antonio passed off the investigation to a colleague in Employee Relations with whom she had been collaborating since July, Lisa Sweberg ("Sweberg"). Mr. von der Schmidt forwarded the "Correspondence.zip" e-mail to Sweberg upon their being introduced at the end of August.



**Lisa Sweberg**

41. When asked directly whether Mr. von der Schmidt should have representation present for their first call, Sweberg, a lawyer herself, indicated that she did not believe this would be necessary as it would be fact-finding in nature[5]:

> "I do not believe you need legal counsel given that the purpose of this call is for me to better understand the dynamics at issue and the internal concerns you've raised. It's simply fact finding consistent with our protocol in Employee Relations for reviewing employee concerns."

42. Sweberg proceeded to lie about her prior involvement in the investigation in subsequent calls to conjure the appearance of an independent review, which had already included the Head of

---

[4] In contrast, Hornbach had been compelled to issue a public apology when his unprofessional conduct was directed at Managing Director, Andrew Sheets ("Sheets"; Global Head of Cross Asset Strategy), in front of a large internal audience. This apology stemmed from Hornbach's rude remarks in an internal research discussion over email.

[5] Note that photo evidence of this e-mail from Sweberg would later be removed from Mr. von der Schmidt's personal devices.

Institutional Equities and Research Human Resources, Patricia "Patty" Hynes ("Hynes"), as well as the Firm's internal lawyers.

43. On a September 13 recorded call, Sweberg expressed further interest in Hornbach's inappropriate remarks mocking Chinese accents and making light of the term 'jihad':

> "You-you gave— you-you highlighted a few in particular, um, that were problematic and explained why, but I needed that, um, context from you to understand, you know, what-what it was you were pointing out in them that was, you know, inappropriate or bothersome."

44. Note that HR had already obtained a copy of Hornbach's correspondence when it duplicated Mr. von der Schmidt's Bloomberg Anywhere account data on July 26, 2021.

45. Mr. von der Schmidt is of Cuban heritage with a partner of Asian heritage. Mr. von der Schmidt felt significant discomfort and took offense to the bigoted comments he had fielded from Hornbach over Bloomberg IB, a texting platform utilized for professional workplace communications.

46. On multiple occasions, Hornbach expressed bigoted remarks and stereotypes. As detailed below, Hornbach reinforced pernicious stereotypes concerning how Chinese people pronounce "Thank You" and "Hello."

47. Sweberg ultimately reaffirmed D'Antonio's previous findings, namely that Hornbach's conduct and comments, including various prejudiced remarks that she excused, did not warrant any apology and that the Firm believed it unnecessary to change Mr. von der Schmidt's reporting structure.

### *With Hate Crimes on the Rise, Morgan Stanley Managing Director Hornbach Chose to Showcase his Bigotry at Work*

48. While working for the Firm under Hornbach's management, Mr. von der Schmidt was exposed to an onslaught of antagonistic behavior and discriminatory statements.

49. Mr. von der Schmidt raised these concerns with Tirupattur on June 18, 2021[6].

50. Tirupattur then escalated these "very serious" concerns to Human Resources himself. As a result of his disclosure to Tirupattur, Mr. von der Schmidt came to suffer Hornbach and McCool's retaliation.

---

[6] Note that Morgan Stanley's Code of Conduct calls for outreach to a supervisor when observing discriminatory, legal, or ethical concerns.

51. As described below, on multiple occasions, Human Resources pacified Hornbach's CLEAR ACTS OF BIGOTRY by framing his mocking transliterations as simply "phonetic" in nature, ignoring various objectionable comments entirely.

52. On multiple occasions, from September 2020 to September 2021, Hornbach expressed bigoted remarks and stereotypes against the People's Republic of China and the Chinese people.

53. As detailed below, Hornbach reinforced bigoted stereotypes concerning how Chinese people pronounce "Thank You" and "Hello."

54. Additionally, as detailed below, Hornbach stated that he "liked the sound of […] an II [Institutional Investor] farm in Urumqi."

55. Upon information and belief, the Uighurs (also spelled as Uyghurs) are an ethnic minority group primarily living in the Xinjiang autonomous region of the People's Republic of China; Ürümqi is the capital.

56. The Uighurs are predominantly Muslim and are the alleged subject of human rights abuses that the People's Republic of China have repeatedly denied.

57. By writing "I like the sound of that," Hornbach is saying that he likes the sound of a Muslim-Chinese forced-labor camp dedicated to supporting his Institutional Investor poll results.

58. The following exchanges occurred over Bloomberg IB:

> September 10, 2020:
> 21:00:27 Matthew Hornbach: I chatted with a guy from China Minsheng Bank last night
> 21:00:32 Matthew Hornbach: His name?
> 21:00:34 Matthew Hornbach: Wu Han
> 21:00:38 Matthew Hornbach: No Joke
> 21:00:44 Employee: Oh boy
> 21:01:16 Matthew Hornbach: "So, are you positive you'll vote?"
>
> September 11, 2020:
> 15:12:38 Matthew Hornbach: sankyuu
> 15:12:49 Matthew Hornbach: Did you bust out any Mandarin last night?
>
> September 18, 2020:
> 16:22:48 Employee: yo
> 16:22:55 Matthew Hornbach: harrow

[…]
16:36:02 Matthew Hornbach: Our most successful strategy may just be asking Robin Xing how he did it
16:36:22 Matthew Hornbach: lol
16:36:45 Matthew Hornbach: An II farm in Urumqi
16:36:50 Matthew Hornbach: I like the sound of that
16:36:50 Employee: yikes

November 5, 2020:
20:30:20 Matthew Hornbach: The Ding Dong one?
20:30:22 Matthew Hornbach: lol
20:30:25 Employee: Unleash the Liquidity
20:30:32 Matthew Hornbach: Yeah, that's the title

59. On September 30, 2021, Sweberg ultimately reaffirmed D'Antonio's previous findings, namely that Hornbach's conduct and comments, including various prejudiced remarks that she excused, did not warrant any apology and that the Firm believed it unnecessary to change Mr. von der Schmidt's reporting structure.

60. In response to Mr. von der Schmidt saying,

> "[…] now we're attributing others' unacceptable actions to my personal circumstances […] the fact that I started all of this by just reaching out to meet Vishy for coffee and ended up here is mind-blowing to me", Sweberg replied, "What did you expect to happen?."

### *Morgan Stanley Managing Director Hornbach's Prejudice Toward Chinese people Negatively Impacts His Chinese Subordinates*

61. Upon information and belief, Morgan Stanley pays Chinese and Asian employees less than their Caucasian counterparts. Hornbach's lack of professionalism and mocking bigotry perpetuate harmful prejudices that further persistent wage and promotion gaps.

62. Anti-Chinese violence in New York City has soared during the covid-19 pandemic; the police recorded 131 bias incidents against Asians in 2021, up from 28 in 2020 and just three in 2019[7].

63. Upon information and belief, Hornbach used his power and platform to discriminate against ethnic Chinese and grossly underpaid his Chinese subordinates compared to their non-Chinese colleagues.

---

[7] https://nypost.com/2022/02/20/inside-nycs-skyrocketing-anti-asian-violence-how-hate-speech-led-to-hate-crimes/

64. On or about March 9, 2022, on a recorded call with the Firm's attorney, Dermot J. Sullivan ("Sullivan"), Mr. Blackburn confronted Sullivan about Mr. von der Schmidt's accusation that his Chinese colleagues that report to Hornbach all earn less than their Caucasian counterparts, which Sullivan justified:

> **Mr. Blackburn:** ... Eddie thinks that Matt thought that he was in a safe space, in a safe room to make anti-Asian statements or make anti-Asian jokes concerning the way how Chinese people speak, and how they pronounce words, and Eddie knows for a fact that the Chinese workers make less than the comparators within Matt's group.

> **Sullivan:** That's a market function.

65. In the face of such tragedies and blatant discrimination, Morgan Stanley and its agents have opted to silence those who would voice good-faith concerns.

### Hornbach's Islamophobic References at Work Reflect Minorities' Struggle for Equal and Professional Respect

66. On multiple occasions, Hornbach has made statements akin to the following:

August 4, 2020:
14:52:56 Matthew Hornbach: Sounds like a holdover from the GHadd days
14:56:04 Matthew Hornbach: The G-Hadd
14:56:20 Matthew Hornbach: He waged a Holy War on the Bond Market
14:56:27 Matthew Hornbach: G-Hadd

67. Muslims are also overrepresented in EEOC claims, comprising 40% of EEOC workplace discrimination claims despite only accounting for 1% of the U.S. population. Muslims not only experience overt racial attacks in the workplace in the form of various epithets and physical harm, but also experience Islamophobic microaggressions and even unconscious biases that further isolate them from other employees, leading to increased discrimination and creating barriers to access with respect to career progression.

*See* Mark Fowler et al., *Islamophobia: Challenges and Opportunities in the Workplace,* Tanenbaum (2019),https://tanenbaum.org/wp-content/uploads/2019/05/Islamophobia-

in-the-Workplace.pdf.

68. In the face of such tragedies and blatant discrimination, Morgan Stanley and its agents have opted to silence those who would voice good-faith concerns.

*As A Caucasian Morgan Stanley Employee Relations Attorney,*
*Sweberg believes she is the voice for ethnic Chinese and is recorded EXCUSING Hornbach's*
*bigotry as acceptable because Hornbach is married to a Japanese woman,*
*ignoring centuries of History between China and Japan*

69. In a *CLEAR AND BREATHTAKING DISPLAY OF IGNORANCE*, on a recorded call, Sweberg supported and excused Hornbach's anti-Chinese statements as acceptable specifically because Hornbach's wife is Japanese.

70. On the same September 30, 2021, recorded call, Sweberg informed Mr. von der Schmidt that she did not see any issue with Hornbach's comments and agreed with D'Antonio's statement that Hornbach's comments were not intended to mock Asian individuals. Sweberg contended that Hornbach was only making a ***phonetic*** interpretation of *Japanese*:

> "our understanding is that this is virtually a phonetic translation of him saying 'thank you' in Japanese […] and was not intended to mock the Asian accent."

71. Sweberg's meager attempt at whitewashing Hornbach's statements fails due to a complete reading of Hornbach's IM thread detailed in Paragraph 53 above. Hornbach explicitly refers to Mandarin (a language spoken in China). Hornbach knew that he was speaking about Chinese people, Mr. von der Schmidt knew that Hornbach was referring to Chinese people, yet Morgan Stanley Attorney Sweberg says Hornbach was talking about Japanese people.

72. Sweberg attempted to engage in acrobatic revisionist history to reframe Hornbach's bigotry as an acceptable conversation because Hornbach's wife is Japanese. Sweberg felt that a Caucasian man marrying a Japanese woman somehow gave him a pass to make anti-Chinese comments. Sweberg's ignorance is equivalent to **"all Asians are all the same."**

73. Sweberg dismissed Hornbach's usage of 'GHadd' as only the abbreviation of a name and asserted that Employee Relations "do not understand it to be a double entendre," notwithstanding Hornbach's explicit references to "G-Hadd" and "Holy War". On the other hand, Sweberg conceded that "the reference is not consistent with [the Firm's] expectations, and [Employee Relations has] provided feedback to [Hornbach] for it"

74. Sweberg's intellectual dishonesty should be gravely embarrassing for the Firm, but a simple query of the Firm's history concerning racial discrimination and retaliation in the workplace demonstrates that Sweberg was toeing the company line. As described above, on multiple occasions, Human Resources pacified Hornbach's CLEAR ACTS OF BIGOTRY by framing his mocking transliterations as simply "phonetic" in nature, ignoring various objectionable comments entirely.

75. Mr. von der Schmidt's participation in such an internal inquiry is protected for a reason: Hornbach's lack of professionalism and mocking bigotry perpetuate harmful prejudices that negatively affect his subordinates and colleagues while furthering persistent wage and promotion gaps.

76. Sweberg dismissed Mr. von der Schmidt's fears of retaliation, opting to mischaracterize or fictionalize prior documented events to suit a budding Firm narrative that Mr. von der Schmidt was a disgruntled employee who had responded poorly to performance feedback, this notwithstanding his being the most cumulatively read primary author in Global Research and garnering numerous client accolades.

77. Keeping with the nature of Morgan Stanley Research Management and HR's collective retaliation for good faith reporting to a superior (who himself initiated the investigation into Hornbach's misconduct), Sweberg referenced and committed to Hornbach's false assertions vis-à-vis daily responsibilities and publication timing expectations to brazenly allege that Mr. von der Schmidt had not performed adequately (in contrast to reviews and readership).

78. Here, in direct contrast to the firm's written policy (detailed below), Sweberg posited that Mr. von der Schmidt should direct any concerns regarding retaliatory behavior to his HR coverage person (D'Antonio) or Hornbach himself.

www.morganstanley.com/about-us-governance/code-of-conduct



### Raising Legal and Ethical Concerns and Reporting Misconduct

#### Speaking Up

We each have an obligation to speak up if, in the course of our employment, we encounter a situation that raises legal or ethical concerns. This includes potential fraud or other wrongdoing, whether within the Firm or by an external party. If you have a concern regarding a potential violation of this Code or a Firm policy, it is your responsibility to promptly inform at least one of: your supervisor, a member of LCD, your HR representative, a designated contact under a specific policy or procedure or the Integrity Hotline.

Morgan Stanley encourages individuals raising concerns to identify themselves so that the information can be reviewed promptly and thoroughly. Reported concerns will be treated as confidentially as possible, including limiting the disclosure of the identity of the person raising the concerns, consistent with applicable law and Morgan Stanley's commitment to conducting a thorough review of any identified issues. In addition, the Firm provides a mechanism for anonymous reporting through the Integrity Hotline, and otherwise as required by law.



### Non-Retaliation Commitment

Our continued success depends on the open communication of concerns by employees without fear of retaliation. The Firm takes allegations of misconduct seriously and prohibits retaliation against or the victimization of anyone raising a concern in good faith.



**Commit to Diversity and Inclusion**

Morgan Stanley is committed to providing a work environment that promotes diversity and inclusion, where everyone feels a sense of belonging and is treated with dignity and respect. Our policies promote equal employment opportunity without discrimination or harassment on the basis of race, color, religion, creed, age, sex, sex stereotype, gender or transgender, gender identity or expression, sexual orientation, national origin, citizenship, disability, marital and civil partnership or union status, pregnancy, veteran or military service status, genetic information or any other characteristic protected by law. For more information, refer to the Non-Discrimination and Anti-Harassment/Dignity at Work Policy for your region.

You are encouraged to participate in the programs and activities sponsored by the Firm to promote diversity and inclusion ☑



## Supervisor Responsibilities

If you are a supervisor, you must:

- demonstrate the highest ethical standards and sustain a culture of doing the right thing

- help employees understand how the Code, as well as laws, regulations and Firm policies, apply to them and with respect to any contingent worker for whom you are an Assignment Contact, help ensure they adhere to the Standard of Conduct applicable to them

- supervise the activities and conduct of the people you manage for compliance with applicable laws, rules, regulations and Firm policies

- take appropriate action, including escalation, when you have concerns

Failure to properly execute your supervisory obligations may result in discipline up to and including the termination of your employment and civil, criminal and regulatory exposure for you and Morgan Stanley.

18

Morgan Stanley's culture, values and reputation differentiate us from our peers and have provided a strong foundation for our enduring success. As a global financial institution our reputation is our most precious asset. Once damaged or lost, it is very difficult to restore.

Our core values inform everything we do: *Put Clients First, Lead with Exceptional Ideas, Do the Right Thing, Commit to Diversity and Inclusion* and *Give Back*. Our Code of Conduct reflects our continued commitment to act in accordance with these values and in full alignment with the letter and spirit of applicable laws, regulations and our policies.

The Code of Conduct outlines the standards of ethical conduct that we expect of every employee and that underlie our success. Please read it carefully and consider what it says. If you are aware of any actions that violate the Code, we depend on you to speak up. We prohibit retaliation against anyone who makes a good faith report of known or suspected misconduct. We depend on you to challenge yourself and others to evaluate conduct through the lens of the Firm's values.

Like you, I am proud to be part of a Firm that has such a distinguished history and promising future. Our firm's founding partners understood that maintaining the trust of their clients was essential to their success, and they stayed true to this guiding principle. Our culture and values honor both our history and our aspirations for the future. Thank you for doing your part to continue upholding our proud heritage.

*James P. Gorman*

**James P. Gorman**
Chairman and Chief Executive Officer

### *Post "Investigation," HR Leaks Findings to Hornbach, Who Escalates Retaliation Against Mr. von der Schmidt*

79. In an email on the morning of October 4, 2021, in which he copied Dhingra, Hornbach alluded to some of the contents of the September 30, 2021, confidential ER findings call. In an act of retaliation and in an effort to hide his previous actions, Hornbach attempted to re-write and reframe his retaliatory January 28, 2021, call as instead pertaining to scheduled feedback. On a whim, he retroactively re-defined Mr. von der Schmidt's work responsibilities in a manner inconsistent with those that had prevailed for the duration of Mr. von der Schmidt's employment, instantly accusing him of not meeting these new criteria, and threatening Mr.

von der Schmidt's employment at Morgan Stanley.

### *Hornbach Calls Female Managing Director, Chief U.S. Economist Ellen Zentner an "Embarrassment" to Global Macro Strategy Team*

80. Hornbach's depravity was not limited to discrimination against the People's Republic of China, ethnic Chinese, and disregard for the Muslim community. Upon information and belief, Hornbach made sexist, misogynistic comments directed against Managing Director, Ellen Zentner ("Ms. Zentner") who is the Firm's Chief U.S. Economist.

81. Hornbach would often compose emails to the Global Macro Strategy team mocking the work of the US Economics team and Ms. Zentner specifically, including *after* the conclusion of the Summer 2021 HR proceedings. Hornbach has openly taken exception to the Firm's decision to have this female executive spearhead strategic publications and discourse regarding the Federal Reserve. In one instance, Hornbach wrote in a permanent Bloomberg "Global Macro Strategy" chat with upwards of 27 members, "Update on the Fed call, apparently Ellen 'sees nothing in the data that warrant more than 4 hikes' so there you have it." Dhingra continued, "Of course […] they have to choose between the embarrassment of the 4 fed call change in 2 months, or a bigger fed call change in a week post CPI".

82. Upon information and belief, Hornbach has referred to Ms. Zentner as "incompetent" and an "embarrassment to the firm," undermining and disparaging her professional standing to an audience of subordinates and colleagues. Hornbach has openly taken exception to the Firm's decision to have this female executive spearhead strategic publications and discourse regarding the Federal Reserve.

### *Morgan Stanley Senior Executives Knew, or Should Have Known About Hornbach's Behavior, and Intentionally Chose to Turn a Blind Eye to It*

83. Pursuant to the Firm's internal policy, managers are privy to the Bloomberg Messenger and Internal Messenger logs of all of their subordinates. Upon information and belief, all of these logs are monitored frequently, and managers are alerted by internal risk of any troubling messages sent over these platforms by their subordinates[8].

84. Upon information and belief, McCool, Tirupattur, Simon Bound ("Bound"), and Edward "Ted" Pick ("Pick") were made aware of Hornbach's unprofessional, racist, xenophobic, and

---

[8] This would include profanity, discrimination, racist remarks, sexist jokes, etc.

sexist comments, including his remarks pertaining to the People's Republic of China as well as a prominent female executive, Ellen Zentner. After learning of Hornbach's deplorable behavior specific to retaliation and discrimination, McCool, Tirupattur, Bound, and Pick ignored it, placing Mr. von der Schmidt, the Chinese subordinates of Hornbach, as well as other minorities or anyone willing to speak up in harm's way.

Over the past two years, Mr. von der Schmidt directly informed the following individuals of Hornbach and/or Human Resources's actions; in spite of Mr. von der Schmidt's irrefutable reporting, these **WILLING PARTICIPANT** senior executives placed profits over people in condoning and emboldening bigoted Managing Director Hornbach.



**James Gorman, CEO**
**Simon Bound's Direct Manager**

85. Notified by Mr. von der Schmidt via email on April 18, 2022. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.



**Simon Bound**
**Managing Director and Global Director of Research**
**Denise McCool's Direct Manager**

86. Notified by Mr. von der Schmidt via email on April 5, 2022. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.



**Vishwanath "Vishy" Tirupattur**
**Managing Director and Global Director of Fixed Income Research**
**Hornbach's Direct Manager**

87. Notified by Mr. von der Schmidt on June 18, 2021. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and

discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.

**Denise McCool**
**Managing Director and COO of Research**
**Tirupattur's Co-Manager, and Hornbach's Superior**

88. Notified by Mr. von der Schmidt via email on April 5, 2022. As of the date of this complaint, Hornbach is still in his position as Managing Director, and still possesses the ability to harm and discriminate against the People's Republic of China, Chinese Americans, Muslims, as well as other ethnic groups.

*Morgan Stanley Research Management's Brazen Collective Retaliation Against*
*Mr. von der Schmidt For Participating in A Protected Activity Causes Emotional Distress,*
*Prompts His Temporary Disability Leave*

89. Continuing the September 30 findings call, Sweberg went on to dismiss Mr. von der Schmidt's fear of retaliation, opting to mischaracterize or fictionalize prior documented events to suit a budding Firm narrative that Mr. von der Schmidt was a disgruntled employee who had responded poorly to performance feedback, this notwithstanding glowing appraisals, his being the most cumulatively read primary author in Global Research, and numerous internal and client accolades. In contrast to the Firm's written policies, Sweberg posited that Mr. von der Schmidt should direct any concerns regarding retaliatory behavior to his HR coverage person (D'Antonio) or Hornbach himself.

90. In an email on the morning of October 4, 2021, in which he copied Dhingra, Hornbach alluded to some of the contents of the September 30, confidential Employee Relations findings call. In an act of retaliation and in an effort to hide his previous actions, Hornbach attempted to re-write and reframe his retaliatory January 28, 2021, call as instead pertaining to scheduled feedback. On a whim, he retroactively re-defined Mr. von der Schmidt's work responsibilities in a manner inconsistent with those that had prevailed for the duration of Mr. von der Schmidt's employment, instantly accusing him of not meeting these new criteria and threatening Mr. von der Schmidt's employment at Morgan Stanley.

91. With Friday's GMC publication canceled without explanation on Thursday, October 7, 2021, Tirupattur sent an unsolicited Zoom meeting invitation on Friday morning for a videoconference on October 8 with Mr. von der Schmidt, who was unable to accommodate the sudden request. In his reply, Tirupattur attached a formal letter of reprimand authored

with Hynes, requesting immediate acknowledgment from Mr. von der Schmidt.

92. Advising Mr. von der Schmidt of consequences up to and including termination and reminding him of his at-will employment in the context of alleged conduct violations, the letter incorporated demonstrable mischaracterizations and falsehoods in what appeared to establish a precursor to fire Mr. von der Schmidt for a contrived set of causes. Notably, the Firm cited Mr. von der Schmidt's forwarding of the "Correspondence.zip" email to Sweberg as an infraction, failing to reference the original message sent to D'Antonio on July 20, 2021, and then Tirupattur on July 23. Both Tirupattur and Hynes were aware that Mr. von der Schmidt was participating in a protected activity regarding the investigation by HR and that his forwarding the attachment to Sweberg (who was already involved in the investigation) constituted an aspect of this protected activity.

93. Morgan Stanley waited until March 2022 to raise an inquiry with FINRA stemming from that particular July 2021 correspondence, after it had become clear that Mr. von der Schmidt presented an imminent litigation risk to the Firm. Note that Morgan Stanley was found in September to have weaponized a regulatory filing to defame a former employee.

94. Physically overwhelmed by the acute stress[9] stemming from the Firm's retaliation in response to his participation in the HR investigation and his voicing concerns about Hornbach's behavior and objectionable comments to a supervisor (as per policy), out of concern for his health, Mr. von der Schmidt met with his psychologist, Dr. Judith Lee ("Dr. Lee"), that afternoon and requested Short Term Disability / FMLA leave the evening of October 8, 2021. At this time, Mr. von der Schmidt first spoke with his attorney, Tyrone Blackburn, Esq. ("Mr. Blackburn").

95. On October 14, Hornbach personally removed Mr. von der Schmidt as the sender of the Global Macro Commentary. On September 30, Sweberg had told Mr. von der Schmidt, "You're the only person, I believe, the GMC has been published under other than Matt, and he provided you with the privilege of pub-publishing it under your name". By Employee Relations' own admission, the Firm retaliated against Mr. von der Schmidt by revoking said "privilege" less than a week into protected leave after participating in a protected activity.

---

[9] In an "acute stress" response, the autonomic nervous system is activated and the body experiences increased levels of cortisol, adrenaline, and other hormones that produce an increased heart rate, quickened breathing rate, and higher blood pressure.

96. Mr. von der Schmidt's mobile and remote log-in privileges were also removed on October 22 after he had been copied on an email pertaining to GMC scheduling; on a recorded call, the Information Technology ("IT") hotline informed Mr. von der Schmidt that this was due to an HR hold.

*Morgan Stanley HR <u>Again</u> Leaks Confidential Employee Information to Managing*
*Director Hornbach, who violates HIPAA to Defame and Disparage Mr. von der Schmidt*

97. On or around October 29, 2021, Hornbach conveyed to an equity sales colleague that Mr. von der Schmidt's departure was medical in nature, which was subsequently relayed to a client. Hornbach repeatedly violated HIPAA in such a manner so as to defame and disparage Mr. von der Schmidt.

98. Upon information and belief, the Firm's HR and managers often disclose confidential medical information to other employees at the Firm. A MetLife representative conveyed this without solicitation in a conversation with Mr. von der Schmidt on February 25, 2022.

99. Hornbach also spread mistruths about Mr. von der Schmidt's character and work product internally to senior management and other team members. Hornbach questioned Mr. von der Schmidt's work ethic and baselessly claimed that Mr. von der Schmidt was mentally and/or physically incapable of executing his role. Upon information and belief, Hornbach went so far as to inform individuals who work in other financial institutions outside of Morgan Stanley that Mr. von der Schmidt was mentally incapacitated; he even falsely asserted that Mr. von der Schmidt had been effectively terminated.

100. All of Hornbach's claims are demonstrably false. Hornbach also has considerable power as a Morgan Stanley Managing Director, who is a globally-recognized strategist. He fully understood that his attacks on Mr. von der Schmidt's character, intellect, and fortitude could lead to the end of Mr. von der Schmidt's career in financial services.

*Protected Medical Leave Fails to Protect Mr. von der Schmidt from*
*Morgan Stanley's Continued Harassment*

101. Immediately following MetLife's formal approval of short-term leave, Mr. von der Schmidt received voicemails from different numbers and an email from Arpan Parmar ("Parmar"), a lawyer for Morgan Stanley's Legal and Compliance Department (specifically, "Special Investigations"). This outreach began October 26, and Hynes left a voicemail for Mr. von der Schmidt on November 1 instructing Mr. von der Schmidt to contact Parmar (as opposed to her directly) in order to resolve an "urgent" matter.

102.     Upon receipt of an appearance letter from Mr. Blackburn sent November 1, 2021, which informed the Firm that Mr. Blackburn had been retained as Mr. von der Schmidt's counsel and which issued a preservation notice as well as instructions to refrain from further direct contact with his client, the Firm put in a request to Bloomberg Anywhere to deactivate Mr. von der Schmidt's account.

103.     The Firm also sought information on any materials transferred via the terminal software. A member of Morgan Stanley's Technology and Operations Risk group contacted Bloomberg on November 3, 2021 (**Attachment 3**):

> We're hoping you can assist us with tracking down any file transfer log data Bloomberg can provide and how we can obtain the file, Correspondence.zip, that was uploaded to Bloomberg by one of our users, EVONDERSCHM4@Bloomberg.net, as seen in the attached email.

104.     The account deactivation the next day on November 4 de-linked Mr. von der Schmidt's name and account from his published research and affiliation with Morgan Stanley. This furthered the detrimental impression that Mr. von der Schmidt had left the Firm, less than a month into his protected FMLA leave.

105.     An internal transfer assumed full-time responsibility for the GMC in mid-December 2021, replacing Mr. von der Schmidt in his role prior to the conclusion of FMLA leave.

106.     Concurrent with another colleague's outreach to Mr. von der Schmidt that conveyed his impression of a medically-related leave, Morgan Stanley's attorneys, including Sullivan, did not deny Hornbach's defamation of Mr. von der Schmidt in conversations with Mr. Blackburn in December 2021.

107.     Having previously suggested two-track settlement negotiations, in December the Firm's lawyers proceeded to threaten Mr. von der Schmidt with dismissal upon his return from protected leave, replete with a commensurate FINRA U5[10] disclosure. If Mr. von der Schmidt did not accept a $75,000 buy-out, Morgan Stanley's lawyers assured Mr. Blackburn that Mr. von der Schmidt's 2021 variable compensation award would be minimal and that he would be terminated for cause immediately upon his return to work.

---

[10] FINRA Form U5 is used in relation to separation of employment; in practice, (negative) U5 disclosures preclude gainful employment opportunities at other financial industry firms.

***Defendants Admittedly Retaliated Against Mr. von der Schmidt with his Variable Compensation for the Fiscal Year 2021 After Classifying His Work as "Best In Class."***

108.    As mentioned, on January 14, 2021, Mr. von der Schmidt, Hornbach, and Dhingra participated in a year-end (2020) compensation communication, which Mr. von der Schmidt had recorded. During the call, Hornbach offered routine praise and delivered a modest raise to Mr. von der Schmidt for his efforts captured in a $150,000.00 bonus. Hornbach also guaranteed that Mr. von der Schmidt would be promoted to Executive Director at the 2021 year's end when he said, "***My hope is that at the end of this year, when you get to Executive Director because you've earned it, this [compensation] number is going to be a much better number***."

109.    True to their threats, the Firm instead awarded Mr. von der Schmidt a $10,000.00 bonus for 2021, the de facto minimum, on January 13, 2022. Morgan Stanley's external counsel admitted that this was "case-closed retaliation" on a call with Mr. Blackburn in March.

110.    An important client of the Firm reached out to Mr. von der Schmidt later in January 2022 after he "saw that [Mr. von der Schmidt] left [Morgan Stanley]," presuming such from the Firm's removal of Mr. von der Schmidt from Bloomberg and his position leading the Global Macro Commentary.


***Morgan Stanley Routinely Violates HIPAA
And Pressures Mr. von der Schmidt to go on Long-Term Disability
to Delay his Plans to Return to Work***

111.    On Friday, March 4, 2022, Mr. Blackburn emailed a settlement demand letter to the Firm's lead attorney for the Institutional Securities Group ("ISG"), Sullivan, who immediately attempted to contact Mr. Blackburn upon receipt[11].

112.    On Tuesday, March 15, 2022, Gina Mango ("Mango") at MetLife emailed Mr. von der Schmidt to schedule a Citrix Webex conference meeting to prepare him for his return to work after a final leave extension had been granted through March 27, 2022.

113.    After Sullivan demurred on settlement absent further information and materials backing Mr. von der Schmidt's assertions, Mr. Blackburn notified Morgan Stanley of their intention to file at the Equal Employment Opportunity Commission (EEOC) on March 18.

---

[11] Note that Sullivan's position would necessitate direct interaction with Pick, the Head of ISG.

Sullivan demanded that the claim be filed in arbitration first, despite the provisions of the Arbitration Agreement itself.

114.     On Monday, March 21, 2022, Mango emailed Mr. von der Schmidt a courtesy reminder of their scheduled Webex appointment the following day. In the early evening, Ira Rosenstein ("Rosenstein"), the Firm's external counsel from Morgan Lewis, contacted Mr. Blackburn for the first time.

115.     On Tuesday, March 22, 2022, a new point of contact at MetLife, Kim Christopher ("Christopher"), reached out to Mr. von der Schmidt to tell him that she would be taking over for Mango.

116.     On Wednesday, March 23, 2022, Mr. Blackburn emailed Rosenstein to remind him of Mr. von der Schmidt's planned return to work on March 28.

117.     On Thursday, March 24, 2022, Mr. von der Schmidt called Christopher together with Dr. Lee. Christopher asked Mr. von der Schmidt to apply for another medical leave extension through April 16, 2022, to afford the Firm additional time to arrange accommodations, which were meant to include remote work provisions and a change in reporting structure (among others). Leave through April 16 at this juncture would have pushed Mr. von der Schmidt into Long-Term Disability, almost certainly resulting in the legal termination of his employment. Mr. Blackburn emailed Rosenstein on this same day to propose a mediation alternative.

### *In Anticipation of his Return to Work, The Firm Follows Through on Threat, Pro-Morgan Stanley FINRA Investigator Displays Intimidation Tactics Aiming to Confiscate Incriminating HR Evidence <u>Eight Months Later</u>, Fearing EEOC filing*

118.     On Tuesday, March 29, 2022, Leslie Boo Jackson ("Boo Jackson"), a Principal Investigator for FINRA based in New Orleans, composed a letter (the "March 29 Letter") demanding materials related to Mr. von der Schmidt's July 20, 2021 email to D'Antonio in HR (which included "Correspondence.zip") in accordance with FINRA Rule 8210 in response to a Morgan Stanley filing. The various materials and personal account information were requested no later than March 12, 2022, a date that *preceded* the letter's by 17 days and was nevertheless bolded. Coincidentally, April 12 would have amounted to a two-week interval from the date of the letter, suggesting it may have been pre-populated earlier in March when a call with Parmar had been scheduled.

119.     The March 29 Letter's Addendum A - Request for Information provides: "We will not (1) entertain requests for confidential treatment of any information or documents the firm provides in response to this request; (2) give the firm notice of any subpoena or access request we receive that encompasses any such information or documents; or **(3) undertake to return documents when this examination is completed**." FINRA's motto, displayed in the footer of its correspondence, is "Investor protection. Market integrity."



120.     Thomas Nelli ("Nelli"), a Senior Vice President leading FINRA examination teams, served as Regional Director overseeing FINRA's South Region, which included the New Orleans office. Additionally, Nelli previously worked as a Managing Director and high-ranking compliance officer at Morgan Stanley, where he had spent most of his career.

### *Mr. von der Schmidt Returns to Work: Pleas Ignored by Morgan Stanley, Treated Like a Second-Class Employee, Vulnerability to Cyber Attacks Increased*

121.     On April 4, 2022, Mr. von der Schmidt emailed the Firm's IT department to prepare for his return to work. D'Antonio replied to this email chain on April 5, informing Mr. von der Schmidt that his manager had been "changed" to Dhingra, that his password may have since lapsed, and that the Firm was removing him from his role with the GMC. As mentioned, a full-time hire had already begun managing the GMC in December 2021.

122.     On Tuesday, April 5, 2022, Mr. von der Schmidt contacted the Firm's IT support to restore his remote log-in credentials. After confirming that his account had been locked by HR on October 22, 2021, the technician, based in Utah, instructed Mr. von der Schmidt on a recorded call to change his Citrix display settings to accommodate his monitors' native resolution instead of windowed mode, leaving Mr. von der Schmidt more vulnerable to a cyber

attack. The next day, Mr. von der Schmidt was asked to restore his work-issued iPhone, thus wiping all stored data.

123.       Upon first logging in to "MyDesk" (the Firm's remote networking portal), Mr. von der Schmidt found that a former employee's name appeared before his own name was displayed (which he noted aloud on the call). Mr. von der Schmidt discovered that he had only been granted limited systems access, which had not been the case prior to his leave. His access to the Firm's and other professional software was now severely restricted.

124.       D'Antonio's email correspondence with Mr. von der Schmidt continued by way of his personal email account, wherein she ignored Mr. von der Schmidt's highlighting of the loss of his standing and opportunity commensurate with his removal from the GMC.

125.       Hornbach deleted Mr. von der Schmidt from the internal directory as a GMC administrator on February 28, 2022. D'Antonio justified the Firm's retaliatory action on April 5 by contending that this arrangement obviated the need to interact with Hornbach directly. D'Antonio also disregarded Mr. von der Schmidt's concerns regarding his managerial structure, which remained identical to that in October.

### Week One: Return to Work coincides with a Sudden Denial of MetLife's suggested Leave Extension, Firm Further Restricts Mr. von der Schmidt's Resource Access

126.       On Wednesday, April 6, 2022, Mr. von der Schmidt returned to work by logging in remotely, encountering the same limited systems access. Dhingra emailed Mr. von der Schmidt to say that he would touch base the following week and rebuffed a request for assistance. Mr. von der Schmidt was excluded from Microsoft Teams and other group forums, remaining on Skype despite the Firm's plans to deprecate the application after fully migrating.

127.       A OneDrive sync failure (**Attachment 4**) populated in the bottom right corner of Mr. von der Schmidt's primary monitor at home on April 6. That error indicated that Mr. von der Schmidt's access to an unfamiliar drive was denied. He did not utilize OneDrive at work, and the red alert window did not match the genuine OneDrive color scheme. Clicking for further details prompted administrative credentials that were not supplied by Mr. von der Schmidt. This is consistent with a software phishing attempt to solicit Mr. von der Schmidt's logon credentials for his *personal* computer used to connect to work remotely.[12]

---

[12] This was made possible by the Webex client's changed DPI awareness privileges that stemmed from IT's unsolicited request on April 5 to allow the web client to access native resolution settings.

128.     Separately, a MetLife claims specialist contacted Mr. von der Schmidt on April 6 to inform him that the recent extension application for his claim had been denied, even though it had been requested by Christopher on Morgan Stanley's behalf.

129.     D'Antonio emailed Mr. von der Schmidt on Thursday, April 7, to inform him that McCool was working to restore his credentials for Bloomberg and Teams and that she was responsible for his systems access; in reality, McCool withheld *critical components necessary* to perform Mr. von der Schmidt's job. Upon information and belief, McCool orchestrated the harassment campaign that followed.

130.     That same day, Mr. von der Schmidt received an email (**Attachment 5**) purporting to contain a link to a Morgan Stanley Benefits document. The sender address did not match authentic benefits emails (**Attachment 6**), nor did the logo image files. Note that external image requests are not just a principal means for email tracking pixel technology but also a vulnerable attack surface given communication with a foreign server through which identifying and/or sensitive information may be transmitted.

### *Within Days of His Return to Work, Morgan Stanley Directs Cyberattacks toward Mr. von der Schmidt's Computer and Tampers with Evidence to Absolve Firm Culpability*

131.     On Friday, April 8, 2022, Mr. von der Schmidt emailed a prominent member of the press at 11:11 am from his personal account as a follow-up to a previous introduction conveying the parameters of Mr. von der Schmidt's emerging conflict with Morgan Stanley and their efforts to silence him.

132.     At 1:02 pm on Friday, April 8, Mr. von der Schmidt received a Skype notification for an IM from an unfamiliar research blast-mail account named "Research Learning." The Firm did not routinely make use of internal blast messages and, in any case, had stopped using Skype in favor of Teams. The message carried a hyperlink ostensibly containing information pertaining to a new Research toolkit, while the syntax also closely resembled Morgan Stanley's simulated spam exercises: "Need help creating infographics for your note? Want to track engagement on emails sent to clients? Find the answers and more at http://researchtoolkit."

133.     Mr. von der Schmidt right-clicked the window to dismiss the notification alert. Within thirty seconds, the Skype notification flash reappeared on the taskbar and in the conversation window. An identical message appeared below the first. Mr. von der Schmidt right-clicked once more to dismiss the second notification.

134.     At 1:03 pm, Mr. von der Schmidt received an email (**Attachment 7**) to his work Outlook inbox, displaying the conversation history for just one of the IMs from blastimprod-researchlearning-skype@morganstanley.com. Unlike a typical Skype log, which would populate natively in Outlook's 'Conversation History' folder, the sender was hyperlinked for reply in the primary inbox message's 'Subject' field. Thus, the receipt was not genuine.

135.     Upon information and belief, Petroni Bascombe ("Bascombe"), an HR employee with an MS in Information Systems and Data Analytics, who was involved in designing Human Resources Information Systems (HRIS)[13] and User Acceptance Testing (UAT)[14] for the Firm, was instrumental in this tunneling attempt.

### *After Receiving a Detailed, Comprehensive Preservation Notice From Mr. Blackburn, The Firm Tampers with Discoverable Evidence*

136.     Later on April 8, Mr. von der Schmidt discovered evidence of tampering concerning Outlook calendar entries pertaining to dates relevant to the HR investigation that took place during Summer 2021. New, and in some cases, multiple, acceptance records for a January 28, 2021, call (in which Hornbach had retaliated) appeared in internal archive queries, as did cancellations or deletions of original entries.

137.     The selection of January 13, 2021 (**Attachment 8**) does not appear coincidental: Sweberg falsely portrayed the January 28 retaliatory call as instead motivated by Hornbach's desire to discuss Mr. von der Schmidt's dissatisfaction with his 2020 compensation award when she delivered her HR findings to Mr. von der Schmidt on September 30, 2021. While 2021 year-end compensation was communicated on January 13, 2022, bonuses for 2020 were communicated on January 14, 2021. The latter date corresponded to Mr. von der Schmidt's recorded Zoom call with Hornbach and Dhingra. Mr von der Schmidt was not even appraised of his year-end 2020 compensation on January 13, given that he was not informed until the next day. The fabricated entries were inconsistent with the 2021 calendar: it is impossible for Mr. von der Schmidt to have expressed displeasure with a compensation figure that had not yet been disclosed to him.

---

[13] HRIS is a system that is used to collect and store data on an organization's employees.
[14] UAT is the final testing stage in software development, it is usually done manually, with users creating real-world situations and testing how the software reacts and performs.

138.     Please note the Firm's publicly stated position with respect to evidence preservation:

> "We are required to preserve information, documents and other materials, whether in physical or electronic form, in connection with litigation, investigations and regulatory and administrative proceedings. You must comply with any notices from LCD directing you to preserve information, documents or materials, including those that may reside on any personal phone, tablet, computer, or other device—such as email, text/SMS, and message applications."
> https://www.morganstanley.com/about-us-governance/code-of-conduct



**Potential Litigation and Legal Holds:** You must promptly notify LCD if you become aware of any potential litigation or regulatory proceeding involving you in your professional capacity or Morgan Stanley. We are required to preserve information, documents and other materials, whether in physical or electronic form, in connection with litigation, investigations and regulatory and administrative proceedings. You must comply with any notices from LCD directing you to preserve information, documents or materials, including those that may reside on any personal phone, tablet, computer, or other device—such as email, text/SMS, and messaging applications. This preservation obligation extends to applications you have used that have not been approved by the Firm for business use, including communications on devices outside of Morgan Stanley platforms, in violation of Firm policy.

### *Week Two: Absent Accommodations, Cyber Exploitation Attempts Escalate, Hacking Attempt Caught*

139.     Privacy analytics files on Mr. von der Schmidt's personal iPad showed a host of logging reports (such as "Speech Training") and other forensic artifacts beginning on Saturday, April 9, 2022.

140.     The next day, Mr. Blackburn emailed Rosenstein to inform him that Mr. von der Schmidt would be unavailable on Monday, April 11, and cited the lack of previously agreed-upon accommodations.

141.     On Tuesday, April 12, 2022, anticipating that the malicious script window from Friday would remain active upon logging in remotely, Mr. von der Schmidt set up a previously unused spare laptop so that only the software required to connect to the Firm's MyDesk portal through a Citrix client was installed.

142.     After logging in while connected to the access point in his building's lobby, Mr. von der Schmidt's desktop remained nearly as he had left it on Friday in his apartment. The Firm typically conducts global restarts each week on Sunday in which open applications are closed and users are presented with a clean desktop when next logging in. While Mr. von der Schmidt's work build to which he was remotely connected showed that it had been booted Sunday, April 10, the desktop nevertheless remained as it was the week prior but with the Skype application in the foreground. This was inconsistent with Mr. von der Schmidt's seven years of experience at the Firm.

143.     Upon left-clicking into the Skype application window (but not the link itself), a series of items began to populate and quickly disappear, beginning with a command prompt (**Attachment 9**) for Windows Script Host (WSH). Microsoft characterizes WSH, which is fully integrated into the operating system, as a "Windows administration tool" that "creates an environment for hosting scripts"[15][16]. The file shown in the command window on the remote desktop, cscript.exe, is the principle means of implementing WSH from the command line.

144.     An error prompt also appeared: "Windows can't open this type of file (.upd)". The upd extension is associated with a Program Update Information file, or a text file that usually contains information about a specific software update. Active Scripting interprets (i.e., directly executes at runtime as opposed to compiles) a series of commands stored in plaintext files, indicating that the .upd file that could not be opened (but had nevertheless been downloaded and attempted to execute) contained scripts to be hosted by WSH.

145.     Behind the command shell, a Cisco TSP Single Sign On status window populated (**Attachment 10**). A  Telephony Service Provider (TSP) is a software interface to a physical telephony device that can be accessed programmatically.[17] Single sign-on (SSO) allows a user to access multiple resources with only one set of authentication credentials. The HTTP 403

---

[15] https://learn.microsoft.com/en-us/previous-versions/shzd7dy4(v=vs.85)#wsh-objects-and-services
[16] WSH achieves this by exposing Component Object Model (COM) interfaces that host Active Scripting engines. Active Scripting (formerly ActiveX) is typically used to automate tasks, including logon scripts and changes to the registry. With the objects and helper functions provided by WSH, a user can "print messages to the screen, run basic functions such as CreateObject and GetObject, map network drives, connect to printers, retrieve and modify environment variables, and modify registry keys".
[17] The Unified Telephony Application Programming Interface (TAPI) client software for Cisco's Unified Communications Manager is "tightly coupled with the Microsoft Telephony and QWAVE services"; the Microsoft Telephony service is dependent on the Microsoft Remote Connection Manager service.

error code indicated that "Access to the requested resource has been denied," either due to insufficient entitlement or an invalid name.

146.     Approximately two minutes afterward, a notification (**Attachment 11**) appeared from the CiscoTSPNotifier MFC Application[18], which stated, "Unified CM TSP SSO OAUTH Fetch failed - Recieve [sic] TimeOut". This indicates that the TSP failed to fetch an authorization token[19] after a designated period of time had lapsed.

147.     A second notification (**Attachment 12**) from the Cisco TSP Notifier, "Unified CM TSP initialization failed - User not configured in Cisco UCM for CTI usage", indicated that the operation failed on account of a user not being configured to use Computer Telephony Integration (CTI), which allows for the coordination of computer and telephone interactions; third party control of CTI is typically orchestrated by a telephony server, which a user would generally connect to over a local network.

148.     Taken together, the procession of prompts and error notifications indicated that a mouse click into a particular region (likely a canvas object[20]) triggered the execution of hidden and visible code, which started the Windows Script Host from the command line, attempted to interpret plaintext instructions that may not have been executed in full, and then started at least one operation that failed to obtain authorization for Windows services pertaining to telephony integration and remote connections.

149.     After taking a series of live photos of the attempted breach, Mr. von der Schmidt closed the remote client window, disabled the wireless adapter, and created a post-login backup file of the disk on an already-inserted USB key. The aggregate image sizes differed by approximately 25MB (**Attachment 13**).

150.     Later, corresponding with the Natural Wireless support team via email, Mr. von der Schmidt produced photos of the incident and was told, based on their correspondence, "it looks

---

[18] The Microsoft Foundation Class Library "provides an object-oriented wrapper over much of the Win32 and COM APIs", including the WSH environment

[19] OAuth is a "protocol for passing authorization from one service to another without sharing the actual user credentials, such as a username and password […] OAuth is one of the most common methods used to pass authorization from a single sign-on service to another cloud application, but it can be used between any two applications" (https://www.cloudflare.com/learning/access-management/what-is-oauth/). Essentially, OAuth is a mechanism for transferring access rights from one application to another via a token, as opposed to user credentials, typically sent over HTTPS (and thus encrypted).

[20] "<canvas> is an HTML element which can be used to draw graphics via scripting (usually JavaScript)" (https://developer.mozilla.org/en-US/docs/Web/API/Canvas_API/Tutorial)

like you are using a remote desktop client and that the host [Morgan Stanley] computer may have become compromised."

151.    The episode on April 12 demonstrated that Morgan Stanley attempted to gain unauthorized access to Mr. von der Schmidt's personal device via his remote connection to work.

152.    On Wednesday, April 13, a crippling wave of cyberattacks at home compromised Mr. von der Schmidt and Ms. Ngô's local network, including all personal devices and those used for Ms. Ngô's professional business, as a result of a multi-vector phishing and tunneling scheme that exploited Bluetooth and Airplay security vulnerabilities. Ms. Ngô encountered a host of foreign modules tied to ExpressVPN (**Attachment 14**) in her settings. The rest of their personal devices were rendered effectively unusable after the attacks.

153.    On April 15, 2022, Mr. von der Schmidt and Ms. Ngô realized that different applications, consistent with those on their compromised iPhones, were being pushed to their temporary Android phones.

154.    On the morning of Monday, April 18, 2022, Mr. von der Schmidt sent an email to Morgan Stanley CEO James Gorman ("Gorman"). In it, he summarized all the incidents that occurred after Mr. von der Schmidt's brief return to work, including various malicious cyber activities on his work and personal devices leaving him unable to consult confidentially with counsel. Mr. von der Schmidt concluded his plea with, "Morgan Stanley once felt like my home. My sincere hope is that you, as the leader of this Firm, do not stand for such tactics and cruelty."

155.    The email to Gorman on April 18, prompted Mr. von der Schmidt's removal from all Firm systems, including the directory. In Airplane mode, his work-issued iPhone was wiped and restarted remotely within two hours.

156.    Having encountered numerous suspicious circumstances, Ms. Ngô and Mr. von der Schmidt's observations related to sophisticated, multi-vector attacks, all as the cyber-

harassment continued in the form of unauthorized surveillance[21] and remote administration of their personal devices.

157.　　The week of April 18 culminated with persistent harassment and cyber-attacks, prompting Mr. von der Schmidt and Ms. Ngô to seek refuge with family in New Jersey on April 22.

158.　　Morgan Stanley has demonstrated the capacity to remotely administer devices: the Firm did so when it remotely wiped and shut down Mr. von der Schmidt's work-issued iPhone 8 Plus on April 18, 2022.

159.　　The Firm openly acknowledges its monitoring efforts. According to its Monitoring of Communications circular,

- Morgan Stanley carries out monitoring and surveillance of the activities of its employees and others who provide services to the Firm in order to ensure and demonstrate the Firm's (and the individual's) compliance with relevant regulatory obligations.
- Morgan Stanley uses an automated tool and trained staff (including third party consultants where permitted by local regulation) to monitor electronic communications for compliance purposes.
- All electronic or recordable communications including instant message, email, Bloomberg, chat and any other electronic or recordable communications, both internal and external, sent to or from staff (including employees, contractors and any other workers) of Morgan Stanley ("Communications") via Firm Approved Messaging Systems on Firm Systems and Firm Approved Applications on Bring Your Own Devices, such as Mobile Iron, may be subject to Monitoring.
- Personal communications on personal devices which are conducted outside of Firm Approved Applications on such devices are not subject to monitoring.
- "Monitoring" means: accessing, reviewing, disclosing, intercepting and recording use of Communications, made by and to staff in jurisdictions approved by the Legal and Compliance Department.

160.　　In addition to the devices present in their apartment, a variety of newly-purchased devices belonging to Ms. Ngô and Mr. von der Schmidt were compromised since April 22 in New Jersey and California and have been actively exploited via remote administration.[22]

---

[21] "Computer and network surveillance" is the monitoring of computer activity and data stored locally on a computer or data being transferred over computer networks such as the Internet. This monitoring is often carried out covertly and may be completed by governments, corporations, criminal organizations, or individuals.

[22] This exploitation has been predicated on Remote Procedure Calls (RPC), transmitted via numerous protocols, which facilitate distributed computing environments shared by their devices and remote servers on external domains.

161.    Forensic artifacts indicate that the principal method of maintaining control has involved the widespread manipulation of drivers and services[23], including those related to Universal Plug and Play (UPnP) and Bluetooth.

162.    Notification and event infrastructures have been utilized not just for synchronization purposes but also for redirection, process injection[24], and payload delivery. Many devices have been remotely configured for network-based debugging.

163.    All devices have had default and/or recommended settings adversely manipulated by an external party or parties. Such reconfiguration has not just applied to privacy and hardware settings, but also to security features such as firewalls and authentication protocols.

164.    On their Windows devices, remote administration has been effected programmatically through Windows Management Instrumentation (WMI)[25]. Based on the Component Object Model (COM), WMI is also a known attack vector[26].

165.    Windows telemetry, both native to the OS and from the SysInternals suite, has shown extensive services-related activity tied to the registry, with resultant changes to system settings and configurations also evident in the registry itself. Such active manipulation of the Windows registry is consistent with the broader weaponization of methods "designed to avoid many traditional forensic artifacts and tools, by keeping attack techniques in memory[27]."

166.    To examine the registry of a Surface Laptop Go purchased in New Jersey in May, Mr. von der Schmidt engaged a West Coast cybersecurity professional who consulted with another forensic expert at his firm. The latter identified more than 100 suspicious driver extensions of interest from the pre-execution environment alone, which was relayed to Mr. von der Schmidt on June 23, 2022. A second Surface Laptop Go also purchased in New Jersey exhibited a similarly compromised registry and remote presence (**Attachment 15**).

---

[23] See Create or Modify System Process: Windows Service, https://attack.mitre.org/techniques/T1543/003/
[24] https://attack.mitre.org/techniques/T1055/
[25] WMI is an implementation of Web-Based Enterprise Management (WBEM), a standard defined by an industry consortium and that "encompasses the design of an extensible enterprise data-collection and data-management facility that has the flexibility and extensibility required to manage local and remote systems that comprise arbitrary components." (*Windows Internals, Part 2, 7th Ed.*, Allievi, Ionesco, Russinovich, & Solomon, Microsoft Press).
[26] See for example, Matt Graeber's 2015 Black Hat paper, "Abusing Windows Management Instrumentation (WMI) to Build a Persistent, Asynchronous, and Fileless Backdoor" (https://www.blackhat.com/docs/us-15/materials/us-15-Graeber-Abusing-Windows-Management-Instrumentation-WMI-To-Build-A-Persistent%20Asynchronous-And-Fileless-Backdoor-wp.pdf). The WBEM interface itself is susceptible to privilege escalation techniques (https://attack.mitre.org/tactics/TA0004/).
[27] (*Adversarial Tradecraft in Cybersecurity*, Borges, Packt). The expert adds: "the irony is, using these techniques as well as variations on these techniques, is anomalous and different in terms of computing."

167.    On Apple devices[28], iOS artifacts materialized on Ms. Ngô and Mr. von der Schmidt's iPhones and iPads on April 25 while they were in New Jersey amid irregular activity exhibited on other devices[29], which has since persisted in California. Such artifacts included extensive iOS data and analytics reports chronicling anomalous memory corruption (with stack traces) and recurring logs scraping plaintext data fields such as "MenstrualCycleDaily", as evidenced by a video recording of an unboxed and subsequently compromised iPhone 13 taken on May 14, 2022, in New Jersey.

168.    Customized payloads (**Attachment 16**) on Ms. Ngô's laptop (a computer used for her professional endeavors) were actually created and modified on February 5 and 17, respectively. The user name listed as the owner, "nsurlsessiond", indicates the utilization of NSURL, whose classes can be used "to access the content of remote resources"[30]. The payload contents included files downloaded from external sources and that would reappear on other devices.

169.    In May, Ms. Ngô discovered a suspicious user account that had modified the contents of the Correspondence.zip folder she had downloaded from Gmail, changing the folder name to HR.zip (**Attachment 17**) on March 28, 2022 (Mr. von der Schmidt's original return to work date). In October, a new MacBook Pro purchased in California had its user privileges modified to grant the same, unfamiliar "staff" account read and write access to the "MS Photos" (**Attachment 18**) folder specifically, which contained evidence for this complaint.

170.    Recovery logs and active services on Android devices indicated enrollment[31] in a Mobile Device Management (MDM) platform, without either Mr. von der Schmidt or Ms. Ngô's consent.

171.    Customized boot volumes and drivers have edified post-exploitation persistence on Ms. Ngô and Mr. von der Schmidt's personal devices, in conjunction with HTTP/TCP-based Command and Control (C2) listening posts. The latter includes a communications beacon discovered on a Surface Laptop Studio Mr. von der Schmidt purchased in California and only

---

[28] On August 17, Apple disseminated security documentation flagging two critical software vulnerabilities (https://support.apple.com/en-us/HT213413) that highlighted the potential for arbitrary code execution with kernel privileges, which was covered by various media outlets. These vulnerabilities were also relayed by the Cybersecurity & Infrastructure Security Agency (CISA) on August 18: "an attacker could exploit one of these vulnerabilities to take control of an affected device" (https://www.cisa.gov/uscert/ncas/current-activity/2022/08/18/apple-releases-security-updates-multiple-products).

[29] Note that Apple Privacy reports have flagged conspicuous resource access as well as suspicious IP connections corroborating other indicators of domain-fronting (see Proxy, https://attack mitre.org/techniques/T1090/).

[30] https://developer.apple.com/documentation/foundation/nsurl

[31] https://www.android.com/enterprise/management/

used in the state. The malicious software, which in the case of the Studio has made such configurations as allowing unauthenticated (**Attachment 19**), and anonymous logons (**Attachment 20**) has remained despite operating system updates.

172.     In summary, all personal devices have had their settings, behavior, and functionality administered remotely, with available forensic artifacts[32] decidedly pointing to in-memory techniques and obfuscation mechanisms that dovetail with various persistence implementations.

173.     This platform has not just allowed for the monitoring and interception of virtually all input and output (I/O) operations and networking activity occurring on Ms. Ngô and Mr. von der Schmidt's personal devices, but it has also enabled malicious actors to gain controlling access to Ms. Ngô and Mr. von der Schmidt's private data and personal communications (including evidence backups).

174.     Critical digital and photographic evidence pertaining to the 2021 HR investigation, subsequent retaliation, and pending civil claims has been accessed, altered or deleted.

175.     Attachments once named "Correspondence.zip," which the Firm itself referred to by that name specifically on November 3, 2021, have been renamed to "HR.zip" on all devices and personal email accounts for Mr. von der Schmidt, Ms. Ngô, and others. (**Attachment 21, 22**).  The contents of the email message and the components within the attached folder have been fabricated, degraded, or removed. External parties have interfered with efforts to access the original compressed folder, most recently reflected in a forwarded email that generated an automatic virus quarantine and alert on Ms. Ngô's laptop.

176.     Meanwhile, illegitimate examiner correspondence demanding evidence earmarked for preservation culminated with the imposition of a public FINRA bar on Mr. von der Schmidt from associating with any member Firm in any capacity[33].

177.     Out of good faith, Mr. von der Schmidt was transparent about his documentation of Hornbach's liable behavior and that of his voluntary participation in the investigation into his conduct started by Management and HR. Inadvertently, Mr. von der Schmidt came into possession of an aggregate amount of incriminating digital and physical evidence of Morgan

---

[32] See Indicator Removal on Host, https://attack.mitre.org/techniques/T1070/
[33] Note that Mr. von der Schmidt's constructive discharge took effect May 17, and his registration with Morgan Stanley was closed on June 10, absent any disclosures.

Stanley Research Management's institutionalized culture of discrimination and retaliation and that of how Human Resources conducts its business.

178.     The backlash suffered by Mr. von der Schmidt and by extension Ms. Ngô for following the Code of Conduct implemented by Morgan Stanley in reporting discrimination and misconduct privately to a superior offers an example of how cultural misconduct can invite circumstances that further corporate and criminal malfeasance.

179.     Malicious cyber activities by the agents of Morgan Stanley to mitigate the liability presented by evidence of employee or HR misconduct pose an inevitable risk to investors, the safety and civil liberties of the public, and (current, former, or future) employees.  Upon information and belief, "Risk Management" tactics such as cybercrime, harassment, invasion of privacy, and evidence tampering are an abuse of power and resources.

## COUNT I
## AS FOR THE FIRST CAUSE OF ACTION
## ADA/FMLA DISABILITY DISCRIMINATION
### (On behalf of Mr. von der Schmidt against Morgan Stanley)

180.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint in paragraphs 1-179.

181.     The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

182.     Because acute stress disorder substantially limits at least one of Plaintiff von der Schmidt's major life activities, Plaintiff von der Schmidt is an individual with a disability under the ADA/FMLA.

183.     Plaintiff von der Schmidt was fully qualified to be a Vice President in Global Research and could perform all the essential functions of the position, as evidenced from his "Best in class" 2020 performance review, and $150,000.00 bonus. Plaintiff von der Schmidt worked for Defendant for over a year and a half before he was diagnosed with acute stress disorder and was constructively discharged, as detailed above.

184.     Defendant is a covered employer to which the ADA/FMLA applies.

185.     Defendant constructively discharged Plaintiff von der Schmidt from employment solely because Plaintiff von der Schmidt requested (and the Firm reneged on) the following reasonable accommodations:

    a. Refusal of changing managerial and organizational reporting structure after agreeing to do so.

    b. Refusal to provide Mr. von der Schmidt with the same resources or extended time to complete and submit the Global Macro Commentary[34].

186.     Defendant made no individualized assessment to determine whether Plaintiff von der Schmidt could perform the job's essential functions or whether an alternate reasonable accommodation would enable him to be employed as a Vice President in Global Research by Defendant, as is required under the ADA/FMLA.

187.     Defendant's constructive discharge of Plaintiff von der Schmidt based on his disability and Defendant's failure to make an individualized assessment to determine whether Plaintiff von der Schmidt could be employed or whether a reasonable accommodation would enable him to be employed by Defendant violated the ADA/FMLA.

188.     The Defendant's conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of the defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

## COUNT II
## AS FOR THE SECOND CAUSE OF ACTION
## ADA/FMLA RETALIATION (Against Morgan Stanley)
### (On behalf of Mr. von der Schmidt against Morgan Stanley)

189.     Plaintiffs incorporate herein by reference as if outlined in full the averments of paragraphs 1-188.

190.     To state a retaliation claim under the ADA or Title VII, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16

---

[34] Mr. von der Schmidt never asked to be removed from the Global Macro Commentary; he only requested the same resources that his colleagues received.

(2d Cir. 2015) (citation omitted) (setting forth elements of a Title VII retaliation claim); *see also Smith v. New York City Dep't of Educ.*, 808 F. Supp. 2d 569, 581 (S.D.N.Y. 2011) (setting forth elements of an ADA retaliation claim and noting that "[r]etaliation claims under the ADA . . . subject to the same burden-shifting analysis as claims arising under Title VII"). *McCarrick v. Corning, Inc.*, No. 18-CV-6435-FPG, 2019 U.S. Dist. LEXIS 81227, at *7-8 (W.D.N.Y. May 14, 2019).

<u>PARTICIPATION IN A PROTECTED ACTIVITY</u>:

191.     Here, Plaintiff von der Schmidt participated in protected activity when he went on disability leave for acute stress disorder.

<u>MORGAN STANLEY WAS AWARE THAT PLAINTIFF VON DER SCHMIDT WENT ON DISABILITY LEAVE</u>:

192.     As detailed above, Mr. von der Schmidt's medical provider, Dr. Lee, placed him on short-term disability leave beginning in October 2021. Mr. von der Schmidt utilized the Firm's leave provider, MetLife Insurance, to facilitate his short-term disability leave of absence. Upon information and belief, Met Life notified the Firm about Mr. von der Schmidt's taking ADA/FMLA-protected short-term disability leave.

<u>MORGAN STANLEY RETALIATED AGAINST MR. VON DER SCHMIDT, UPON RETURN FROM DISABILITY LEAVE</u>:

193.     As detailed above, upon Mr. von der Schmidt's return from short-term disability leave, he was a victim of sophisticated cyber tunneling attacks. In addition, Mr. von der Schmidt was intentionally isolated from his colleagues. Upon information and belief, the intentional isolation[35] of Mr. von der Schmidt upon return to work was in the following form:

    a.  Minimal to no contact with colleagues.

    b.  Limited or no systems access[36], intentionally withheld by Denise McCool, and

---

[35] The social environment in a workplace can prove to be a powerful motivator; fear of employer-sponsored isolation "might well" influence an employee's decision whether to "make or support a charge of discrimination." *White*, 548 U.S. at 57.  *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 U.S. Dist. LEXIS 31469, at *28 (D. Conn. March 11, 2016).

[36] Plaintiff's inability to access or use the MetLife computer system for a given period of time would have the indicia of an adverse employment action.  See *Gelin v. Geithner*,  No. 06 Civ. 10176, 2009 U.S. Dist. LEXIS 24865, 2009

c. Mr. von der Schmidt's revocation and removal from the Global Macro Commentary[37], which Mr. von der Schmidt created and stewarded for the better part of two years[38].

d. Prior to his return from disability/FMLA leave, Defendants permanently replaced Mr. von der Schmidt with an individual who was intended to be a temporary replacement.

e. This act was a pretext for the Defendants intention of never allowing Mr. von der Schmidt to return to his ADA/FMLA-protected position,

CAUSAL CONNECTION BETWEEN MR. VON DER SCHMIDT TAKING DISABILITY LEAVE AND THE RETALIATION:

208. As detailed above, the temporal proximity between Mr. von der Schmidt's attempted return to work and the Firm's intentional acts detailed in the preceding paragraphs are so close (48 hours) that it removes all doubt of retaliatory intent.

209. As previously stated, and as evidenced by his glowing performance reviews, Plaintiff von der Schmidt was fully qualified to be a Vice President in Global Research and could perform all the essential functions of the position. Plaintiff von der Schmidt worked for Defendant for over a year and a half before he was diagnosed with acute stress disorder and was constructively discharged, as detailed above.

---

WL 804144, at *14 (S.D.N.Y. March 26, 2009) ("The disruption to Plaintiff's remote access from October through November 2005 also arguably qualifies as an adverse employment action, as it continued after Plaintiff's suspension had ended, thereby interfering with Plaintiff's ability to access the IRS computer system while at home or working in the field."); see also *Terry v. Ashcroft*, 336 F.3d 128, 145 (2d Cir. 2003) (holding that suspension of use of a government-owned vehicle was materially adverse where "it appears that to fully engage in his . . . position [plaintiff] would have had to perform field work."). Thus, MetLife's action in depriving the Plaintiff of access to the computer system, which appears to have been needed to fully engage in his position, could easily fall into the category of "adverse employment action." *De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 411-12 (E.D.N.Y. 2013).

[37] Matthew Hornbach stated that the GMC was the most cumulatively read document in global research every year.

[38] Viewing Plaintiff's alleged adverse actions in the aggregate, the Court finds that Plaintiff has raised triable issues of fact as to whether the withholding of documents, stripping of responsibilities, hostility, assignment to an isolated cubicle, failure to receive a multiline telephone, and malfunctioning security badge constitute adverse actions. These incidents, to the extent they were intentional, would dissuade a reasonable employee from making a discrimination charge."); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 372 (S.D.N.Y. 2008) ("[F]or the purposes of a retaliation claim, bad performance reviews are an adverse employment action."). *Van Brunt-Piehler v. Absolute Software, Inc.*, 504 F. Supp. 3d 175, 195 (W.D.N.Y. 2020).

That Plaintiff maintained the same salary is of little consequence because "even where a plaintiff retains the same title and salary following a transfer, [s]he may demonstrate an adverse action by showing that [s]he has been *de facto* 'stripped of [her job] responsibilities and not allowed to perform those functions.'" *Torregiano v. Monroe Comm. College*, 11-CV-6300, 2015 U.S. Dist. LEXIS 144992, 2015 WL 6641784, at *12 (W.D.N.Y. Oct. 26, 2015). *Panagopoulos v. N.Y. State DOT*, 172 F. Supp. 3d 597, 619 (N.D.N.Y. 2016).

210.    The Defendant is a covered employer to which the ADA applies.

211.    The Defendant's conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of the defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

### COUNT III
### AS FOR THE THIRD CAUSE OF ACTION
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (CFAA)
#### (On behalf of the Plaintiff Ngô against Defendants)

212.    Plaintiffs incorporate herein by reference, as if outlined in full, the averments of this Complaint's paragraphs 1-211.

213.    The CFAA is "principally a criminal statute" with a limited private cause of action. *LivePerson Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015). To state a claim under the CFAA's private cause of action, Trucco must plead that Redcell "(1) accessed a 'protected computer'; (2) 'without any authorization or exceeding its authorized access'; and (3) caused "loss" in excess of $5,000." *Id. Redcell Corp. v. A.J. Trucco*, 2022 U.S. Dist. LEXIS 41064, at *8-9 (S.D.N.Y. Mar. 8, 2022).

### THE FIRM ACCESSED A PROTECTED SERVER AND COMPUTER[39]

214.    As to the first prong, the CFAA defines a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication." *Redcell Corp. v. A.J. Trucco*, 2022 U.S. Dist. LEXIS 41064, at *9 (S.D.N.Y. Mar. 8, 2022).

215.    For over four years Ms. Ngô has worked as a professional stylist and designer.  Ms. Ngô has clients in New York, California, New Jersey, and Connecticut, and her affected server is engaged in interstate commerce and was used to conduct business across state lines.  In that

---

[39] It is important to note, that Defendants illegally accessed, altered, and deleted data from Mr. von der Schmidt's computer and cellphones, and other personal devices up to and after the date of his resignation from the Firm. Mr. Blackburn made several criminal referrals on behalf of Plaintiffs to the following agencies:  NYS Attorney General; NJS Attorney General; United States Securities Exchange Commission; United States Department of Homeland Security; United States Cybersecurity and Infrastructure Security Agency; US Attorney's Office Southern District of New York; US Attorney's Office District of New Jersey; and the United States Federal Bureau of Investigation.

effect, the computer and cellphones which were impacted by defendants hacking, were also used for the business and the businesses operated in two different States.

### DEFENDANTS ACCESSED MS. NGÔ'S PROTECTED SERVER AND COMPUTER WITHOUT AUTHORIZATION

216.    The CFAA, by its plain language, prohibits improper "access" to a protected computer, "not misuse or misappropriation." *University Sports Pub. Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 383, (S.D.N.Y. 2010). An entity acts "without authorization" when it "accesses a computer without permission to do so," and "exceeds authorized access" when it "has permission to access certain information on a computer, but access[es] other information as to which [it] lacks permission." *JBC Holdings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 523 (S.D.N.Y. 2013) (citation omitted). *Redcell Corp. v. A.J. Trucco*, 2022 U.S. Dist. LEXIS 41064, at *10-11 (S.D.N.Y. Mar. 8, 2022)."

217.    Here, Defendants accessed Ms. Ngô's computer and server, which she used to conduct business that impacts interstate commerce.  Defendant did not have authorization or permission to access Ms. Ngô's computer.  The scope of Defendant's access is detailed above.

### MS. NGÔ'S SPENT IN EXCESS OF $5,000 TO UNCOVER, RECOVER, RESTORE, AND PROTECT HER SERVER AND COMPUTER

218.    The CFAA's provisions make clear that "loss" encompasses "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense . . . ." *LivePerson*, 83 F. Supp. 3d at 512 (citing 18 U.S.C. § 1030(e)(11*)). Redcell Corp. v. A.J. Trucco*, 2022 U.S. Dist. LEXIS 41064, at *17 (S.D.N.Y. Mar. 8, 2022).

219.    Here, as detailed above, Plaintiff secured the services of a computer forensic company in an effort to uncover, recover, restore and protect their server, computer, and cellphone devices after Defendant's hacked their computer.  This unnecessary cost was a direct result of the defendant's actions.

220.    Defendant's conduct was intentional, willful, deliberate, and in callous disregard of the Plaintiffs' rights.  As a result of Defendant's actions, the Plaintiffs have suffered and will continue to suffer economic and non-economic harm.  Because of the Defendant's

discrimination and retaliation, the Plaintiffs are entitled to all legal and equitable remedies available under the law.

## COUNT IV
## AS FOR THE FOURTH CAUSE OF ACTION
## CONSTRUCTIVE DISCHARGE
### (On behalf of Mr. von der Schmidt against Morgan Stanley)

221.      Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-220.

222.      A constructive discharge claim requires a showing that "an employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Ingrassia v. Health and Hosp. Corp.*, 130 F. Supp. 3d 709, 724 (E.D.N.Y. 2015) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). An employee must show that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign... [and that] he actually resigned." *Richard v. N.Y.C. Dep't of Educ.*, No. 16-CV-957(MKB), 2017 U.S. Dist. LEXIS 50748, 2017 WL 1232498, at *13 (E.D.N.Y. March 31, 2017) (internal quotation marks omitted) (quoting *Green v. Brennan*, 578 U.S. 547, 136 S.Ct. 1769, 1777, 195 L. Ed. 2d 44 (2016)).

223.      An employee plaintiff is not required to prove that h[is]er employer intended to cause h[is]er resignation but must show that the Defendant's actions were deliberate. See *Murdaugh v. City of New York*, No. 10-Civ-7218(HB), 2011 U.S. Dist. LEXIS 23333, 2011 WL 798844. *Knight v. MTA N.Y.C. Transit Auth.*, No. 19 CV 1428 (PKC)(LB), 2021 U.S. Dist. LEXIS 187672, at *25-26 (E.D.N.Y. September 28, 2021).

## DEFENDANTS CREATE AN INTOLERABLE WORK ENVIRONMENT

224.      As detailed above, the Firm and their agents created an intolerable working environment throughout Mr. von der Schmidt's employment. Mr. von der Schmidt experienced the following:

      a.  Retaliation after exposing Hornbach's racist rants and unprofessional behavior,

      b.  Isolation in an act of retaliation after returning from ADA disability leave, and

      c.  Cyberattacks and hacking of his and Ms. Ngo's personal devices.

225.     After raising concerns about the aforementioned acts, Mr. von der Schmidt was ignored by Gorman, McCool, Tirupattur, and Bound. As a direct result of the onslaught of cyberattacks and hacking attempts, Mr. von der Schmidt moved out of his home and temporarily relocated to New Jersey with his family. Despite these moves, Defendant persisted with their actions, and Mr. von der Schmidt was left with no option other than to resign.

### MR. VON DER SCHMIDT ATTEMPTED TO MAINTAIN HIS RESOLVE AND CONTINUE WORKING, BUT THE CYBER ATTACK AND INTENTIONAL ISOLATION FROM HIS COLLEAGUES MADE EXECUTING HIS ROLE IMPOSSIBLE

226.     Here, any objective, reasonable person in Mr. von der Schmidt's position would have resigned if faced with intentional isolation from their work colleagues. As detailed above, Mr. von der Schmidt's job required him to interact with colleagues across the world. One way Mr. von der Schmidt could do that was through Bloomberg Messenger and Microsoft Teams.  As stated above, upon his return to work from ADA-protected disability leaves, Mr. von der Schmidt was initially only given access to Skype messenger, a system that was phased out of the Firm.  The remaining essential platforms (Bloomberg Messenger and Microsoft Teams) were deliberately withheld by McCool (with the knowledge of Bound as he was copied on relevant emails).

### MORGAN STANLEY'S ACTIONS WERE DELIBERATE

227.     Here, as evidenced by the emails Mr. von der Schmidt sent to HR, of which both Bound and McCool were aware, Mr. von der Schmidt requested access to be reinstated to all of the necessary platforms to execute the essential functions of his position and the Firm ignored him.  From the date of his return to the date of his resignation, Mr. von der Schmidt was not given full access to Bloomberg Messenger and Microsoft Teams.  McCool oversaw giving Mr. von der Schmidt access to the necessary platforms to execute the essential functions of his position. As evidenced by several emails, McCool ignored Mr. von der Schmidt's requests and elected not to provide him with the necessary access.

228.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of

the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

### COUNT V
### AS FOR THE FIFTH CAUSE OF ACTION
### VIOLATION OF THE NYSHRL AND NYCHRL
### (On behalf of Mr. von der Schmidt against Defendants)

229.    Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-228.

230.    The New York State Human Rights Law (*see* Executive Law § 296) prohibits discrimination in employment on the basis of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status (*see* Executive Law § 296[1][a]). To establish a prima facie violation of this provision, a plaintiff must show at trial that (1) he or she is a member of a protected class, (2) he or she was qualified to hold the subject position, (3) he or she was terminated from employment or suffered another adverse employment action, and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination (*see Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305, 819 N.E.2d 998, 786 N.Y.S.2d 382; *Cotterell v State of New York*, 129 AD3d 653, 654, 10 N.Y.S.3d 558). *D'Agostino v. MMC E., LLC*, 2020 NY Slip Op 03381, ¶ 2, 184 A.D.3d 719, 721, 125 A.D.3d 751, 721, 125 N.Y.S.3d 751, 753 (App. Div.).

### MR. VON DER SCHMIDT IS A MEMBER OF A PROTECTED CLASS

231.    As detailed above, Mr. von der Schmidt is a Hispanic male, and as a Hispanic male, Mr. von der Schmidt is a member of the minority protected class.

### MR. VON DER SCHMIDT WAS QUALIFIED FOR HIS POSITION AS VICE PRESIDENT IN GLOBAL RESEARCH

232.    Here, as evidenced from January 14, 2021, compensation call, Hornbach referred to Mr. von der Schmidt's GMC publication as "best in class;" Mr. von der Schmidt was awarded a $150,000.00 compensation bonus for the fiscal year 2020, and Mr. von der Schmidt was promised a promotion to Executive Director at the end of the year.

MR. VON DER SCHMIDT SUFFERED AN ADVERSE EMPLOYMENT ACTION

233.     Here, as evidenced by a recorded call the week of March 21, 2022, the Firm's attorney Rosenstein conceded that the Firm retaliated against Mr. von der Schmidt because Mr. von der Schmidt raised concerns surrounding Hornbach's Chinese and Muslim bigotry.

234.     In addition to their admission, the Firm and Hornbach deliberately stripped Mr. von der Schmidt of the tools needed to execute the essential functions of his job by refusing to provide him with the same resources (as detailed above) afforded to his colleagues.

235.     In addition to refusing to provide Mr. von der Schmidt with the necessary resources, the defendants gave Mr. von der Schmidt a $10,000 bonus for the fiscal year ending 2021 (down $140,000 from the prior year's bonus), and they reneged on their promise to promote Mr. von der Schmidt to Executive Director.

THE ADVERSE ACTION OCCURRED UNDER CIRCUMSTANCES GIVING RISE TO AN INFERENCE OF DISCRIMINATION

236.     Here, as detailed above, the temporal proximity between the $150,000 bonus, the promise to be promoted to Executive Director, and being referred to as "Best in Class" vs. Mr. von der Schmidt raising concerns about Hornbach's bigotry and the defendants admitted acts of retaliation is so close that it removes all doubt of discriminatory intent.

237.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

**COUNT VI**
**AS FOR THE SIXTH CAUSE OF ACTION**
**Retaliation under NYCHRL and NYSHRL**
**(On behalf of Mr. von der Schmidt against Defendants)**

238.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-237.

**RETALIATION UNDER NYSHRL**

239.     To state a *prima facie* case, Plaintiff must allege (1) that he participated in a

protected activity, (2) that his participation was known to his employer, and (3) that his employer, after that, subjected him to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ 02512 (CM), 2022 U.S. Dist. LEXIS 31075, at *29 (S.D.N.Y. February 22, 2022).

## MR. VON DER SCHMIDT PARTICIPATED IN A PROTECTED ACTIVITY

240.     As detailed above, Mr. von der Schmidt participated in protected activity when he raised concerns about Hornbach's anti-Chinse and Muslim bigotry.

## DEFENDANTS KNEW OF MR. VON DER SCHMIDT'S PARTICIPATION IN A PROTECTED ACTIVITY

241.     Here, as detailed above, defendants were made aware of Mr. von der Schmidt's participation in a protected activity because Mr. von der Schmidt cooperated with Human Resources' sham investigation into Hornbach's bigotry and behavior.

## MATERIALLY ADVERSE EMPLOYMENT ACTION

242.     Here, as detailed above, Mr. von der Schmidt was the victim of relentless acts of retaliation:

   a.  Denied equal research associate assistance in researching and writing the GMC,

   b.  Denied a promotion to Executive Director after being promised a promotion before reporting Hornbach's bigotry,

   c.  Received a $10,000 bonus after being characterized as "Best in Class" and receiving a $150,000 bonus,

   d.  Heightened scrutiny of Mr. von der Schmidt's work product in comparison to his colleagues. Defendants punished Mr. von der Schmidt for publishing the GMC "late" while allowing several of Mr. von der Schmidt's colleagues to publish after 7 pm, and

   e.  On a recorded call, the Defendant's counsel, Rosenstein, admits that the defendants retaliated against Mr. von der Schmidt.

CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE
EMPLOYMENT ACTION

243.     Here, as detailed above, the temporal proximity between the $150,000 bonus, the
promise to be promoted to Executive Director, and being referred to as "best in class" vs. Mr.
von der Schmidt raising concerns about Hornbach's bigotry and the defendants admitted acts
of retaliation is so close that it removes all doubt of discriminatory intent.

## RETALIATION UNDER NYCHRL

244.     The elements of retaliation claims brought against employers under § 1983 or the
NYSHRL mirror those under Title VII. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d
72, 91 (2d Cir. 2015). By contrast, NYCHRL claims "must be analyzed separately and
independently from federal and state discrimination claims." *Mihalik v. Credit Agricole
Cheuvreux North America, Inc.*, 715 F.3d 102, 112-13 (2d Cir. 2013).
The NYCHRL's retaliation provision must be interpreted broadly and provides liability for
conduct not covered by its federal and state counterparts. *Campo v. City of N.Y.,* No. 19-
CV-04364 (NGG) (SJB), 2022 U.S. Dist. LEXIS 60288, at *18 (E.D.N.Y. March 31, 2022).

245.     The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice ... to
retaliate or discriminate in any manner against any person because such person has ...
opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). "[T]o
prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an
action opposing her employer's discrimination, and that, as a result, the employer engaged
in conduct that was reasonably likely to deter a person from engaging in such action."
*Mihalik*, 715 F.3d at 112 (citation omitted).

ENGAGED IN PROTECTED ACTIVITY

246.     As detailed above, Mr. von der Schmidt participated in protected activity when he
raised concerns about Hornbach's anti-Chinse and Muslim bigotry.

<u>MR. VON DER SCHMIDT HAD A GOOD FAITH BELIEF THAT
HORNBACH'S ACTIONS WERE UNLAWFUL</u>

247.     The plaintiff "need not prove that her underlying complaint of discrimination had merit but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

248.     As detailed above, by reporting Hornbach's bigotry Mr. von der Schmidt sacrificed his career in standing up for his Chinese-American colleagues, citizens of the People's Republic of China, and his Muslim colleagues.

249.     As the manager of several Chinese employees, Hornbach was in the position to allow his bigotry to detrimentally impact their compensation and careers. Mr. von der Schmidt's motivation for reporting Hornbach's behavior was to shine a light on his misconduct and callous discrimination, which is evident in the clear pay disparity experienced by his Chinese and other Asian colleagues.

250.     As detailed above, when this issue was raised to the Firm's attorney, Sullivan, he ignored NYS and NYC equal pay laws when he downplayed the Chinese employee's pay disparity by blaming it on "market conditions."

<u>MATERIALLY ADVERSE EMPLOYMENT ACTION</u>

251.     Here, as detailed above, Mr. von der Schmidt was the victim of relentless acts of retaliation:

    a.   Denied equal research associate assistance in researching and writing the GMC,

    b.   Denied a promotion to Executive Director after being promised a promotion prior to reporting Hornbach's bigotry,

    c.   Received a $10,000 bonus after being characterized as "Best in Class" and receiving a $150,000 bonus,

    d.   Heightened scrutiny of Mr. von der Schmidt's work product in comparison to his colleagues. Defendants punished Mr. von der Schmidt for publishing the GMC "late" while allowing several of Mr. von der Schmidt's colleagues to publish after 7 pm, and

    e.   On a recorded call, the Defendant's counsel, Rosenstein, admits that the

defendants retaliated against Mr. von der Schmidt.

## CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE EMPLOYMENT ACTION

252.     Here, as detailed above, the temporal proximity between the $150,000 bonus, the promise to be promoted to Executive Director, and being referred to as "Best in class" vs. Mr. von der Schmidt raising concerns about Hornbach's bigotry and the defendants' admitted acts of retaliation is so close that it removes all doubt of discriminatory intent.

253.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendants' actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

### COUNT VII
### AS FOR THE SEVENTH CAUSE OF ACTION
### Invasion of Privacy New Jersey
### (On behalf of Plaintiffs against Morgan Stanley)

254.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-253.

255.     New Jersey recognizes the common law privacy tort of "intrusion upon seclusion." *Soliman v. Kushner Cos., Inc*., 433 N.J. Super. 153, 77 A.3d 1214, 1224 (N.J. Sup. Ct. App. Div. 2013) (quoting *Hennessey v. Coastal Eagle Point Oil Co*., 129 N.J. 81, 609 A.2d 11, 17 (N.J. 1992)).   This tort imposes civil liability for invasion of privacy on "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Hennessey, 609 A.2d at 17 (quoting Restatement (Second) of Torts, § 652B).  The privacy invasion "need not be physical"; indeed, it may arise from "some other form of investigation or examination" into an individual's "private concerns." See id. To succeed with a claim for intrusion upon seclusion, a plaintiff "must establish that he possessed a reasonable expectation of privacy" in the affairs or concerns intruded upon.  See *G.D. v. Kenny*, 205 N.J. 275, 15 A.3d 300, 320 (N.J. 2011).

256.     As detailed above, the Plaintiffs were forced to take refuge with family in New Jersey due to the Defendants' relentless invasion of privacy. While in New Jersey, the defendants continued to engage in acts of invasion of privacy.

## DEFENDANTS INTRUDED UPON THE SOLITUDE OR SECLUSION OF PLAINTIFFS' PERSONAL AFFAIRS

257.     Here, as detailed above, on multiple occasions beginning no later than April 9, 2022, to present, the Firm, either directly and or indirectly through their authorized agents, invaded, accessed, altered, and destroyed data stored on multiple personal computers and cellphone devices belonging to Ms. Ngô and Mr. von der Schmidt.

*The following is a breakdown of Defendant's Invasion of Plaintiff's Privacy While the Plaintiffs were temporarily domiciled in New Jersey*:

- April 25: Suspicious log activity reappears on Eddie's personal iPhone and iPad when powered back on in NJ.  This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA disability leave.

- On or about April 26: Suspicious logging activity begins on Ms. Ngô iPad Pro (used for styling work).  This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA disability leave.

- May 9: Eddie's new Surface Laptop Go was compromised in NJ upon setup; registry captured for first Surface Laptop Go (subsequently uploaded to Github and analyzed).  This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA disability leave.

- May 13: Eddie's second new Surface Laptop Go compromised in NJ upon setup.

- May 14: Video taken of unboxed iPhone 13 exhibiting signs of compromise consistent with other devices.

- May 21: Wake-up logs indicate memory corruption on shared iPhone 13 Pro.  This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA disability leave.

- June 8: Videos of foreign processes running under different users and privileges on Ms. Ngô MacBook Pro were recorded.  This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA

disability leave.

- June 19: Logoff prevented by the presence of another signed-in user on the second Surface Laptop Go. This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA disability leave.
- June 20: Discovery of tampered evidence photos on Eddie's personal iPhone and iPad.
- June 20: Discovery of tampered email attachments on both Keanna and Eddie's personal Gmail accounts.
- June 24: Suspicious payloads discovered on Ms. Ngô old MacBook Pro.
- July 6: Live analysis of the second Surface Laptop Go indicates WMI exploitation and compromised communication features.
- July 27: Activity logs on Ms. Ngô personal iPhone are shown as modified on this date, although she did not have possession of the phone. This activity was similar to the Phishing and Hacking Attempts Plaintiff's experienced when Mr. von der Schmidt initially returned to work from ADA/FMLA disability leave.

## PLAINTIFFS NGÔ AND VON DER SCHMIDT POSSESSED A REASONABLE EXPECTATION OF PRIVACY

258. Plaintiffs had a reasonable expectation of privacy not to have the data on their cellphones and computers invaded, accessed, altered, and destroyed by Defendants directly and indirectly by their authorized agents.

259. As an employee of Defendant, Mr. von der Schmidt often worked from home on personal and corporate devices. Mr. von der Schmidt did not grant the Defendants permission to access his non-work devices.

260. On the other hand, Ms. Ngô is not an employee of the Defendants. Ms. Ngô did not work on any of Defendants' corporate devices. Ms. Ngô exclusively used her personal devices. Ms. Ngô did not have a relationship with Defendant and was an innocent bystander and victim of Defendants' cyber intrusion targeting Mr. von der Schmidt's personal devices.

261. Mr. von der Schmidt and Ms. Ngô both had personal information, files, and documents pursuant to this case, as well as images and calendar entries that were altered and/or deleted.

262. When agreeing to work from home, Mr. von der Schmidt did not anticipate that the defendants would intentionally engage in a sophisticated phishing and tunneling attack on his

personal devices.

## PLAINTIFFS WERE HARMED

263.     As a direct and proximate cause of the Defendant's invasion of privacy, the Plaintiffs have suffered financial and psychological harm, the details of which can be provided under seal.

264.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Ms. Ngô and Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiffs Ngô and von der Schmidt have suffered and will continue to suffer both economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt and Ms. Ngô are entitled to all legal and equitable remedies available under the law.

## COUNT VIII
## AS FOR THE EIGHTH CAUSE OF ACTION
### The New Jersey Computer-Related Offenses Act
**(On behalf of Plaintiffs against Morgan Stanley)**

265.     Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-264.

266.     The CROA is an anti-computer-hacking statute that provides a civil remedy to "[a] person or enterprise damaged in business or property as the result of" certain enumerated actions.  N.J. Stat.  Ann.  2A:38A-3; see also *Marcus v. Rogers*, 2012 N.J. Super.  Unpub. LEXIS 1523, 2012 WL 2428046, at *4 (N.J. Sup. Ct. App. Div. June 28, 2012).

 a.  The purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data, database, computer program, computer software, or computer equipment existing internally or externally to a computer, computer system, or computer network;
 b.  The purposeful or knowing, and unauthorized altering, damaging, taking, or destroying of a computer, computer system, or computer network;
 c.  The purposeful or knowing, and unauthorized accessing or attempt to access any computer, computer system, or computer network;
 d.  The purposeful or knowing, and unauthorized altering, accessing, tampering with, obtaining, intercepting, damaging, or destroying of a financial instrument; or
 e.  The purposeful or knowing accessing and reckless altering, damaging, destroying, or obtaining of any data, database, computer, computer program, computer software,

computer equipment, computer system, or computer network.

### PLAINTIFFS LOST USE OF THEIR COMPUTERS AND CELLPHONES

266.    Here, as detailed above, the Plaintiffs lost the use of their personal cellphones and computer devices as a direct and proximate cause of the Defendants' relentless acts of cyber exploitation.

267.    Upon information and belief, Defendants knew or should have known that accessing Plaintiffs' personal devices was an illegal invasion of their privacy.

268.    Upon information and belief, Defendants knew or should have known that Plaintiffs did not provide them with permission to invade, access, and/or alter data on their personal devices.

269.    Upon information and belief, as detailed above, Defendants purposefully or knowingly altered data on the personal computer and cellphone devices of Plaintiffs.

### PLAINTIFFS WERE HARMED

270.    As a direct and proximate cause of the Defendants' invasion of privacy, the Plaintiffs have suffered financial and psychological harm, the details of which can be provided under seal.

271.    The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt and Ms. Ngô have suffered and will continue to suffer both economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt and Ms. Ngô are entitled to all legal and equitable remedies available under the law.

### COUNT IX
### AS FOR THE NINTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (On behalf of Mr. von der Schmidt against Morgan Stanley)

272.    Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-271.

273.    Under New York Law, [IIED] has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Saleh*, 2013 U.S. Dist. LEXIS 142207, 2013 WL 5439140, at *11.

*Tigano v. United States*, 527 F. Supp. 3d 232, 246 (E.D.N.Y. 2021).

## EXTREME AND OUTRAGEOUS CONDUCT

274.     Here, as detailed above Defendants engaged in several acts of extreme and outrageous conduct.  The following are a sample of the extreme and outrageous conduct visited upon Mr. von der Schmidt:

    a.  Denied equal research associate assistance in researching and writing the GMC,

    b.  Denied a promotion to Executive Director after being promised a promotion before reporting Hornbach's bigotry,

    c.  Received a $10,000 bonus after being characterized as "Best in Class" and receiving a $150,000 bonus,

    d.  Heightened scrutiny of Mr. von der Schmidt's work product in comparison to his colleagues.  Defendants punished Mr. von der Schmidt for publishing the GMC "late" while allowing several of Mr. von der Schmidt's colleagues to publish after 7 pm,

    e.  Intentional isolation from members of his team upon his return to work after a disability leave,

    f.  Denial of his requested accommodations upon return from disability leave, and

    g.  Unauthorized access and exploitation of his and Ms. Ngô's personal computers, cellphones, and other electronic devices.

## DEFENDANTS INTENDED TO CAUSE MR. VON DER SCHMIDT HARM

275.     It is evident from a recorded call that the Defendant's counsel, Rosenstein, admits that the defendants retaliated against Mr. von der Schmidt after he reported Hornbach's bigotry.  Rosenstein's recorded admission is a concession to Defendant's desire to cause Mr. von der Schmidt harm.

## THERE WAS A CAUSAL CONNECTION BETWEEN DEFENDANT'S CONDUCT AND MR. VON DER SCHMIDTS INJURIES

276.     As detailed above, the temporal proximity between Mr. von der Schmidt reporting Hornbach's bigotry, his attempted return to work after a disability leave, and the Firm's

intentional acts detailed in the preceding paragraphs are so close that it removes all doubt of harm visited upon Mr. von der Schmidt and Ms. Ngô.

## MR. VON DER SCHMIDT SUFFERED SEVERE EMOTIONAL DISTRESS

277. As evidenced by Mr. von der Schmidt and Ms. Ngô's medical provider's medical records, Mr. von der Schmidt and Ms. Ngô have suffered immensely. The details of Mr. von der Schmidt and Ms. Ngô's mental and emotional distress can be revealed under seal.

278. The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Ms. Ngô and Mr. von der Schmidt's rights. As a result of Defendants' actions, Plaintiffs von der Schmidt and Ngô have suffered and will continue to suffer both economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt and Ms. Ngô are entitled to all legal and equitable remedies available under the law.

## COUNT X
### AS FOR THE TENTH CAUSE OF ACTION
#### Negligent Hiring, Retention
### (On behalf of Mr. von der Schmidt against Morgan Stanley)

279. Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint's paragraphs 1-278.

280. A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others (*see Gonzalez v City of New York*, 133 AD3d 65, 67-68, 17 N.Y.S.3d 12 [1st Dept 2015]; Restatement [Second] of Agency § 213, Comment *d*). The cause of action does not need to be pleaded with specificity (*Doe v Enlarged City Sch. Dist. of Middletown*, 195 AD3d 595, 596, 144 N.Y.S.3d 639 [2d Dept 2021]; *see JG v Goldfinger*, 161 AD3d 640, 641, 79 N.Y.S.3d 1 [1st Dept 2018]). *Waterbury v. N.Y.C. Ballet, Inc*., 2022 NY Slip Op 02890, ¶ 4, 205 A.D.3d 154, 160, 168 N.Y.S.3d 417, 423 (App. Div.).

## THE FIRM KNEW OF HORNBACH'S HARMFUL PROPENSITIES

281. As detailed above, Hornbach had been compelled to issue a public apology when his unprofessional conduct was directed at Managing Director Sheets in front of a large

internal audience. This apology stemmed from Hornbach's rude remarks in an internal research discussion over email.

282.     Additionally, pursuant to the Firm's internal policy, managers are privy to the Bloomberg Messenger and Internal Messenger logs of all of their subordinates.  Upon information and belief, all of these logs are monitored frequently, and managers are alerted to the internal risk of any troubling messages sent over these platforms by their subordinates.

283.     Upon information and belief, McCool, Tirupattur, Bound, Pick, and Gorman were aware of Hornbach's unprofessional, racist, xenophobic, and sexist comments, including his remarks concerning the People's Republic of China as well as those pertaining to a prominent female executive, Ellen Zentner.  They were made aware of this by Mr. von der Schmidt directly and indirectly, as well as through the Firm's internal Risk Monitoring Program.

284.     After learning of Hornbach's deplorable behavior, McCool, Gorman, Tirupattur, Bound, and Pick ignored it, placing Mr. von der Schmidt, the Chinese subordinates of Hornbach, as well as other minorities or anyone willing to speak up in harm's way.

285.     The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Mr. von der Schmidt's rights.  As a result of Defendant's actions, Plaintiff von der Schmidt has suffered and will continue to suffer both economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Mr. von der Schmidt is entitled to all legal and equitable remedies available under the law.

## **JURY DEMAND**

Plaintiffs demand a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

- a. For past, present, and future general damages in an amount to be determined at trial;
- b. For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;
- c. Any appropriate statutory damages;
- d. For costs of suit;

e. For interest as allowed by law;

f. For attorney's fees;

g. The cause of action authorized by any appropriate punitive or exemplary damages against Defendant Morgan Stanley, Defendant Hornbach, and Defendant McCool;

h. For such other and further relief as the Court may deem proper.

Dated: December 16, 2022

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.

## ATTACHMENTS

**Attachment 1**



**Attachment 2**



**Attachment 3**



The email shown in the image reads:

**H01232580673 File Recovery**

From: Message Compliance (BLOOMBERG)
To: Edward von der Schmidt (MORGAN STANLEY & CO.)
Cc: Morrin Carlin • Galia Conin • Kelly.Thammavongsa@morganstanley.com • Alex.Dirdara@morganstanley.com

Bloomberg Vault Advanced Specialists    http://www.bloomberg.com/vault/

Hello all,

Thank you for reaching out to the Bloomberg Message Compliance team. We are looking into your request. I have looped in a member of our engineering team as they seem better suited to assist with this request.

I will keep you updated.

Best,
Sophie Dolan
Bloomberg Message Compliance

-----------------

wgoldsholl@bloomberg.net

Your question was:
Re:Bloomberg File Transfer Logs and Content Request

Hi Kelly, Alex,
I'm copying our Message Compliance team (cc Galia Conin supporting MS account), as well as Morrin Carlin who oversees the MS AMER relationship with Bloomberg.

MSG Comp+Galia, is this something Vault side might be able to assist with?

Thanks in advance for your help
Wil

From: Kelly.Thammavongsa@morganstanley.com At: 11/03/21 11:50:05 UTC-4:00To:
Wilbur Goldsholl (BLOOMBERG/ 731 LEX )
Cc:  Alex.Dirdara@morganstanley.com
Subject: Bloomberg File Transfer Logs and Content Request

Good morning Wil,

We're hoping you can assist us with tracking down any file transfer log data Bloomberg can provide and how we can obtain the file, Correspondence.zip, that was uploaded to Bloomberg by one of our users, EVONDERSCHM4@bloomberg.net, as seen in the attached email.

Thanks,

Kelly Thammavongsa
Vice President | Technology and Operations Risk

3 Edison Drive
Alpharetta, GA 20005
Office:  (678) 319-7687

NOTICE:  Morgan Stanley is not acting as a municipal advisor and the opinions or views  contained herein are not intended to be, and do not constitute, advice within  the meaning of Section 975 of the Dodd-Frank Wall Street Reform and Consumer  Protection Act. If you have received this communication in error, please destroy  all electronic and paper copies and notify the sender immediately. Mistransmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent required and/or permitted under  applicable law, to monitor electronic communications,

PHILIPS

**Attachment 4**



**Attachment 5**



**Attachment 6**



--------- Forwarded message ---------
From: **HR Services** <MorganStanleyBenefits@alight.com>
Date: M
Subject: Change Contributions Request Received
To: <

Morgan Stanley

Your Change Contributions request was received on 01-14-2021. Your confirmation number is 3206146.
You may return to the Benefit Center website at www.morganstanley.com/benefits.

For More Information
**Benefit Center Website**
From the office - Type *benefits* in your browser
From home - www.morganstanley.com/benefits
**HR Services Representatives**
1-877-MSHR-411 (674-7411)

9 am to 7 pm Eastern, weekdays
(Outside the US and Canada – +1 718-354-1343)

This email was generated automatically and can't accept replies.

The information contained in this email may be confidential or otherwise protected from disclosure. If you're not the intended recipient, *or if it was sent to you in error, please delete this email.* Any dissemination, distribution or other use of the contents of this email by anyone other than the intended recipient is strictly prohibited.

**Attachment 7**



**Attachment 8**



**Attachment 9**



**Attachment 10**



**Attachment 11**



**Attachment 12**



**Attachment 13**



**Attachment 14**



**Attachment 15**



**Attachment 16**



**Attachment 17**



**Attachment 18**



**Attachment 19**



**Attachment 20**



**Attachment 21**



**Attachment 22**

